Cheryl A. Williams (Cal. Bar No. 193532)
Kevin M. Cochrane (Cal. Bar No. 255266)
caw@williamscochrane.com
kmc@williamscochrane.com
WILLIAMS & COCHRANE, LLP
42072 5th Street, Suite 103
Temecula, CA 92590
Telephone: (619) 793-4809

Attorneys for Plaintiff
PAUMA BAND OF MISSION INDIANS

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PAUMA BAND OF LUISENO MISSION INDIANS OF THE PAUMA & YUIMA RESERVATION**, a/k/a PAUMA BAND OF MISSION INDIANS, a federally-recognized Indian Tribe,<br><br>Plaintiff,<br><br>vs.<br><br>**STATE OF CALIFORNIA**; and **EDMUND G. BROWN, JR.**, as Governor of the State of California;<br><br>Defendants. | Case No.:  **'16 CV 1713 BAS JMA**<br><br>**COMPLAINT** |

Case No.:_____
COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

**INTRODUCTION**

1. This case concerns whether the State of California ("State") has negotiated with the Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation ("Pauma" or "Tribe") in good faith to conclude a class III gaming compact under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq*. As background, the State executed an original form gaming compact ("1999 Compact")[1] with Pauma, but then suppressed the total number of slot machine licenses available thereunder so it could induce the Tribe into executing an amendment ("2004 Amendment") and paying 2,460% as much in revenue sharing for what should have been preexisting license rights. The United States Court of Appeals for the Ninth Circuit held that the State misrepresented Pauma's contract rights and ordered rescission of the 2004 Amendment and restitution of the $36.2 million in revenue sharing that the State acquired through its unreasonable actions. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* 813 F.3d 1155, 1169 (9th Cir. 2015) ("*Pauma II*").

2. Facing the prospect that the State would delay paying the restitution award for years as it appealed the issue to the Supreme Court of the United States, Pauma invoked a mandatory renegotiation provision in Section 12.2 of its 1999 Compact in order to acquire the ability to operate new forms of class III games (*i.e.*, on-track horse wagering and lottery games that are not presently "authorized" to the California State Lottery) so it could remain competitive with the four much-more-successful destination resort casinos that surround the Tribe's small, tent-based gaming facility on a remote stretch of State Road 76 in northern San Diego County. The State responded by indicating that it would

---

[1] A true and correct copy of the 1999 Compact is attached hereto as **Exhibit 1**. For the Court's convenience, the compact giving rise to the negotiations and the entire record of negotiations between the parties – save for one negotiation transcript – accompanies this complaint. *See Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1041 (9th Cir. 2010) ("*Rincon II*") ("We therefore hold that good faith should be evaluated objectively based on the record of negotiations, and the state's subjective belief in the legality of its requests is not sufficient to rebut the inference of bad faith created by objectively improper demands.").

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

negotiate in good faith for such rights, but then conversely refused to explain what it would actually negotiate – preferring to discuss the "preliminary" scope of negotiations issue at the first negotiation session between the parties.

3. Yet when the first negotiation session took place, the State simply explained that Pauma's ability to offer such games was "murky" and preferred to send the Tribe its legal position on the "preliminary" scope of negotiations issue in writing after the meeting. Following this, however, the State backtracked from sending this letter, and then over the course of the next eight months flatly refused to discuss the "preliminary" scope of negotiations issue, as the "State's preference [was now to] discuss[ ]  substantive matters during in-person meetings."

4. This preference changed yet again when the parties met for a second time in September 2015, as the State would not discuss the new forms of gaming and simply asked Pauma to transmit proposed compact language in writing for it to consider at some unspecified point in the future. After counsel for Pauma complied with the State's request and conveyed the two easy fixes to the terms of the 1999 Compact needed to provide the Tribe with its desired lottery rights, the State broke-off negotiations about those games by stating that it was simply going to send the Tribe a "complete draft [compact]" in the coming weeks.

5. This "complete [draft] compact" did not contain *any* new forms of gaming and turned out to be a compact that the State had negotiated with another tribe who would sign it the following day – only with more onerous revenue sharing terms so the State can recoup some of the $36.2 million it will have to disgorge as a result of the prior lawsuit between the parties. The transmission date for this "complete draft [compact]" is five hundred and twenty-two (522) days after the start of the renegotiations, and, despite the immense lapse of time, the State has *still* not explained what new gaming rights it will or will not negotiate under the "preliminary" scope of negotiations issue. For reference sake, the total duration of the negotiations for the 1999 Compact and 2004 Amendment were 120 days and 160 days, respectively.

Case No.: _____
COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

6. With the parties at an obvious impasse due to the State engaging in "surface bargaining" for the past eighteen months so it can protect established gambling interests, Pauma now brings this complaint in order to invoke the statutory remedy under IGRA that is designed to "process gaming arrangements on an expedited basis." *Rincon II*, 602 F.3d at 1041; *see Mashantucket Pequot Tribe v. Connecticut,* 913 F.2d 1024, 1033 (2d Cir. 1990) ("Further, the manifest purpose of the statute is to move negotiations towards a resolution where a state either fails to negotiate, or fails to negotiate in good faith, for 180 days after a tribal request to negotiate."). The first stage of this statutory remedy is simply an order directing the parties to renew negotiations to "conclude such compact within a 60-day period." *See* 25 U.S.C. § 2710(d)(7)(B)(iii). All this harmless remedy requires is the Court to issue a finding of bad faith negotiation against the State (*see* 25 U.S.C § 2710(d)(7)(B)(iii)), which should happen without delay.

## JURISDICTION AND VENUE

7. The district court has jurisdiction over this action pursuant to the U.S. Const. art. I, § 8, cl. 3 ("Indian Commerce Clause"); 25 U.S.C. § 2701 *et seq*., including, but not limited to, 25 U.S.C. § 2710(d)(7)(A)(i); 28 U.S.C. § 1331 ("Federal Question Jurisdiction") and 1362 ("Indian Tribes Jurisdiction"); and § 9.1(d) of the 1999 Compact and/or the 2004 Amendment.[2]

8. The State has waived its Eleventh Amendment immunity from suit in Cal. Gov't Code § 98005 and § 9.4(a) of the 1999 Compact and/or 2004 Amendment.

9. Venue is proper in the United States District Court for the Southern District of California under § 9.1(d) of the 1999 Compact and/or 2004 Amendment since Pauma's gaming facility is located in San Diego County, and 28 U.S.C. § 1391(b) since some of the State defendants are located, reside, and are otherwise subject to personal jurisdiction within this district.

---

[2] The relevant compact provisions discussed herein are the same under the 1999 Compact and the 2004 Amendment, and this complaint will describe them accordingly in the hopes of preempting any irrelevant arguments from the State.

Case No.: _____

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

10. This action presents an actual and live controversy as to whether the State has negotiated in bad faith with Pauma for the past eighteen month. The district court has the power to remedy this dispute in accordance with the Prayer for Relief, *infra*.

## PARTIES

11. The Pauma Band of Mission Indians is a federally-recognized Indian tribe whose reservation is located in and around Pauma Valley in northern San Diego County.

12. The State of California is the thirty-first sovereign state of the United States.

13. Edmund G. Brown, Jr. is the current Governor of the State of California, and Pauma brings this suit against him in his official capacity.

## GENERAL ALLEGATIONS

### I.   BASICS OF IGRA

14. IGRA was enacted in response to the Supreme Court's opinion in *California v. Cabazon,* 480 U.S. 202 (1987), which held that Public Law 280 states like California lack the power to enjoin a form of reservation-based tribal gaming if the state merely regulates the same conduct within its own territory rather than prohibit it altogether. *Id.* at 211-12.

15. The following year Congress passed IGRA, a statutory scheme that categorizes the potential forms of tribal gaming into three different classes, each of which possesses a different degree of regulation. *See In re Indian Gaming,* 331 F.3d 1094, 1096 (9th Cir. 2003).

16. The most heavily regulated of the three classes is class III gaming, the residual category that includes all the forms of gambling that are not previously defined as being class I or class II. *See* 25 U.S.C. § 2703(8). Falling within this class are the types of games typically seen in or associated with Atlantic City and Nevada casinos, such as lottery games, wagering on horse races, house-banked card games, and slot machines. *See Rincon II,* 602 F.3d at 1022 n.2.

17. Among the prerequisites for offering a form of class III gaming is that the tribe is "located in a State that permits such gaming for any purpose by any person, organization, or entity." *See* 25 U.S.C. § 2710(d)(1)(B). The Ninth Circuit has interpreted

4                                 Case No.: _____
COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

the "entity" element within the "any person, organization, or entity" phrase in IGRA to include Indian tribes, so that a tribe may operate a specific class III game even if it is the only one in the state that is legally capable of doing so. *See Artichoke Joe's Cal. Grand Casino v. Norton,* 353 F.3d 712, 726-31 (9th Cir. 2003).

18. After identifying such a class III game, the tribe "shall request the State… to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A).

19. Though the State bears the duty to negotiate in good faith, the Supreme Court obfuscated the jurisdictional basis that allowed tribes to enforce this obligation in federal court, finding the provision in Section 2710(d)(7)(A)(i) of IGRA that conferred the district courts with jurisdiction over "any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purposes of entering into a Tribal-State compact… or to conduct such negotiations in good faith" was an invalid abrogation of Eleventh Amendment immunity. *See Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 72-73 (1996).

20. The people of the State rectified this decision by amending the California Government Code to provide tribes with a cause of action against the State in the event it, *inter alia*, fails to negotiate a compact in good faith. The pertinent part of the statutory section provides that "the State of California also submits to the jurisdiction of the courts of the United States in any action brought against the state by any federally recognized California Indian tribe asserting any cause of action arising from the state's refusal to enter into negotiations with that tribe for the purpose of entering into a different Tribal-State compact pursuant to IGRA or to conduct those negotiations in good faith, the state's refusal to enter into negotiations concerning the amendment of a Tribal-State compact to which the state is a party, or to negotiate in good faith concerning that amendment, or the state's violation of the terms of any Tribal-State compact to which the state is or may

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

become a party." Cal. Gov't Code § 98005.

21. A tribe may initiate a cause of action alleging that a state has failed to negotiate in good faith "after the close of the 180-day period beginning on the date on which the Indian tribe requested the State to enter into negotiations." 25 U.S.C. § 2710(d)(7)(B)(i).

22. IGRA employs a burden-shifting scheme for a bad faith negotiation claim, first requiring a tribe to make out a *prima facie* case of such by showing that "a Tribal-State compact has not been entered into" and that "the State did not respond to the request of the Indian tribe to negotiate such a compact or did not respond to such request in good faith." *See* 25 U.S.C. §§ 2710(d)(7)(B)(ii)(I) & (II).

23. After the introduction of such evidence, the "burden of proof shall be upon the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities." 25 U.S.C. § 2710(d)(7)(B)(ii).

24. As for permissible topics during the course of negotiations, a state is able to request "assessments… in such amounts as are necessary to defray the cost of regulating such activity." 25 U.S.C. § 2710(d)(3)(C)(iii).

25. This authorization to obtain regulatory offsets is the only financial concession a state is able to request according to the express text of IGRA, as the statute goes on to explain that "nothing in this section shall be interpreted as conferring upon a State or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment upon an Indian tribe… to engage in a class III activity." 25 U.S.C. § 2710(d)(4).

26. The Ninth Circuit has loosened this rule by empowering a state to request non-general fund payments (i.e., "revenue sharing") so long as it offers the tribe a meaningful concession that goes above and beyond the standard gaming rights guaranteed by IGRA. *See Rincon II,* 602 F.3d at 1033.

27. If a state asks for a direct tax outright or its revenue sharing demand fails to satisfy the meaningful concession test in *Rincon II*, the district court "shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

1    evidence that the State has not negotiated in good faith." *See* 25 U.S.C. §
2    2710(d)(7)(B)(iii)(II).

3    28. As for the speed with which the court should address the merits of the suit,
4    multiple federal circuit courts, including the Ninth Circuit, have concluded that the
5    "function of the good faith requirement and judicial remedy is to permit the tribe to
6    process gaming arrangements on an expedited basis." *Rincon II*, 602 F.3d at 1041; *see*
7    *Mashantucket Pequot Tribe,* 913 F.2d at 1033 ("Further, the manifest purpose of the
8    statute is to move negotiations towards a resolution where a state either fails to negotiate,
9    or fails to negotiate in good faith, for 180 days after a tribal request to negotiate.").

10   29. The need to expedite the conclusion of a compact means that, in standard
11   compact negotiations that do not involve allegations of latent bad faith conduct against a
12   state for attempting to induce a compact through underhanded means, "good faith should
13   be evaluated objectively based on the record of negotiations, and that a state's subjective
14   belief in the legality of its requests is not sufficient to rebut the inference of bad faith
15   created by objectively improper demands." *Rincon II,* 602 F.3d at 1041.

16   30. One district court order applying the opinion in *Rincon II* explained that the
17   record of negotiations includes the documents exchanged by the parties as well as "some
18   documents in the State's possession… that bear[ ] on the reasonableness of its bargaining
19   position" since, as legislative history for IGRA indicates, "it is States not tribes that have
20   crucial information in their possession that will prove or disprove tribal allegations of
21   failure to act in good faith." *Big Lagoon Rancheria v. California,* 2010 U.S. Dist. LEXIS
22   69144, *14-15 (N.D. Cal. 2010) (citing S. Rep. No. 100-446 at 14 (1998)).

23   31. If the district court finds that a state has negotiated in bad faith, then it shall
24   trigger a tripartite remedial scheme that first involves ordering the parties to conclude a
25   compact within a sixty-day period. *See* 25 U.S.C. § 2710(d)(7)(B)(iii).

26   32. Should the renewed negotiations fail, the second stage of the remedial scheme
27   has the parties submitting their last best compact offers to a court-appointed mediator
28   who shall select the one "which best comports with the terms of this chapter [*i.e.*, IGRA]

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

and any other applicable Federal law and with the findings and order of the court." 25 U.S.C. § 2710(d)(7)(B)(iv).

33. In the event the mediator chooses the tribe's last best compact offer, the State may either consent to the agreement or, if not, the mediator will notify the Secretary of the Interior who shall prescribe, in consultation with the Indian tribe, procedures under which the tribe can conduct class III gaming. *See* 25 U.S.C. §§ 2710(d)(7)(B)(vi), (vii).

## II.   BACKGROUND ON COMPACTING IN CALIFORNIA AND PRIOR DEALINGS BETWEEN THE PARTIES[3]

34. Although IGRA arose in 1988, the first attempt at widespread compacting in California did not occur until a decade later when the voters of the State approved a proposition during the fall of 1998 that would require the Governor to execute a standard form compact with any interested tribe as a ministerial act within thirty days of receiving a request. *See In re Indian Gaming,* 331 F.3d at 1100-01.

35. The following spring, then-Governor Gray Davis commenced negotiations with upwards of sixty Indian tribes to devise a compact that was different from the one approved by the voters the prior fall. *See In re Indian Gaming,* 331 F.3d at 1102.

36. On June 17, 1999, just over a month into the negotiations, a group of tribes sent the State a letter expressing their frustration upon learning that the State was "exploring the concept of an enormous revenue sharing requirement" that they believed would constitute "an impermissible tax on Tribal gaming operations" under IGRA. *See In re Indian Gaming,* 331 F.3d at 1103.

---

[3] The background section is not only included for basic informational purposes, but also because certain claims of bad faith conduct take into consideration the State's prior dealings with Pauma and its track record of acting in bad faith towards tribes in general. 1 E. Allen Farnsworth, *Farnsworth on Contracts* § 3.26c. – Meaning of Fair Dealing (4th ed. 2003) (explaining the good faith inquiry look at the "surrounding circumstances" and the "[p]revious relations of the parties" since such prior interactions "may help show their expectations in the negotiations in controversy"); *see Truitt Mfg. Co.,* 351 U.S. at 154-55 (explaining a court should look at "[t]he previous relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations") (Frankfurter, J., concurring).

Case No.: _____
COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

37. Against these complaints of illegal taxation, the State devised a strategy to obtain its desired tax receipts in a different manner in the final compact offer that it provided to the assembled tribes at 8:00 p.m. on September 9, 1999 – the night before the legislative recess (*i.e.*, ostensibly the final date the State legislature could approve the compacts before leaving for the remainder of the year). After delivering the compact, the State's negotiation team informed the tribes that they had to decide whether to accept or reject the compact by 10:00 p.m. – a deadline that was later extended to midnight. *See In re Indian Gaming*, 331 F.3d at 1104; *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 629 F. Supp. 2d 1091, 1111 (E.D. Cal. 2009) ("*Colusa I*").

38. The chairman of the Cachil Dehe Band of the Colusa Indian Community – one of the tribes in attendance – overheard some of his peers ask the State's negotiator to explain the meaning of the new provisions in the compact, all of whom were rebuffed. *See Colusa I,* 629 F. Supp. 2d at 1111.

39. A representative for the Coyote Valley Tribe then followed the State's negotiator back to the State Capitol to discuss the proposed compact, but was informed that the State's negotiation team was unavailable and then escorted from the area. *See In re Indian Gaming,* 331 F.3d at 1104.

40. The final compact reduced the revenue sharing sought by the State but also obscured the total number of slot machines a signatory tribe could operate.

41. Section 4.3.1 of the 1999 Compact provides each signatory tribe with a baseline entitlement of machines, allowing it to start with the larger of the number of machines it operated immediately before the 1999 Compacts went into effect, on September 1, 1999, or 350.

42. Any revenue sharing fees on the baseline entitlements go into the Special Distribution Fund ("SDF"), a fund designed to offset the impacts of Indian gaming by providing money for, *inter alia*, the "regulatory costs incurred by the State Gaming Agency and the state Department of Justice in connection with the implementation and administration of the compacts" and "the support of state and local government agencies

Case No.: _____
COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

impacted by tribal government gaming."

43. Under Section 4.3.2.2, a signatory tribe can then acquire licenses to operate additional gaming devices on top of the baseline entitlement in Section 4.3.1 up to a maximum of 2,000, with the total number of licenses available to the signatory tribes in the aggregate the output of a complex formula in subsection (a)(1) that provides:

> The maximum number of machines that all Compact Tribes in the aggregate may license pursuant to this Section shall be a sum equal to 350 multiplied by the number of Non-Compact tribes as of September 1, 1999, plus the difference between 350 and the lesser number authorized under Section 4.3.1.

44. Any revenue sharing fees on the licensed machines go into the Revenue Sharing Trust Fund ("RSTF"), a fund designed to provide each "non-compact tribe" – a term that encompasses non-gaming tribes and smaller gaming tribes that operate 350 machines or less – with the sum of $1.1 million per year in financial support.

45. Signatory tribes compete for these licenses during communal draws staged like a "worst-to-first" professional sports draft. The selection order for each round starts with the tribe or tribes with the smallest preexisting device count and ends with those with the largest. At the conclusion of the first round, Section 4.3.2.2(a)(3)(vi) of the 1999 Compact states that "[r]ounds [using the same order of priority] shall continue until tribes cease making draws, at which time draws will be discontinued for one month or until the Trustee is notified that a tribe desires to acquire a license, whichever last occurs."

46. On September 16, 1999, roughly a week after the execution date of the 1999 Compacts, the Office of the Governor asked the chairpersons of the signatory tribes to certify the number of machines their tribes operated on September 1, 1999 so the State had the necessary data for calculating the Section 4.3.2.2(a)(1) license pool formula.

47. The following month, a State assembly member named Bruce Thompson contacted the State's non-partisan and independent Legislative Analyst's Office ("LAO") in the hopes of obtaining an answer that the machine count data in the possession of the Office of the Governor would provide. In particular, Assembly Member Thompson asked

the LAO to indicate, amongst other things, "[h]ow many slot machines… the signed compact[s] allow (statewide)."

48. The response letter from the LAO came out on November 9, 2000 and explains that the office had been unable to "obtain verifiable information on the number of machines" operated by the signatory tribes on September 1, 1999 so it was responding to Thompson's inquiry using a substitute estimate prepared by a law professor within the State. Using this figure, the LAO calculated that the 1999 Compacts authorized 53,000 baseline entitlements under Section 4.3.1 and another 60,000 machines under Section 4.3.2.2.

49. On December 3, 1999, the State's negotiator – acting as Special Counsel to the Governor for Tribal Affairs – responded to the LAO, indicating that the total number of slot machines authorized by the 1999 Compacts was 44,798 – or the product of a simple mathematical calculation set forth in Section 4.3.1, the section setting forth a tribe's baseline machine entitlement. According to the State's negotiator, "[n]othing in Section 4.3.2 authorizes the operation of any more machines than are authorized by Section 4.3.1." Or, as alternatively stated by the State's negotiator in his December 3rd letter, "[e]xcept for foreseeing that the California Gaming Commission may administer the provisions of Section 4.3.2 acting as a neutral trustee, the State's interests in the statewide cap imposed by Section 4.3.1 are not impacted by Section 4.3.2."

50. With the inaugural commissioners for the California Gambling Control Commission ("CGCC") not being appointed till the end of August of the following year and Section 4.3.2.2(a)(3)(vi) of the 1999 Compact merely referencing that a "Trustee" would oversee the license pool, the attorneys for the signatory tribes drafted "Gaming Device License Pool Rules" to bring the license draw system into effect.

51. Paragraph 5 of the Pool Rules indicated that the license pool "shall be administered by a certified public accountant licensed in the State of California… who, in the twelve months immediately preceding the first draw of gaming device licenses under these rules, has not… performed accounting or audit services for the State of California

or for any tribe either drawing licenses from the pool or receiving distributions from the Revenue Sharing Trust Fund ('Pool Trustee')."

52. The signatory tribes then selected Sides Accountancy ("Sides") of Sacramento, California to serve as the Pool Trustee.

53. On May 9, 2000, the State's negotiator drafted a letter to Sides to "commend the Tribes for their efforts" on reaching "an agreement on procedures for drawing machine licenses." The end of the May 9th letter contains dual reminders that Sides "as the Pool Trustee, will monitor the license pool to ensure that no more than the available number of licenses are issued," and "as the Pool Trustee, [it will] certify to the … California Department of Justice that the draw complies with the limitations of the compacts."

54. On May 1, 2000, Pauma executed a form version of the 1999 Compact with the State through a simple exchange of correspondence in which the State said nothing about the license pool provisions of the agreement.

55. With the 1999 Compact executed, Pauma signed an engagement letter with Sides on May 5, 2000 "specify[ing] the terms and conditions of [its] engagement as trustee of the Gaming Device License process set forth in Section 4.3.2.2 of the Compact between the State of California and Tribe."

56. Along with returning the executed version of the engagement letter to Sides, Pauma contemporaneously mailed a letter addressed to Sides as "Trustees" that expressed the Tribe's desire to draw five hundred licenses at the forthcoming inaugural license draw on May 15, 2000. The requisite $625,000 pre-prepayment fee mandated by the 1999 Compact accompanied the letter, but Pauma nevertheless ended the letter by asking the "trustee" to notify the Tribe by facsimile if any items necessary for participation in the draw were missing.

57. On May 15, 2000, Sides informed Pauma that it obtained 500 licenses at the draw earlier that day via a letter signed by "Sides Accountancy Corporation as trustee under the Scope of Work document."

Case No.: _____
COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

58. By the following May, Pauma put its 350 baseline entitlements and 500 licensed machines into commercial operation within a temporary tent gaming facility.

59. On January 16, 2001, shortly after the start of the next year and more than four months after Governor Gray Davis appointed the initial commissioners to the CGCC, the inaugural Chairman of the Commission John Hensley sent a letter to Sides requesting "data obtained in the course of [its] role" overseeing the license draw process. The final two paragraphs of the letter contained reminders for Sides that "as 'pool trustee' you were to ensure that the allocation of machines did not exceed the available number of machines as provided in the compacts" and that "[a]s 'pool trustee' you have a fiduciary responsibility to account for the funds received to the Gambling Control Commission as trustee of the revenue sharing trust fund and to the third party beneficiaries of the compacts."

60. After transmitting the January 16, 2001 letter, the CGCC circulated an issue paper contemplating whether the Commission "[s]hould… immediately assert it's [sic] authority as Trustee under the Tribal-State Gaming Compacts and take over the machine licensing function and require accountability from the temporary trustee and the compacted tribes." The issue paper concluded that the CGCC "has the legal authority to assume control of the license function under the law and the compacts" and advised that the State should take action expeditiously and before May 15, 2001.

61. On March 13, 2001, the Governor Gray Davis headed the recommendation in the issue paper by unilaterally enacting Executive Order D-31-01, which empowered the CGCC to "administer the gaming device license draw process under Section 4.3.2.2.(a)(3), and control, collect and account for all license fees under Section 4.3.2.2.(a)(2)."

62. In the aftermath of the passage of the Executive Order, Sides then mailed a "Notification of Termination of Engagement" to the signatory tribes on November 8, 2001, advising the tribes that it was "terminating [its] engagement as license trustee… effective 60 days from today" and stating that "it has been an honor and privilege to serve

as the license trustee."

63. After assuming control over the administration of the license pool, CGCC Chairman Hensley sent a letter to the Office of the Governor to remind it of the "great deal of resistance [the Commission received] from both the temporary Trustee, Michael Sides Accountancy, and from many of the tribes" when trying to obtain payment data before taking over the draw process. The purpose of the letter was to communicate the CGCC's intent to cap the license pool "as soon as possible and to ask for input from tribal leaders so that they can buy into the process and the solution." Hensley then disclosed the two interpretations of the license pool formula that appealed to him. The first was the one advanced by the State's negotiator in its December 3, 1999 letter to the LAO, except Hensley would essentially double count the baseline machine entitlements under Section 4.3.1 to make up for the fact that the State's negotiator simply omitted the licensed machines under Section 4.3.2.2(a)(1) altogether. The second formulation was one created by the LAO after receiving the December 3, 1999 letter from the State's negotiator that similarly accounted for both the baseline entitlements in Section 4.3.1 and the licensed machines in Section 4.3.2.2(a)(1).

64. During a meeting on May 29, 2002, the CGCC determined the principles it would or would not apply when interpreting the 1999 Compact. A principle arising from the CGCC's trustee status would not apply because, in the opinion of the CGCC, "although the Commission is referred to in the Compacts as a trustee… [it] cannot be regarded as a trustee in the traditional sense, but rather as an administrative agency with responsibilities under the Compacts for administration of a public program in the nature of a quasi-trust."

65. The CGCC also rejected a canon of construction that would construe ambiguities against the State even though the federal courts would later explain that "it is undisputed that the State's negotiation team actually drafted the language in the Compact." *Colusa I,* 629 F. Supp. 2d at 1115; *see San Pasqual Band of Mission Indians v. California,* No. 06-0988, Dkt. No. 97, 13:6-7 (S.D. Cal. Mar. 29, 2010) ("It is

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

undisputed Defendants drafted the Compact and presented it to Plaintiff and other tribes.").

66. At a second commission meeting the following month on June 19, 2002, the CGCC unilaterally interpreted the license pool formula by choosing the first formulation Hensley said appealed to him in his prior letter to the Office of the Governor – a formulation that provided for 32,151 licenses and was 32,132 and 23,800 licenses smaller than the other two options under consideration. *See Colusa I,* 629 F. Supp. 2d at 1112.

67. In describing the reason behind its decision, Commission Palmer explained that the CGCC chose the "conservative" and "low-end interpretation" simply because the provision is "imprecise, [and] subject to varying interpretations."

68. Chairman Hensley went one step further and explained that the chosen number was not the "absolute number," but simply one "arbitrarily" chosen by the CGCC to serve in the "interim" until the signatory tribes could renegotiate their compacts with the State.

69. By capping the license pool at 32,151 licenses, the CGCC created an annual structural shortfall in the RSTF of over $50,000,000, which the State could only rectify by removing an equivalent amount of money from the SDF that would otherwise go towards funding regulatory purposes. *See* Cal. Gov't Code § 12012.90.

70. On or about December 8, 2003, Pauma submitted an application with the CGCC to acquire 750 licenses at a draw scheduled for December 19th of that year. However, the CGCC only awarded Pauma 200 of the 750 requested licenses before the license pool – as defined by the Commission – became fully depleted for the first time. *Pauma II,* 813 F.3d at 1161.

71. A day after Pauma received notice of the license draw results from the CGCC, on January 7, 2004, the State held a conference call to introduce the attorney who would try to renegotiate the 1999 Compacts on its behalf. As reported by multiple newspapers, during the course of the conference call, the State's new negotiator stated that it was "an opportune time to re-examine the tribal-state relationship" since "[c]learly, we think the

current compacts do not provide fair payment to the state for what is a monopoly on [c]lass III (casino-style) gaming."

72. Pauma entered into negotiations with the State in order to obtain what-should-have-been preexisting licenses and executed an amended compact ("2004 Amendment") on June 21, 2004. Entering into the 2004 Amendment increased the annual cost of operating Pauma's 1,050 machines by 2,460%, turning $315,000 in judicially-sanctioned RSTF fees into payments of $7,750,000. Of this total, $2,000,000 went into the RSTF and the remaining $5,750,000 was supposed to be used as security for the issuance of regulatory bonds, but the State claims it simply dumped the money into the General Fund instead. *See Rincon II,* 602 F.3d at 1034 (explaining that general fund revenue sharing is "not an authorized subject of negotiation under [Section] 2710(d)(3)(C)(vii) of IGRA"). Section 4.3.3(a) of the 2004 Amendment indicates that the alleged $5.75 million general fund payment alone represents "at least 13% of the Tribe's net win in 2003," the year prior to amendment.

73. In addition to requiring these "revenue sharing" fees, the 2004 Amendment (via Section 10.8.8) mandated that Pauma execute an intergovernmental agreement ("MOU") with San Diego County to pay additional regulatory costs at the local level – an agreement that ultimately imposed $38 million in infrastructure expenditures to largely county roads and annual payments of, amongst other amounts, $400,000 for sheriff service, $40,000 for the prosecution of casino-related crime, and $200,000 for a gambling addiction program.

74. More than three months after the execution date of the 2004 Amendment, a signatory tribe to one of the 1999 Compacts named the Cachil Dehe Band of the Colusa Indian Community filed suit in the United States District Court for the Eastern District of California requesting declaratory relief regarding the total number of licenses created by the Section 4.3.2.2(a)(1) formula. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California,* No. 04-2265 FCD KJM, Dkt. No. 1 (E.D. Cal. Oct. 25, 2004) (generally "*Colusa*").

75. The district court at first dismissed the suit after accepting the State's argument that a determination on the size of the license pool could potentially harm the sixty-plus absent tribes who were necessary parties that could not be joined because of their sovereign immunity. *See Colusa,* 2006 U.S. Dist. LEXIS 29931 (E.D. Cal. May 16, 2006).

76. After the Ninth Circuit revived the suit (*see Colusa,* 536 F.3d 1034 (9th Cir. 2008)), the district court ultimately granted summary judgment in the tribe's favor on April 22, 2009 – more than four-and-a-half years after the filing of the complaint – and held that the Section 4.3.2.2(a)(1) license pool formula authorizes 10,549 more licenses than the CGCC maintained. *See Colusa I,* 629 F. Supp. 2d at 1113.

77. Approximately two weeks after the release of the dispositive order in *Colusa I,* on May 5, 2009, Pauma transmitted a letter to the Office of the Governor raising the supervening decision, arguing that it showed the 2004 Amendment resulted from mistake and was subject to rescission, and proposing the parties settle the matter out of court.

78. The Office of the Governor responded roughly twelve weeks later – on June 22, 2009 – by "disagree[ing] that the Band's compact with the State is subject to judicial rescission" and suggesting that seeking legal recourse could actually harm the tribe. As for rescission, the Office of the Governor claimed that even if the remedy were granted "it is possible that Pauma may not benefit from such a determination given that rescission of the Band's compact could leave it with no compact at all." Any related restitutionary remedy could similarly strip away all of Pauma's revenues, as the Office of the Governor explained that "assuming Pauma's suit for rescission could overcome the State's sovereign immunity, any financial restoration obligation would not rest solely upon the State, but could require the Band to disgorge all the benefits it has received from the ability to operate class III gaming under its compact." After advancing these warnings, the Office of the Governor not only rejected the idea of settlement outright, but terminated the discussions altogether by explaining that it did "not believe it would be fruitful to continue the meet and confer process to discuss the matter further."

79. On September 29, 2009, Pauma nevertheless made a second and final attempt

17                    Case No.: _____
COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

at settlement by asking the State to reduce the Tribe's "revenue sharing" obligations to $4,000,000 per year "until December 31, 2013, or until any additional Gaming Devices are added to the Casino Pauma floor, whichever occurs first."

80. The Office of the Governor rejected this proposal roughly a month later, on November 2, 2009, going on to explain that if Pauma did not become current on its past-due revenue sharing payments in four days' time, "or fails to make timely payment thereafter in accord with the terms of the Amended Compact, the State will consider the Band in material breach of its Amended Compact."

81. Section 11.2.1(c) of the 1999 Compact and/or the 2004 Amendment indicates a material breach enables the claimant to "unilaterally terminate [the] Compact upon service of written notice on the other party."

82. The inability to settle the matter led Pauma to file suit in the Southern District of California to seek, *inter alia*, rescission of the 2004 Amendment and restitution of the heightened revenue sharing fees paid thereunder. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* No. 09-01955, Dkt. No. 1 (S.D. Cal. Sept. 4, 2009) ("*Pauma*").

83. The district court ultimately awarded Pauma the aforementioned remedies, even though it labelled restitution as specific performance. *See Pauma,* Dkt. Nos. 227 & 245 (S.D. Cal. Mar. 18, 2013 & Dec. 3, 2013).

84. According to the district court, the monetary remedy fit within two different waivers of sovereign immunity. The first is the one in Section 9.4(a) of the 1999 Compact and/or 2004 Amendment that provides the parties waive whatever immunity they may have so long as "[n]either side makes any claim for monetary damages (that is, only injunctive, specific performance, including enforcement of a provision of this Compact requiring payment of money to one or another of the parties, or declaratory relief is sought)." *See Pauma,* Dkt. No. 238 (S.D. Cal. June 11, 2013). The second is the waiver in Section 98005 of the Government Code that waives the State's immunity in federal court for, amongst other things, "any cause of action arising from… the state's violation

of the terms of any Tribal-State compact to which the state is or may become a party." *See* Cal. Gov't Code § 98005. In the words of the district court, "That's exactly what happened here. The State did not properly determine the number of licenses. They were entitled to licenses under the '99 Compact. There was [sic] licenses available. They should have gotten them under the terms of that compact. It was a violation, and the money should be returned." *Pauma,* Dkt. No. 240 (S.D. Cal. 2014).

85. Before it would award Pauma the restitutionary remedy, however, the district court required the parties to partake in a mandatory settlement conference before the magistrate judge. *See Pauma,* Dkt. No. 227, 31:8-9 (S.D. Cal. Mar. 18, 2013). Prior to the first settlement conference that occurred on May 9, 2013 (*see Pauma,* Dkt. No. 234 (S.D. Cal. May 9, 2013)), the Pauma tribal membership voted to negotiate for an extension on the term of the 1999 Compact to recapture the eight-plus years of compact rights that the State frustrated by misrepresenting the size of the license pool. *See Pauma,* Dkt. No. 256-1, 2:17-28 (S.D. Cal. Jan. 30, 2014). However, the magistrate judge posted a minute order explaining that "[n]o settlement was reached" as a result of the conferences. *Pauma,* Dkt. No. 235 (S.D. Cal. May 21, 2013).

86. Since this time, the State has not any initiated settlement talks or other negotiations with Pauma.

### III. POST-JUDGMENT REALITY AND IMPETUS FOR NEGOTIATIONS

87. After the closure of the district court proceeding during the summer of 2014, Pauma found itself still short the $36.2 million in restitution that the State had yet to pay, operating the same 1,050 gaming devices that it was authorized to operate in December 2003 within the same temporary tent facility that opened in May 2001, and surrounded by much larger destination resort casinos operated by neighboring tribes.

88. Pauma is located in Pauma Valley in northern San Diego County along the northern, State-Road-76 portion of a loop road on the east side of Interstate 15 that consists of the aforesaid State Road 76 on the north and State Road 78 on the south.

89. Patrons hoping to access Pauma by travelling east along State Road 76 must

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

first past the reservation of the neighboring Pala Band of Mission Indians, a tribe that operates a four-diamond resort casino housing up to 2,500 slot machines just five miles to the west of Pauma.

90. While Pauma is also accessible from the east via the southern, State-Road-78 portion of the loop road, patrons must first pass the resort casinos operated by the San Pasqual Band of Mission Indians and the Rincon Band of Luiseno Mission Indians. San Pasqual operates the Valley View casino, a gaming facility housing 2,000 slot machines that recently won nineteen "Best of Gaming" awards by Casino Player Magazine. Rincon, which is just five miles to the east of Pauma, operates up to 2,500 slot machines within the Harrah's Resort Southern California.

91. Potential patrons travelling south on Interstate 15 from the Los Angeles metro area must also first pass the Pechanga Resort & Casino on the southern end of Temecula before they reach any of the casinos along State Roads 76 or 78. This casino, which is operated by the Pechanga Band of Luiseno Indians, has up to 3,800 gaming devices and is not only the largest casino in California, but in the entire western United States as well.

92. To help survive in a saturated gaming market filled with more advanced and prosperous competitors, Pauma contacted the State about obtaining the ability to operate new forms of gaming that other tribal casinos in the region did not offer.

93. Section 12.2 of the 1999 Compact and/or 2004 Amendment contains a mandatory renegotiation provision that states in full, "This Gaming Compact is subject to renegotiation in the event the Tribe wishes to engage in forms of Class III gaming other than those games authorized herein and requests renegotiation for that purpose, provided that no such renegotiation may be sought for 12 months following the effective date of this Gaming Compact."

94. Under Section 4.1 of the 1999 Compact and/or 2004 Amendment, the only gaming rights given to Pauma are "Gaming Devices" (which are further defined as slot machines), any banking or percentage card game, and "[t]he operation of any devices or games that are *authorized* under state law to the California State Lottery."

95. As indicated earlier, a certain type of class III game is lawful on Indian lands and is thus a permissible subject of compact negotiations if, *inter alia*, the state permits such gaming "for any purpose by any person, organization, or entity," including an Indian tribe. *See* 25 U.S.C. § 2710(d)(1)(C); *see Artichoke Joe's,* 353 F.3d at 726-31.

96. One form of class III gaming that it not provided for under the 1999 Compact and/or 2004 Amendment is lottery games that are legal under State law but nevertheless *not* presently "authorized" to the California State Lottery.

97. The California State Lottery is generally empowered to offer lottery games under Article IV, Section 19(d) of the California Constitution (*see* Cal. Const. art. IV, § 19(d)), and with this grant of power the California State Lottery Commission picks and chooses which games it wants to offer by "promulgat[ing] regulations specifying the types of lottery games to be conducted by the lottery." Cal. Gov't Code § 8880.28(a).

98. An approved regulation will begin by specifying that the lottery has "*authorized*" itself to offer a particular game before proceeding to detail the method of play. For example, the "Daily Derby" section of the lottery regulations begins with a section entitled "Authorization" that explains "[t]he California Lottery may conduct Daily Derby, a draw game pursuant to these regulations." *See* California State Lottery, Regulations § 3.1.1 (Sept. 24, 2015), *available at* http://static.www.calottery.com/~/media/Approved Regulations 09-24-15.pdf (last visited June 22, 2016).

99. According to its regulations, as of the filing date of this complaint, the lottery has "authorized" eleven types of lottery games (*i.e.,* Daily Derby, Daily 4, Daily 3, Fantasy 5, Hot Spot, Mega Millions, Powerball, Raffles, Superlotto Plus, Scratchers, and Monopoly Millionaires' Club) even though the California Constitution permits a virtually limitless number of others. *See* California State Lottery, Regulations §§ 3.1-3.11 (Sept. 24, 2015), *available at* http://static.www.calottery.com/~/media/Approved Regulations 09-24-15.pdf (last visited June 22, 2016).

100. Along with the California State Lottery, the California Constitution also empowers Indian tribes to generally offer lottery games – and not simply lottery games

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

that are "authorized" to the California State Lottery – by providing that "the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts." Cal. Const. art. IV, § 19(f).

101. A second form of class III gaming that is not provided under the 1999 Compact and/or 2004 Amendment is on-track wagering at horse races.

102. Article IV, Section 19(b) of the California Constitution states that "[t]he Legislature may provide for the regulation of horse races and horse race meetings and wagering on the results." Cal. Const. art. IV, § 19(b).

103. As of the filing date of this complaint, horse racing and on-track betting is offered at tracks in Del Mar, Los Alamitos, Santa Anita, Golden Gate Fields outside Berkeley, and Cal-Expo in Sacramento.

IV.   **THE NEGOTIATIONS BETWEEN THE PARTIES**

   **A. November 24, 2014 – Formal Renegotiation Request by Pauma[4]**

104. On November 24, 2014, Pauma transmitted a formal request to commence renegotiations of the 1999 Compact and/or 2004 Amendment pursuant to the mandatory renegotiation provision of Section 12.2 of the agreements. After citing Section 12.2 of the compacts, the letter goes on to state that "Pauma hereby formally requests renegotiation of the 1999 Compact and/or 2004 Amendment on the basis that the Tribe wishes to offer… on-track betting at an on-reservation horse track" and lottery games that are not currently authorized under State law to the California State Lottery.

105. As for the sought-after lottery games, Pauma listed the legal but presently unauthorized lottery games it hoped to offer, including traditional punchboards; games

---

[4] A true and correct copy of the November 24, 2014 letter from Pauma to the State is attached hereto as **Exhibit 2**.

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

that "use the theme of roulette, dice, baccarat, blackjack, Lucky 7s, draw poker, slot machines, or dog racing;" games played on video terminals; games offered by the Multi-State Lottery Association and not licensed to the State of California, games offered by any other state and not licensed to the State of California; games that are part of a unique tribal lottery system; and any other withheld lottery games.

106. The November 24, 2015 letter then proceeds to detail the basis for the request, stating with respect to the lottery games that those are "permitted to be conducted and operated on tribal lands subject to [a] compact" under Article IV, Section 19(f) of the California Constitution, but, in an "anti-competitive move," the State limited the lottery games under the 1999 Compact and/or 2004 Amendment to those "authorized under state law to the California State Lottery."

**B. December 15, 2014 – Response Letter by the State[5]**

107. Via a letter dated December 15, 2014, Senior Advisor for Tribal Negotiations Joginder Dhillon responded on behalf of the Office of the Governor. The December 15th letter started out by reiterating the new forms of gaming Pauma hoped to offer and then stated that "[t]he State agrees to commence discussions regarding a Compact which addresses these forms of gaming and is committed to negotiating in good faith with the goal of achieving policy objectives of promoting tribal economic development, self-sufficiency, and strong tribal governments, while also protecting the State's rights and interests agreed upon by the parties and otherwise guaranteed by law."

108. However, Dhillon equivocated in the following paragraph by raising doubt about what the State would actually negotiate. In relevant part, the December 15th letter states, "I should note that the issues of scope of authorized class III gaming activities, and other specific issues that may have been raised in your letter are subjects for the negotiation and will be addressed in good faith and within the framework of applicable state and federal laws as we proceed." Nevertheless, the letter ended by explaining that

---

[5] A true and correct copy of the December 15, 2014 letter from the State to Pauma is attached hereto as **Exhibit 3**.

the State hoped to discuss "preliminary issues" such as the "scope of… our negotiations" at the first meeting between the parties.

### C. January 16, 2015 – First Negotiation Session

109. The first meeting between the parties took place on January 16, 2015 at the Office of the Attorney General in San Diego, California. At the outset of the discussion, counsel for Pauma requested that a court reporter record the face-to-face negotiation sessions, but Dhillon objected, explaining his preference to keep the discussion off-the-record so the parties could speak, in his words, "open and honest[ly]."

110. The discussion on the first substantive subject of horse wagering began with the State explaining that an on-track betting compact has never been done before in California, and that a representative from the California Horse Racing Board should attend a future negotiation session to help deconstruct the maze of State regulation on the subject. Following this, Senior Assistant Attorney General Sara Drake then asked Pauma to disclose its vision and business plan for the project, which Pauma was hesitant to do given the State's purely regulatory role (versus being a joint venturer) and lack of trust-worthiness as is evidenced by the events leading up to and during the prior compact suit.

111. As for the lottery games topic, Dhillon began the discussion by asking for examples of the sort of lottery games Pauma hoped to offer, to which counsel for Pauma stated that the Tribe "desire[s] to offer different games than those offered by other tribes" and directed him to the list of lottery games in the Tribe's opening November 24th letter. Then, Dhillon requested legal authority supporting Pauma's position that a tribe can operate lottery games not presently authorized to the California State Lottery, to which counsel for Pauma again raised the November 24th letter and explained that a tribe's right to offer lottery games is guaranteed by Article IV, Section 19(f) of the California Constitution. In response to this, Deputy Attorney General T. Michelle Laird explained that the issue was "murky" and in need of further research before Dhillon brought an end to the discussion by stating that the Office of the Governor would provide Pauma with the State's position on this "preliminary" scope issue before the next meeting so the

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

parties could move on to discussing actual terms.

**D. January 30, 2015 – Summary Letter by the State[6]**

112. However, Dhillon then backtracked on his promise to provide the State's position on the lottery games topic in a subsequent January 30, 2015 letter, explaining that "[t]he State [only] agreed to research the general legal framework [for lottery games] before our next meeting, not to provide its legal position in writing to the Tribe."

**E. May 8, 2015 – Letter Raising Inaccuracies by Pauma[7]**

113. When communications resumed after a short hiatus to tend to the principal briefing on appeal in the ongoing compact litigation, Pauma's then-Chairman Randall Majel transmitted a letter to the State on May 8, 2015 to address the inaccuracies in Dhillon's prior January 30th letter. Chairman Majel took issue with Dhillon refusing to provide the State's position on the requested lottery games and again feigning that he "lacks clarity about the games the Tribe intends to offer."

114. To dispel any lingering confusion, Chairman Majel's May 8th letter reiterated the list of lottery games set forth in Pauma's opening November 24th letter and provided a step-by-step legal analysis in support of the Tribe's position that explained lottery games are a permissible subject of compact negotiation under *Artichoke Joe's* (since a tribe qualifies as an "entity" under IGRA) and "Article IV, Section 19(f) of the State Constitution empowers tribes to operate *all* types of lottery games and not simply those granted to the State Lottery."

115. After this, Chairman Majel then communicated that his "hope and expectation is that [Dhillon] will detail the contours of this agreement [to negotiate] in writing before

_____

[6] A true and correct copy of the January 30, 2015 letter from the State to Pauma is attached hereto as **Exhibit 8**. Though not detailed herein, the record of negotiations includes additional letters sent between the parties before the January 30th letter including one from Pauma to the State on December 23, 2014 (**Exhibit 4**), one from the State to Pauma on January 2, 2015 (**Exhibit 5**), one from Pauma to the State on January 6, 2015 (**Exhibit 6**), and one from Pauma to the State on January 20, 2015 (**Exhibit 7**).

[7] A true and correct copy of the May 8, 2015 letter from Pauma to the State is attached hereto as **Exhibit 9**.

our next meeting by identifying the games over which the State is and is not willing to negotiate." Otherwise, Pauma will simply be "spinning its wheels" as the State "hold[s] a subsequent negotiation session without necessarily explaining whether [it] is actually there to negotiate." To stave off any more disagreements about what was said during in-person meetings, Chairman Majel also clarified that his "position is now and always has been that transcribing or otherwise recording our meetings will best protect the interests of the Tribe while also making our discussions more productive."

**F.  May 27, 2015 & August 13, 2015 – Reply Letters by the State[8]**

116. Dhillon responded on May 27, 2015, explaining that Pauma has not clearly described "the kinds of horse racing or lottery games it sought to conduct," but he hoped to discuss the matter further during a negotiation session in or around the month of August that the State agreed to record. Despite Chairman Majel's request, the May 27th letter was completely silent on the State's position regarding the negotiability of the lottery games Pauma had identified at least three times previously, but, as explained by Dhillon in a subsequent August 13, 2015 letter, the State's preference was to discuss substantive matters – a term presumably meant to include the "preliminary" scope of negotiations topic – during face-to-face encounters between the parties.

**G. September 8, 2015 – Second Negotiation Session**

117. This preference for discussing matters in-person turned into the converse when the parties met at the next negotiation session that took place on September 8, 2015 at the Office of the Attorney General in Sacramento, California.

118. The discussion began on horse wagering, and though a representative from the California Horse Racing Board was present, Dhillon immediately suggested that

---

[8] True and correct copies of the May 27, 2015 and August 13, 2015 letters from the State to Pauma are attached hereto as **Exhibit 10** and **Exhibit 12**, respectively. Though not detailed herein, the record of negotiations includes a letter sent from Pauma to the State between the dates of the aforementioned exhibits on August 5, 2015 (**Exhibit 11**), and another on August 18, 2015 (**Exhibit 13**), just days after the second reply letter from the State at Exhibit 12.

Pauma simply author a first draft of the relevant compact regulations (even though the State is supposed to negotiate for the regulations it wants) and then send them to him for review. When counsel for Pauma sought to make the process more collaborative or at least have the parties exchange competing drafts considering that all the institutional knowledge regarding the myriad of regulations governing the horse-racing industry was on the State's side of the table, Dhillon remained steadfast and said that "it's probably best for you to at least lay something out and we will absolutely put something on paper and get it back to you."

119. When Pauma asked to discuss some of the many issues it had with the convoluted horse racing regulations, Dhillon again tried to get Pauma to merely convey those in writing after the meeting, saying "I think it probably be best, again for us to – if you want to send us what those are, for us to get together and talk about those and come back with a – with a constructive, you know, you know response, you know, rather than just shoot from the hip."

120. Counsel for Pauma had developed some familiarity with the legions of statutes and regulations governing horse racing and wagering in California in advance of the meeting, and expected the State to be able to discuss these laws during the negotiation session. *See* Cal. Bus. & Prof. Code § 19400-19668; *see* California Horse Racing Board, CHRB Rule Book (June 14, 2016), *available at* http://www.chrb.ca.gov/policies_and_regulations/chrb_rule_book_0616.pdf (last visited June 28, 2016) (setting forth 258 pages of horse racing regulations). Yet, as questions persisted, Dhillon and the attorneys from the Office of the Attorney General continually kept dodging these questions until Dhillon simply interrupted the discussion with an eye on bringing it to an end by stating, "I'd really rather we get into the compact issues" – by which he presumably meant proposed language for a draft agreement that he hoped to review in writing and discuss at some unspecified point in the future.

121. Upon hearing this comment about discussing specific compact language and seeing the State's intransigence on the horse wagering subject, counsel for Pauma redi-

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

rected the discussion to the lottery game topic with the hope of nailing down actual language, but again Dhillon tried to terminate the conversation by saying "[s]o why don't you put together something and we will respond. On both of those issues, I think that's the best way to go. So rather – because otherwise we are just doing – we are arguing about the concept." Nevertheless, counsel for Pauma persisted, proposing a simple fix to the existing compact language that would provide the Tribe with the gaming rights it desired. As to that, after reciting the language of Section 4.1(c) of the 1999 Compact that explains the permissible lottery games only includes those that are "authorized" under state law to the California State Lottery, counsel for Pauma went on to state:

> So the way I construe this, is that there is essentially eleven games, lottery games, that tribes are able to use, able to offer. What we would like to do is sort of just eliminate the reference to California State Lottery and broaden it so the Tribe is just simply offer[ing] – or authorized to offer lottery games more generally.

122. After Pauma proposed this language, Dhillon raised the fact that the proceeds of the State Lottery go to support schools statewide, insinuating that the existing structure of the State Lottery may be reason enough to not negotiate the topic. In response to this, counsel for Pauma raised the fact that protectionism is not a valid defense for refusing to negotiate under IGRA during a dialogue that went as follows:

> Mr. Dhillon:  And [the lottery proceeds that go to schools statewide] benefit[ ] all of our kids, right?
>
> Mr. Cochrane: I get it. But you – I don't know if protectionism is, like a valid concern under IGRA, though. You know, there is a way to provide tribes with equal rights.
>
> Ms. Drake: Actually, it is valid under IGRA. If you look at IGRA, one of the things that the State is entitled to negotiate over is to protect its own gambling industry. I'm not suggesting we would do that. But that's expressed in IGRA.
>
> Mr. Cochrane: That's a – that's a colorful interpretation. I would – I –
>
> Ms. Drake: It's straight language. It's not colorful interpretation.

123. From there, the State tried to bring the discussion to a halt by taking a break

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

(which Pauma declined) before once again revisiting its prior argument that the Tribe has never communicated the lottery games it is seeking to negotiate:

> Ms. Drake: Yeah, I mean, this is the first time you have given us any idea of what kind of lottery games you are going to want to do.
>
> Mr. Cochrane: No. No. Sara, we have written this out like four times.
>
> Ms. Drake: No, you haven't.
>
> Mr. Cochrane: Essentially all I did was repeat what we have put in writing like four times now.

124. To resolve the disagreement, counsel for Pauma simply asked Dhillon to read aloud Pauma's original November 24th letter. Dhillon agreed but simply dropped the issue as he was scanning the relevant text of the letter and instead raised the State's other common refrain about the legal basis supporting Pauma's request. According to Dhillon, Pauma was "conceding, though, that there is no obligation under IGRA [for the State to provide those lottery games], you just believe it's within the Governor's constitutional authority? That's what you are saying, I think, right? … Because no one else in the state is doing it. Right?"

125. In response, counsel for Pauma again raised the *Artichoke Joe's* argument that lottery games in general are negotiable under IGRA in California because tribes, amongst others, can operate them under the State Constitution:

> Mr. Cochrane: I think the language under IGRA just says as long as it's legal to any person or entity. As long as it's legal to one person. Now, the catch for you is it's legal for all tribes. They are just not using that right as of yet.

126. This comment finally brought an end to the lottery games discussion, with Dhillon insisting on taking a break over the continued objections from Pauma. Once talks resumed, Dhillon segued away from the lottery games topic and back to horse wagering. Believing a substantive conversation on either of those two topics was over, counsel for Pauma asked Dhillon for his thoughts on other provisions of the compact that would be revised during the renegotiations. In response to this, Laird explained that the State had not agreed to negotiate anything other than the specific provisions pertaining to horse

wagering and new lottery games in a discussion that went as follows:

Ms. Laird: [Renegotiation] may be what you were coming here for, but the State hasn't agreed to any more than those two provisions at this point.

Mr. Cochrane: Oh, I'm glad that's at least out on the table because we haven't been able to figure out what the State was or was not agreeing to… for like nine months.

Ms. Williams: Right. We have been asking that question over and over again.

Mr. Dhillon: Where did you ask that question?

Ms. Williams: Like, every time we have talked to you. We said let's – let's put something in writing as to what we are actually negotiating because at this point we don't know.

…

Mr. Cochrane: So help us out. I mean, what do you guys – what are you guys here for?

127. After this comment, the State stopped the proceedings for a second time, this time so Dhillon and his attorneys from the Office of the Attorney General could discuss strategy in a private room down the hall. When talks resumed, Dhillon took a different tack to bring the substantive discussions to an end by immediately going into a tirade against counsel for Pauma by saying in succession:

Mr. Dhillon: I mean, I just wish we had a videographer to see the looks on his face as he talks to people and just the sarcastic remarks… I mean, that's so unprofessional.

Mr. Cochrane: I get it. I get it.

Mr. Dhillon: You know what, you can leave the baggage at the door. Okay?

Mr. Cochrane: Okay. I –

Mr. Dhillon: If we are going to do something for your client, maybe you should step up and be a little more professional.

Mr. Cochrane: Right.

Mr. Dhillon: You got it?

Mr. Cochrane: I got it. I got huge personal failings. Right. We should leave those at the door, though. Okay. Because when – we mentioned renegotiate in our initial letter[,] [t]he definition of renegotiate means to renegotiate

30        Case No.: _____
COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

anew. And we said renegotiate the [1999] compact and/or 2004 Amendment.

128. Despite counsel for Pauma's attempts to return the discussion back to the "preliminary" issue of the scope of the renegotiations, Dhillon refused to speak any further and insisted that counsel for Pauma do two things: (1) send a new letter requesting renegotiations since the State had allegedly never consented to renegotiate the controlling compact, and (2) draft compact language pertaining to horse wagering and new lottery games for the State to consider, even though it had yet to explain whether it was willing to negotiate for these rights in the first place

**H. October 6, 2015 – Repeated Request for Formal Renegotiations by Pauma[9]**

129. On October 6, 2015, Pauma's present Chairman Temet Aguilar transmitted a letter to Dhillon in which he reiterated Pauma's formal request in its original November 24, 2014 letter to commence "renegotiation[s] of the 1999 Compact and/or 2004 Amendment," while also raising the fact that the State had agreed to "discuss all the normal trappings of a compact" in its December 15, 2014 response letter. In closing, Chairman Aguilar's October 6th letter stated that "three hundred and seventeen (317) days have elapsed since the date Pauma transmitted its original negotiation request, and the Tribe is not any closer to knowing whether the State will negotiate and what it will negotiate for. It is well past time for the State to join Pauma in these bilateral negotiations so the parties can work together on crafting the Tribe's next compact."

**I. November 4, 2015 – Letter Denying Pauma's Request to Renegotiate by the State[10]**

130. Dhillon responded in a November 4, 2015 letter that did little to clarify the scope of renegotiations. In regard to lottery games, the letter does not explain whether the State will negotiate for those rights but merely states that "[Dhillon] look[s] forward to considering Pauma's proposed compact language so we can identify and work to resolve

---

[9] A true and correct copy of the October 6, 2015 letter from Pauma to the State is attached hereto as **Exhibit 14**.

[10] A true and correct copy of the November 4, 2015 letter from the State to Pauma is attached hereto as **Exhibit 15**.

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

any potential issues." As for the status of the renegotiations more generally, Dhillon described his understanding of the formal renegotiation request within Pauma's original November 24, 2014 letter and then explained that "the State is under no obligation to renegotiate any matters beyond the scope of those identified in, or related to, your initial request and declines to do so now."

### J. November 25, 2015 – Letter Invoking the Dispute Resolution Process by Pauma[11]

131. With the renegotiations shrouded in abject confusion, counsel for Pauma transmitted a letter to Dhillon on November 25, 2015 triggering the dispute resolution process in Section 9.1 of the 1999 Compact and/or 2004 Amendment. This section of the compacts allows a tribe to bring suit in federal district court to address compact issues if the parties are unable to resolve their differences within "30 calendar days after the first meeting" after receipt of notice of the dispute. According to the November 25th letter, court involvement was necessary because the State was misinterpreting the mandatory renegotiation provision in Section 12.2 of the 1999 Compact and/or 2004 Amendment in order to obfuscate the discussions.

### K. December 4, 2015/December 9, 2015 – Dispute Resolution Meeting and Follow-up Letter by the State[12]

132. After the parties met on or about December 4, 2015 to discuss the dispute, Dhillon continued to refuse to negotiate under the mandatory renegotiation provision of Section 12.2 in a December 9, 2015 letter, indicating that his "interpretation [of the section]… is supported by the specific compact language and reflects the intention and understanding of compact parties." Nevertheless, Dhillon agreed to voluntary negotiate under the preceding Section 12.1 of the 1999 Compact and/or 2004 Amendment that

---

[11] A true and correct copy of the November 25, 2015 letter from Pauma to the State is attached hereto as **Exhibit 16**.

[12] A true and correct copy of the December 9, 2015 letter from the State to Pauma is attached hereto as **Exhibit 18**. Though not detailed herein, the record of negotiations includes an additional letter sent from the State to Pauma on November 30, 2015 (**Exhibit 17**).

states, "The terms and conditions of this Gaming Compact may be amended at any time by the mutual and written agreement of both parties."  This change, however, enabled the State to shift the renegotiations from focusing on the new gaming rights it would *give* Pauma to the new concessions it would *receive* instead.

### L. December 14, 2015 – Clarification Request on Scope of Renegotiations by Pauma[13]

133. Fearing this shift in the discussions was a way for the State to get out of providing Pauma with its new gaming rights, Chairman Aguilar sent a letter to Dhillon on December 14, 2015 asking him to indicate "in a follow-up letter whether the Section 12.1 negotiations will also encompass the new forms of gaming that triggered the negotiation process back in November 2014 – namely, horse racing/on-track betting and lottery games that are not currently authorized to the State Lottery."

### M. January 4, 2015 – Response Letter Requesting Proposed Compact Language on Lottery Games by the State[14]

134. The January 4, 2016 response letter from Dhillon addressed the scope of the redefined "amendment" discussion, but was still evasive as to whether the talks would include any new lottery games. In pertinent part, the January 4, 2016 letter Dhillon states that "the scope of the negotiations includes horse racing… and lottery games, to the extent authorized by the California Constitution, as well as subjects not encompassed by Section 12.2." Dillon then concluded the letter by asking Pauma to provide "proposed language regarding authorized lottery games" as "the next step in our negotiations" in order "to ensure they move forward in a constructive manner."

///

///

///

---

[13] A true and correct copy of the December 14, 2015 letter from Pauma to the State is attached hereto as **Exhibit 19**.

[14] A true and correct copy of the January 4, 2015 letter from the State to Pauma is attached hereto as **Exhibit 20**.

Case No.: _____

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

### N. January 27, 2016 – Letter Detailing Requested Lottery Games Language by Pauma[15]

135. With the State opening up the negotiations to vaguely include "subjects not encompassed by Section 12.2," counsel for Pauma started off its January 27, 2016 response letter to the State by indicating it wanted to negotiate in a piecemeal fashion – one subject at a time – so the parties could actually discuss subjects like the new lottery games in-depth before other issues came into the fray.

136. With Dhillon requesting specific language for new lottery games, the January 27, 2015 letter acquiesced to the State's request by elaborating on the "relatively minor fix" to the 1999 Compact and/or 2004 Amendment raised at the September 8, 2015 negotiation session that would provide Pauma with its long desired lottery rights. First, counsel for Pauma explained for the fifth time (if not more) the legal basis for its request, stating that Pauma may offer the full spectrum of lottery games because both the tribes and the State Lottery have concomitant rights under the State Constitution:

> As to the lottery topic, the central problem with the lottery provision of the 1999 Compact is that it only allows Pauma to offer the devices or games authorized to the California State Lottery even though Article IV, Section 19(f) of the California Constitution allows the tribes to offer lottery games without limitation. *See* Cal. Const. art. IV, § 19(f). Not to mention, the State has this same right under the antecedent Section 19(d), with the State Lottery having absolute discretion to determine which of these games it wants to authorize for play. *See* Cal. Gov't Code § 8880.12. This constitutional grant to the State of the right to operate any lottery games it deems fit confers the same right upon the tribes irrespective of the standalone grant in Section 19(f). *See* 25 U.S.C. § 2710(d)(1)(B) (stating a tribe may conduct a Class III gaming activity on its reservation if the State 'permits such gaming [activity] for any purpose by *any* person, organization, or entity').

137. From there, the two minor corrections to the 1999 Compact and/or 2004 Amendment were laid out, with the first being the inclusion of a definition of the term "Lottery" in Section 2 that was identical to the one under State law. The second was a

---

[15] A true and correct copy of the January 27, 2016 letter from Pauma to the State is attached hereto as **Exhibit 21**.

revision to the scope of permitted lottery games that would replace the "that are authorized under state law to the California State Lottery" language in the authorizing Section 4.1(c) of the 1999 Compact and/or 2004 Amendment set forth below with "that are defined under this compact as a lottery."

> The operation of any devices or games that are authorized under state law to the California State Lottery, provided that the Tribe will not offer such games through the use of the Internet unless others in the state are permitted to do so under state or federal law.

138. To ensure no more confusion remained between the parties about the lottery rights covered by this proposed language, counsel for Pauma stated that the new Section 4.1(c) should explain that the new lottery rights include, but are not limited to, the following games:

> (1) devices or games that are authorized under State law to the California State Lottery, (2) devices or games that are authorized to the Multi-State Lottery Association, (3) devices or games that are authorized to any other state lottery or any other multi-state lottery association, (4) punchboards, (5) "lottery games that use the themes of roulette, dice, baccarat, blackjack, Lucky 7s, draw poker, slot machines, or dog racing," (6) lottery games that are played on video terminals, (7) video lottery games that dispense coins or currency, (8) lottery games that incorporate technologies or mediums that did not exist, were not widely available, or were not commercially feasible in 1984 (save for the restriction on the use of the Internet, *supra*), and (9) any other games or devices that fall within the definition of Lottery.

139. In closing, the January 27th letter informed the State that Pauma would begin to formulate positions on other topics – including horse racing – so the parties could turn to those once the lottery game topic had been fully addressed.

**O. March 7, 2016 – Follow-up Letter by Pauma requesting a Response and Asking the State to Substantiate any Legal Positions with Supporting Evidence[16]**

140. Having not heard anything from the State about these two minor changes to the lottery games topic for the prior six weeks, counsel for Pauma sent a follow-up letter

---

[16] A true and correct copy of the March 7, 2016 from Pauma to the State is attached hereto as **Exhibit 22**.

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

to the State on March 7, 2016, explaining that four hundred and seventy days had elapsed since the commencement of the renegotiations and "yet the State has not indicated whether it is willing to negotiate for the requested lottery games, let alone begin to draft compact language."

141. Anticipating that the State would find a new way to stall negotiations, counsel for Pauma asked that Dhillon expedite his response and substantiate any legal position concerning the availability of the lottery games with supporting evidence, as the duty to negotiate in good faith requires. *See, e.g., Truitt Mfg. Co.,* 351 U.S. at 152-53 ("If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy."); *Press Democrat Publ'g Co. v. NLRB,* 629 F.2d 1320, 1325 (9th Cir. 1980) (explaining that the "[e]xchange of a broad range of information would seem to further the statutory policy of facilitating meaningful… bargaining.").

**P. March 30, 2016 – Response Letter Refusing to Negotiate Certain Lottery Games by the State[17]**

142. Dhillon provided his response on March 30, 2016. On the topic of lottery games, Dhillon finally put forward the State's position, explaining that it had no obligation to negotiate for the new games. According to Dhillon, the provision of the California Constitution providing tribes with the right to operate lottery games has always been understood to limit them to the games operated by the State Lottery:

> The grant of authority to the Governor to negotiate for lottery games under article IV, section 19, subdivision (f) of the California Constitution has always been understood to encompass those games authorized for play by the California State Lottery. This was the intent and understanding of the language proposed by tribal negotiators and presented to the voters as they considered the amendment to the California Constitution.

143. Though making this claim, Dhillon failed to provide any evidentiary support for this legal position despite Pauma requesting as much in its prior March 7, 2016 letter.

---

[17] A true and correct copy of the March 30, 2016 from the State to Pauma is attached hereto as **Exhibit 23**.

Along with putting forward this position, Dhillon then listed the games the State *would not* negotiate rather than those that it would – a list that included "devices or games that are authorized to any other state lottery or any other multi-state lottery association," "lottery games that are played on video terminals," "tribal lottery systems," and "video lottery games that dispense coins or currency."

144. Without providing any clarity on what lottery games he would negotiate (if any), Dhillon went on to explain that he declined the offer to conduct the negotiations in a piecemeal fashion and intended to "provide Pauma a *complete* draft document to guide our future discussions within the next few weeks."

### Q. April 28, 2016 – "Complete Draft [Compact]" without any New Games by the State[18]

145. On April 28, 2016, while counsel for Pauma was in the midst of briefing competing petitions for the Supreme Court in the ongoing compact litigation, the State e-mailed Pauma a "complete draft [compact]." The word version of the document contains a comment bubble at the outset of the document explaining that it was "[t]o be finalized before signing." As for the new gaming rights requested by Pauma, the section of the compact dealing with the scope of authorized gaming says nothing about on-track horse wagering and simply re-confers the same lottery games as the 1999 Compact and/or 2004 Amendment:

Sec. 3.1. Authorized Class III gaming.

(a) The Tribe is hereby authorized and permitted to operate only the following Gaming Activities under the terms and conditions set forth in the Compact:

…

(3) Any devices or games that are authorized under state law to the California State Lottery, provided that the Tribe will not offer such games through the use of the Internet unless others in the state not affiliated with or licensed by the California State Lottery are permitted to do so under state

---

[18] A true and correct copy of the April 28, 2016 "complete draft [compact]" (with cover e-mail) from the State to Pauma is attached hereto as **Exhibit 24**.

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

and federal law.

146. Alongside this provision conferring preexisting lottery rights is a comment bubble that simply says that the "State is open, as indicated in prior correspondence, to discussion regarding the authorization of additional enumerated games."

147. The transmission of this "complete" draft compact occurred on day five hundred and twenty-two (522) of negotiations and the State was still refusing to address the "preliminary" scope of negotiations issue.

148. For comparisons sake, the total length of time it took the State to negotiate the entirety of the 1999 Compact and 2004 Amendment was approximately 120 and 160 days, respectively.

149. During the past six years, various Ninth Circuit courts have issued four (and what should be five) findings of bad faith negotiation against the State. *See Big Lagoon Rancheria v. California,* 789 F.3d 947 (9th Cir. 2015); *Rincon II,* 602 F.3d at 1019; *Estom Yumeka Maidu Tribe of Enter. Rancheria v. California,* 2016 U.S. Dist. LEXIS 19330 (E.D. Cal. Feb. 17, 2016); *North Fork Rancheria v. California,* 2015 U.S. Dist. LEXIS 154729 (E.D. Cal. Nov. 13, 2015).

V.   **Terms of the Complete Draft Compact**

150. The complete draft compact the State offered to Pauma on April 28, 2016 replaces the roughly fifty-four page 1999 Compact in favor of a completely redone one-hundred and thirty-six page proposal that is largely indistinguishable from the one signed by the neighboring Pala Band of Mission Indians the following day and executed with the State just a week later on May 6, 2016. *See* Office of Governor Edmund G. Brown, Jr., Tribal-State Compact between the State of California and the Pala Band of Mission Indians (May 6, 2016), *available at* https://www.gov.ca.gov/docs/5.9.16_Compact.pdf (last visited June 28, 2016). The most notable material differences between the April 28th "complete draft [compact]" and the Pala compact are that the State offered Pauma less machines (2,500 for Pala versus 2,000 for Pauma), a shorter extension on the term of the

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

compact (25 years for Pala versus 20 years for Pauma), and higher revenue sharing into the RSTF (6% of net win for Pala versus 8% for Pauma).

151. As mentioned previously, by shifting the negotiations from the mandatory renegotiation provision of Section 12.2 to the voluntary amendment provision of 12.1, the State changed the tenor of discussions from *giving* new gaming rights to simply *getting* more money and regulations for itself.

### A. Pauma's Rights: Exact Same Gaming Rights and No New Concessions of Meaningful Value

152. As for the exchange of concessions, the April 28th complete draft compact contains concessions (though not necessarily new) in three different categories: games, "enhanced" exclusivity, and an extended term on the agreement. It is worth noting that, according to the Ninth Circuit in *Rincon II*, the exclusivity provided under Article IV, Section 19(f) of the State Constitution "is not a new consideration the State can offer in negotiations because the tribe already fully enjoys that right as a matter of state consti-tutional law." *Rincon II,* 602 F.3d at 1037.

153. As for the first category, the gaming rights offered by the State under its April 28th complete draft compact are identical to those in the 1999 Compact, with the State simply conferring within Section 3.1 of the agreement "Gaming Devices" (a term that is, again, further defined as slot machines), "any banking or percentage card games," and "[a]ny devices or games that are authorized under state law to the California State Lottery." As for total number of slot machines authorized under the compact proposal, the State retained the 2,000 machine limit from the 1999 Compact and actually took away preexisting rights by limiting one of the two gaming facilities permitted by the prior agreement to "hav[ing] no more than five hundred (500) Gaming Devices and shall have a primary purpose other than gaming authorized under IGRA."

154. As for the second category, the exclusivity provision in the 1999 Compact was simply tweaked in a less than "practically worthless" way. Under Section 12.4 of the 1999 Compact, Pauma possessed the right to "terminate this Compact in the event the

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

exclusive right of Indian tribes to operate Gaming Devices in California is abrogated by" political or judicial decision. The April 28th complete draft compact retains this same right but also provides Pauma with the alternative right to a "reduction" on its new RSTF payment if the State decides to take back its previous grant of exclusivity, so long as the revised payment still provides for "compensation to the State for the costs of regulation," "reasonable payments to local governments impacted by tribal government gaming," "grants for programs designed to address and treat gambling addiction," and "such assessments as authorized at such time under federal law."

155. What the exclusivity provision in the April 28th complete draft compact does not contain is an injunction provision that would enable Pauma to enjoin non-tribal competitors from coming into its marketplace. Such a provision was previously conferred by the State under the 2004 Amendment and would at least have *some* value unlike the ineffectual remedies listed above – even though the Ninth Circuit still described the value of the injunction provision from the 2004 Amendment as "practically worthless" and of nothing "more than speculative value." *Rincon II,* 602 F.3d at 1038.

156. As for the third category, the State adjusted the term of the agreement such that, "[o]nce effective, this Compact shall be in full force and effect until twenty (20) years following the effective date."

157. As the Ninth Circuit explained in *Rincon II*, however, standard gaming rights under IGRA – like additional time or machines – cannot serve as the basis for revenue sharing. According to the Assistant Secretary of Indian Affairs, which the Ninth Circuit adopts and quotes in *Rincon II*:

> It is the position of the Department to permit revenue-sharing payments in exchange for *quantifiable* economic benefits *over which the State is not required to negotiate under IGRA,* such as substantial exclusive rights to engage in Class III gaming activities. We have not, nor are we disposed to, authorize revenue-sharing payments in exchange for compact terms that are routinely negotiated by the parties as part of the regulation of gaming activities, such as duration, number of gaming devices, hours of operation, and wager limits.

*Rincon II,* 602 F.3d at 1039.

**B. State's Rights: A Substantial Increase in Revenue Sharing along the Lines of What the State Received under the 2004 Amendment**

158. In exchange for simply extending the term of the 1999 Compact for something less than twenty-years (the 1999 Compact is valid until June 30, 2022 "[i]f the parties have not agreed to extend the [expiration] date of this Compact or entered into a new compact by the [initial] termination date" of December 31, 2020), the State asks for a significant increase in "revenue sharing" under the April 28th "complete draft [compact]."

159. While the 1999 Compact only required Pauma to make revenue sharing payments into the RSTF, the April 28th compact draft compact requires revenue sharing payments into the RSTF, SDF, and directly to San Diego County and other unidentified local jurisdictions pursuant to multiple MOUs.

160. As for the RSTF payment, the 1999 Compact requires Pauma to pay $315,000 into the RSTF annually for operating 1,050 machines. As baseline machine entitlements, the first 350 of these machines are exempt from incurring any revenue sharing fees.

161. The April 28th proposal continues to exempt the first 350 machines from payment but then increases the RSTF fees on the subsequent machines exorbitantly by requiring Pauma to pay "eight percent (8%) of its Net Win [*i.e.*, gross gaming revenues, not income] from the operation of Gaming Devices in excess of [those] three hundred fifty (350)."

162. If Pauma were able to match the relatively-modest average daily slot machine net win at a Las Vegas casino this past calendar year (*i.e.*, $196.50), this eight-percent-of-Net-Win-requirement would equate to an annual RSTF payment of $4,016,460. *See* UNLV Center to Gaming Research, Nevada Gaming Win 2015 (Feb. 2016), *available at* http://gaming.unlv.edu/reports.html (last visited June 28, 2016). This figure alone would represent a 1,175% increase in revenue sharing payments for simply switching from one compact to another.

163. The RSTF fee is just the first revenue sharing fee required under the April 28th proposal, with the second being an unspecified payment into the SDF. Though the State eliminated some of the description for this form of revenue sharing from the April 28th complete draft compact, the contemporaneous Pala compact indicates that the amount of the fees is unilaterally determined by the State according to the monies it appropriates in the Budget Act each year to the following *eight* agencies for supposedly carrying our compact duties: the CGCC, the California Department of Justice, the Office of the Governor, the California Department of Public Health Programs, Office of Problem Gambling, the State Controller, the Department of Human Resources, and the Financial Information System for California. *See* Office of Governor Edmund G. Brown, Jr., Tribal-State Compact between the State of California and the Pala Band of Mission Indians § 4.3 (May 6, 2016), *available at* https://www.gov.ca.gov/docs/5.9.16_Compact.pdf (last visited June 28, 2016).

164. While the actual amount of the SDF payment turns upon the relevant budget appropriations for these eight agencies, the permissible purposes for the SDF funding is not limited to covering those agencies' regulatory expenses. Rather, Section 4.3.1 of the April 28th complete draft compact indicates that the State can use the revenue sharing to cover a host of other purposes, including grants to "local government agencies impacted by tribal government gaming."

165. Though requiring these unspecified, blank-check-style payments into the SDF to support local government agencies, the April 28th complete draft compact nevertheless still requires Pauma to execute MOUs with local jurisdictions and essentially double pay these regulatory costs. The relevant text in Section 4.4 of the April 28th "complete draft [compact]" that requires these MOUs states:

> The Tribe shall enter into agreements with local jurisdictions or state agencies, as appropriate, for such undertaking and services that mitigate the impacts of the Gaming Facility, further the purposes of section 5.3, and thereby benefit the Gaming Facility, the Tribe, or other affected jurisdictions. Copies of all such agreements shall be provided to the State.

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

> The agreements with local jurisdictions or state agencies, as appropriate, required by this section are distinct from those agreements associated with a specific Project and required by section 11.0.

166. As the final sentence of the above block-quote indicates, Section 11 of the April 28th complete draft compact requires Pauma to enter into an additional MOU with San Diego County if the Tribe ever undertakes a "Project," a term the Section 2.22 of the draft compact defines to include any expansion of the gaming facility or construction on a myriad of other unrelated things that were not considered part of a gaming facility under the 1999 Compact such as "access roads, parking lots, a hotel, utility or waste disposal systems, or water supply, as long as such construction or expansion causes a direct or indirect physical change in the off-reservation environment."

167. Almost five years ago, on August 31, 2011, the Assistant Secretary of Indian Affairs opined on the legality of a virtually indistinguishable definition of "Project" in a compact executed between the State and the Habematolel Pomo of Upper Lake ("Upper Lake"), explaining that it was "very troubled by the expansive definition[s]" of "Project" and "Gaming Facility" used by the State that "may encompass the most expansive range of activities in any compact approved, or considered to have been approved, by the Department since the adoption of IGRA in 1988."  In expounding upon this comment, the Assistant Secretary stated that he has:

> significant concerns about whether [the environmental review section] of the Compact, when coupled with the definitions of both "Gaming Facility" and "Project," exceeds the scope of provisions tribes and states may include in a Class III gaming compact under IGRA. The term "Project" includes activities intended to serve the "Gaming Facility," which, in turn, encompasses more than just the actual facilities in which gaming activities will be conducted. Arguably the Compact could even be read to apply to tribal activities far removed from the conduct of gaming, and therefore clearly unrelated to the operation of Class III gaming – such as the development of a tribal power utility or road system. Nothing in IGRA or its legislative history indicates that Congress intended to allow gaming compacts to be used to expand state regulatory authority over tribal activities that are not directly related to the conduct of Class III gaming.

43                Case No.: _____

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

168. According to Section 11.7 of the April 28th "complete draft [compact]," the expansion MOU is supposed to "mitigate[e] … [any] Significant Effect[s] on the Off-Reservation Environment" as well as potentially triple pay local regulatory costs by providing San Diego County with compensation for "law enforcement, fire protection, emergency medical services and any other public services to be provided by the County to the Tribe for the purposes of the Tribe's Gaming Operation as a consequence of the Project," "programs designed to address gambling addiction," and, vaguely, the "mitigation of any effect on public safety attributable to the Project."

169. As mentioned, the MOU Pauma had to execute under the 2004 Amendment in connection with a planned casino expansion project imposed $38 million in infrastructure expenditures to largely county roads and annual payments of, amongst other amounts, $400,000 for sheriff service, $40,000 for the prosecution of casino-related crime, and $200,000 for a gambling addiction program.

170. Although it will invariably impose these sorts of significant revenue sharing fees, the April 28th complete draft compact does not require the ultimate MOUs to go before the Secretary of the Interior as part of the ultimate compact so he can knowingly carry out his statutory duty to determine whether certain provisions of the agreement violate IGRA (and thus cannot be enforced), including the prohibition on taxation contained therein. *See* 25 U.S.C. § 2710(d)(8)(B).

171. Thus, in total, the April 28th complete draft compact would increase Pauma's annual revenue sharing fees for operating 1,050 machines from a $315,000 payment into the RSTF to (1) a RSTF payment of 8% of net win on all machines above 350, (2) an unspecified, unilaterally-determined sum into the SDF to provide, in part, compensation to local governments, and (3) MOUs with local jurisdictions that will double if not triple pay the local regulatory costs associated with Pauma's gaming facility – agreements that will not go before the Secretary of the Interior for approval as part of the compact as IGRA requires.

172. Aside from new monetary impositions, the April 28th complete draft compact

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

actually takes preexisting rights away in the hopes of making the State judgment proof. After realizing that it would likely have to disgorge the fruits of its prior unreasonable conduct in the compact litigation, the State changed the dispute resolution provisions so a tribe could not seek money or a bad faith finding against the State. In particular, the State rewrote the limited waiver of sovereign immunity in the compact to now exempt claims for restitution along with monetary damages, and also inserted a provision barring a tribe from bringing suit to pursue claims for violation of the compact or bad faith negotiation under Section 98005 of the Government Code. In other words, the State is using a contract to take away statutory rights.

173. Additionally, the April 28th complete draft compact does not even attempt to assuage the eight-plus years of contract rights the State obfuscated under the 1999 Compact by grossly limiting preexisting license rights so it could resell them in amended compact negotiations at prodigiously increased prices.

## FIRST CLAIM FOR RELIEF

### [Bad Faith Negotiation – Surface Bargaining/Shadow Boxing (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]

174. Pauma incorporates by reference the preceding general allegations as if set forth in full.

175. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

176. Good faith negotiation law prohibits a party from engaging in "surface bargaining" or "shadow boxing" whereby it employs dilatory tactics or other forms of "sophisticated pretense" to avoid reaching an agreement on a subject of negotiation. *See* 1 E. Allen Farnsworth, *Farnsworth on Contracts* § 3.26c. – Meaning of Fair Dealing (4th ed. 2003) (citing *Continental Ins. Co. v. NLRB,* 495 F.2d 33 (2d Cir. 1974)).

177. In this matter, the State refused to provide its position on the "preliminary"

issue of negotiable gaming rights for nearly eighteen months *even though* that was the subject of the first negotiation session and Dhillon promised to provide the State's position in writing shortly thereafter. After three in-person meetings and the exchange of at least twenty-two letters between the parties, the State simply transmitted a "complete draft [compact]" that it prepared for a different tribe to Pauma on April 28, 2016 that sought legions of new regulations and would simply confer the exact same gaming rights that the Tribe already possesses under the 1999 Compact.

178. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II,* 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

## SECOND CLAIM FOR RELIEF

### [Bad Faith Negotiation – Protectionism (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]

179. Pauma incorporates by reference the preceding general allegations as if set forth in full.

180. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

181. The legislative history of IGRA explains that Congress did not intend the class III compact requirement to be used "for the protection of other state-licensed gaming enterprises from free market competition with Indian tribes." *Crosby Lodge, Inc. v. Nat'l Indian Gaming Comm'n,* 803 F. Supp. 2d 1198, 1206 (D. Nev. 2011) (quoting S. Rep. No. 100-446 at 13 (1988)).

182. In this matter, representatives from the State actually admitted during the second negotiation session that they thought protectionism was a valid defense under

IGRA, and then insinuated that was what they were engaging in order to protect the revenue stream of the State Lottery. The protectionist strategy on the part of the State is evident from its refusal to discuss the "preliminary" scope of negotiation issue during three in-person meetings and at least twenty-two letters exchanged by the parties before simply sending Pauma a "complete draft [compact]" the State had prepared for another tribe that simply omitted any new games.

183. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II,* 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

## THIRD CLAIM FOR RELIEF

### [Bad Faith Negotiation – Refusal to Negotiate for/Reneging on On-Track Horse Wagering (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]

184. Pauma incorporates by reference the preceding general allegations as if set forth in full.

185. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

186. Case law interpreting the objective good faith negotiation requirement under IGRA explains that the refusal to negotiate for an available form of gaming is bad faith even if the State's position arose from a sincere but erroneous belief. *See Rincon II,* 602 F.3d at 1041 (explaining that a subjective belief in the legality of a request is insufficient to rebut the inference of bad faith created by an objectively improper position); *Mashantucket Pequot Tribe,* 913 F.2d at 1033 ("The statutory terms [of IGRA] are clear, and provide no exception for sincere but erroneous legal analyses.").

187. In this matter, on-track horse wagering is legal under Article IV, Section

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

19(b) of the State Constitution and conducted by a number of private entities throughout the State. Yet, the State refused to discuss on-track horse wagering during the second negotiation session and simply instructed Pauma to draft proposed compact terms for the State to consider at some future unspecified point. While counsel for Pauma was in the midst of formulating its position on horse wagering after transmitting proposed language for the new lottery games, Dhillon simply declined to continue negotiating in a piecemeal manner that would enable the parties to focus on the new games, choosing instead to simply send the Tribe a "complete draft [compact]" that the State had prepared for another tribe – one that says nothing about on-track horse wagering.

187. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II,* 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

## FOURTH CLAIM FOR RELIEF

**[Bad Faith Negotiation – Refusal to Negotiate for/Reneging on Lottery Games not Currently Authorized to the California State Lottery (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]**

188. Pauma incorporates by reference the preceding general allegations as if set forth in full.

189. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

190. Case law interpreting the objective good faith negotiation requirement under IGRA explains that the refusal to negotiate for an available form of gaming is bad faith even if the State's position arose from a sincere but erroneous belief. *See Rincon II,* 602 F.3d at 1041 (explaining that a subjective belief in the legality of a request is insufficient

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

to rebut the inference of bad faith created by an objectively improper position); *Mashantucket Pequot Tribe,* 913 F.2d at 1033 ("The statutory terms [of IGRA] are clear, and provide no exception for sincere but erroneous legal analyses.").

191. In this matter, lottery games are legal to the State Lottery under Article IV, Section 19(d) of the State Constitution, and statutory provisions permit the State Lottery to allow (or "authorize") itself to operate a virtually limitless number of lottery games. Moreover, tribes also have the right to operate "lottery games" under Article IV, Section 19(f) of the State Constitution. Despite this, in an anti-competitive move designed to protect the State Lottery, the State has taken the position that "[t]he grant of authority to the Governor to negotiate for lottery games under article IV, section 19, subdivision (f) of the California Constitution has always been understood to encompass those games authorized for play by the California State Lottery." After taking this stance, Dhillon simply transmitted a "complete draft [compact]" to Pauma that the State had prepared for another tribe that simply re-conveys the same gaming rights as the 1999 Compact, and would accordingly limit Pauma to offering only those lottery games the State Lottery has authorized itself to offer.

192. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II,* 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

## FIFTH CLAIM FOR RELIEF

### [Bad Faith Negotiation – Refusal to Negotiate for/Reneging on Video Lottery Terminals (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]

193. Pauma incorporates by reference the preceding general allegations as if set forth in full.

194. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet

to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

195. Case law interpreting the objective good faith negotiation requirement under IGRA explains that the refusal to negotiate for an available form of gaming is bad faith even if the State's position arose from a sincere but erroneous belief. *See Rincon II,* 602 F.3d at 1041 (explaining that a subjective belief in the legality of a request is insufficient to rebut the inference of bad faith created by an objectively improper position); *Mashantucket Pequot Tribe,* 913 F.2d at 1033 ("The statutory terms [of IGRA] are clear, and provide no exception for sincere but erroneous legal analyses.").

196. In this matter, lottery games are legal to the State Lottery under Article IV, Section 19(d) of the State Constitution, and statutory regulations permit the State Lottery to allow (or "authorize") itself to operate a virtually limitless number of lottery games. Moreover, tribes also have the right to operate "lottery games" under Article IV, Section 19(f) of the State Constitution. Despite this, in an anti-competitive move designed to protect the State Lottery, the State has taken the position that "[t]he grant of authority to the Governor to negotiate for lottery games under article IV, section 19, subdivision (f) of the California Constitution has always been understood to encompass those games authorized for play by the California State Lottery." Along with this, Dhillon explained that he would not negotiate for video lottery terminals without providing any basis for his position despite previously being requested to do so by Pauma. After taking this stance, Dhillon simply transmitted a "complete draft [compact]" to Pauma that the State had prepared for another tribe that simply re-conveys the same gaming rights as the 1999 Compact, and would accordingly limit the Tribe to offering only those lottery games the State Lottery has authorized itself to offer.

197. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II,* 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial

remedy is to permit the tribe to process gaming arrangements on an expedited basis").

## SIXTH CLAIM FOR RELIEF

### [Bad Faith Negotiation – Refusal to Negotiate for /Reneging on Video Lottery Games that Dispense Coins or Currency (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]

198. Pauma incorporates by reference the preceding general allegations as if set forth in full.

199. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

200. Case law interpreting the objective good faith negotiation requirement under IGRA explains that the refusal to negotiate for an available form of gaming is bad faith even if the State's position arose from a sincere but erroneous belief. *See Rincon II,* 602 F.3d at 1041 (explaining that a subjective belief in the legality of a request is insufficient to rebut the inference of bad faith created by an objectively improper position); *Mashantucket Pequot Tribe,* 913 F.2d at 1033 ("The statutory terms [of IGRA] are clear, and provide no exception for sincere but erroneous legal analyses.").

201. In this matter, lottery games are legal to the State Lottery under Article IV, Section 19(d) of the State Constitution, and statutory regulations permit the State Lottery to allow (or "authorize") itself to operate a virtually limitless number of lottery games. Moreover, tribes also have the right to operate "lottery games" under Article IV, Section 19(f) of the State Constitution. Despite this, in an anti-competitive move designed to protect the State Lottery, the State has taken the position that "[t]he grant of authority to the Governor to negotiate for lottery games under article IV, section 19, subdivision (f) of the California Constitution has always been understood to encompass those games authorized for play by the California State Lottery." Along with this, Dhillon explained that he would not negotiate for video lottery games that dispense coins or currency

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

without providing any basis for his position despite previously being requested to do so by Pauma. After taking this stance, Dhillon simply transmitted a "complete draft [compact]" to Pauma that the State had prepared for another tribe that simply re-conveys the same gaming rights as the 1999 Compact, and would accordingly limit Pauma to offering only those lottery games the State Lottery has authorized itself to offer.

202. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II,* 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

## SEVENTH CLAIM FOR RELIEF

### [Bad Faith Negotiation – Refusal to Negotiate for/Reneging on a Tribal Lottery System (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]

203. Pauma incorporates by reference the preceding general allegations as if set forth in full.

204. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

205. Case law interpreting the objective good faith negotiation requirement under IGRA explains that the refusal to negotiate for an available form of gaming is bad faith even if the State's position arose from a sincere but erroneous belief. *See Rincon II,* 602 F.3d at 1041 (explaining that a subjective belief in the legality of a request is insufficient to rebut the inference of bad faith created by an objectively improper position); *Mashantucket Pequot Tribe,* 913 F.2d at 1033 ("The statutory terms [of IGRA] are clear, and provide no exception for sincere but erroneous legal analyses.").

206. In this matter, lottery games are legal to the State Lottery under Article IV, Section 19(d) of the State Constitution, and statutory regulations permit the State Lottery

to allow (or "authorize") itself to operate a virtually limitless number of lottery games. Moreover, tribes also have the right to operate "lottery games" under Article IV, Section 19(f) of the State Constitution. Despite this, in an anti-competitive move designed to protect the State Lottery, the State has taken the position that "[t]he grant of authority to the Governor to negotiate for lottery games under article IV, section 19, subdivision (f) of the California Constitution has always been understood to encompass those games authorized for play by the California State Lottery." Along with this, Dhillon explained that he would not negotiate for a tribal lottery system without providing any basis for his position despite previously being requested to do so by Pauma. After taking this stance, Dhillon simply transmitted a "complete draft [compact]" to Pauma that the State had prepared for another tribe that simply re-conveys the same gaming rights as the 1999 Compact, and would accordingly limit Pauma to offering only those lottery games the State Lottery has authorized itself to offer.

207. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II,* 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

### EIGHTH CLAIM FOR RELIEF

**[Bad Faith Negotiation – Refusal to Negotiate for/Reneging on Lottery Games Authorized to the Multi-State Lottery Association or any other State (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]**

208. Pauma incorporates by reference the preceding general allegations as if set forth in full.

209. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

210. Case law interpreting the objective good faith negotiation requirement under IGRA explains that the refusal to negotiate for an available form of gaming is bad faith even if the State's position arose from a sincere but erroneous belief. *See Rincon II,* 602 F.3d at 1041 (explaining that a subjective belief in the legality of a request is insufficient to rebut the inference of bad faith created by an objectively improper position); *Mashantucket Pequot Tribe,* 913 F.2d at 1033 ("The statutory terms [of IGRA] are clear, and provide no exception for sincere but erroneous legal analyses.").

211. In this matter, lottery games are legal to the State Lottery under Article IV, Section 19(d) of the State Constitution, and statutory regulations permit the State Lottery to allow (or "authorize") itself to operate a virtually limitless number of lottery games. Moreover, tribes also have the right to operate "lottery games" under Article IV, Section 19(f) of the State Constitution. Despite this, in an anti-competitive move designed to protect the State Lottery, the State has taken the position that "[t]he grant of authority to the Governor to negotiate for lottery games under article IV, section 19, subdivision (f) of the California Constitution has always been understood to encompass those games authorized for play by the California State Lottery." Along with this, Dhillon explained that he would not negotiate for lottery games authorized to the Multi-State Lottery Association or any other state lottery without providing any basis for his position despite previously being requested to do so by Pauma. After taking this stance, Dhillon simply transmitted a "complete draft [compact]" to Pauma that the State had prepared for another tribe that simply re-conveys the same gaming rights as the 1999 Compact, and would accordingly limit Pauma to offering only those lottery games the State Lottery has authorized itself to offer.

212. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II,* 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

**NINTH CLAIM FOR RELIEF**

**[Bad Faith Negotiation – Failure to Produce Substantiating Evidence (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]**

213. Pauma incorporates by reference the preceding general allegations as if set forth in full.

214. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

215. Good faith negotiation law requires a party to substantiate any material position taken during the negotiations with supporting evidence. *See, e.g., NLRB*, 351 U.S. at 152-53 ("If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy."); *Press Democrat Publ'g Co.*, 629 F.2d at 1325 (explaining that the "[e]xchange of a broad range of information would seem to further the statutory policy of facilitating meaningful… bargaining.").

216. In this matter, counsel for Pauma sensed that the State would take an unreasonable position on the legality of the requested lottery games after invoking the dispute resolution process a year into the negotiations, and thus requested that the State "substantiate its position [on the lottery games topic] with supporting evidence." Despite this, Dhillon simply responded by advancing the legal argument that the drafters' "intent and understanding" of the tribes' constitutional right to conduct lottery games was to only "encompass those games authorized for play by the California State Lottery" – a position Dhillon took without providing any evidentiary support whatsoever. After taking this stance, Dhillon shifted the discussion away from the lottery games topic by simply transmitting a "complete draft [compact]" to Pauma that the State had prepared for another tribe that simply re-conveys the same gaming rights as the 1999 Compact (*i.e.*, slot machines, house banked card games, and only those lottery games that the State

Lottery has authorized itself to offer).

217. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II,* 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

**TENTH CLAIM FOR RELIEF**

**[Bad Faith Negotiation – Erecting Procedural Barriers (*North Fork* Claim) (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]**

218. Pauma incorporates by reference the preceding general allegations as if set forth in full.

219. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

220. Good faith negotiation law prohibits a party from "carv[ing] out additional procedural hurdles," as "doing so would render the duty to negotiate in good faith toothless." Order on Cross-Motions for Judgment on the Pleadings, *North Fork Rancheria v. California,* No. 15-00419, Dkt. No. 25, 22:25-23:7 (N.D. Cal. Nov. 13, 2015).

221. In this matter, the process began under the mandatory renegotiation provision of Section 12.2 of the 1999 Compact and/or 2004 Amendment, with Dhillon acknowled-ging in his initial December 15, 2014 response letter that "[t]he State agrees to commence discussions regarding a Compact which addresses the[ ] forms of gaming" sought. After a year of dodging the question of whether it would actually negotiate for those games, Dhillon simply shifted the basis for the discussions from the mandatory renegotiation provision of Section 12.2 to the voluntary amendment provision of Section 12.1. Though he assured Pauma that the discussions would still include the new forms of gaming

56                    Case No.: _____

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

sought by Pauma, Dhillon used this change in the basis for the negotiations to shift the discussion from what the State would *give* to what it would *receive*. As a consequence, Dhillon simply transmitted a "complete draft [compact]" to Pauma that the State had prepared for another tribe that incorporates legions of new regulations while simply re-conveying the same gaming rights of the 1999 Compact (*i.e.*, slot machines, house bank-ed card games, and only those lottery games that the State Lottery has authorized itself to offer).

222. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II,* 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

## ELEVENTH CLAIM FOR RELIEF

**[Bad Faith Negotiation – Offering Another Tribe's Compact without any Real Negotiation (*Pala* Claim I) (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]**

223. Pauma incorporates by reference the preceding general allegations as if set forth in full.

224. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

225. The basic requirement under IGRA is that a state conduct individualized, sovereign-to-sovereign negotiations with the tribe on the other side of the bargaining table. In fact, IGRA makes this clear by indicating the "State shall negotiate with the Indian tribe in good faith to enter into such a compact" (*see* 25 U.S.C. § 2710(d)(3)(A)) and then listing the seven categories of concessions a state can request during such negotiations. *See* 25 U.S.C. § 2710(d)(3)(C)(i)-(vii). The State's cognizance of this duty to negotiate one-one-one appears on the very face of the April 28, 2016 "complete draft

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

[compact]," as the recitals in the document indicate that the parties are interacting on a "sovereign-to-sovereign basis" with the goal of securing "mutual respect, and mutual benefits."

226. In this matter, the State did not conduct any individualized negotiations with Pauma. After feigning that it would negotiate for on-track horse wagering and lottery games not authorized to California State Lottery for nearly eighteen months, Dhillon simply threw in the towel and sent Pauma a "complete draft [compact]" that the State had negotiated with another tribe (and which that tribe would sign the following day). The April 28th "complete draft [compact]" is a carbon copy of this other compact, with the State simply changing specific material terms to Pauma's detriment – by, for example, reducing the maximum number of slot machines from 2,500 to 2,000, shortening the length of the term extension from twenty-five years to twenty, and then increasing the demanded amount of RSTF revenue sharing from 6% of net win to 8%. Simply put, Pauma commenced these negotiations to get something different (*i.e.*, new gaming rights) and the State simply offered more of the same pursuant to a compact it negotiated with another tribe.

227. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II*, 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

## TWELFTH CLAIM FOR RELIEF

### [Bad Faith Negotiation – Retribution-ism (*Pala* Claim II) (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]

228. Pauma incorporates by reference the preceding general allegations as if set forth in full.

229. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

1   to agree on the "preliminary" scope of negotiations issue let alone conclude a compact.

2   *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

3   230. The good faith inquiry not only looks at the language of the agreement, but

4   the "surrounding circumstances" as well after taking into account "[t]he previous

5   relations of the parties." 1 E. Allen Farnsworth, *Farnsworth on Contracts* § 3.26c. –

6   Meaning of Fair Dealing (4th ed. 2003); *see Truitt Mfg. Co.,* 351 U.S. at 154-55

7   (explaining a court should look at "[t]he pervious relations of the parties, antecedent

8   events explaining behavior at the bargaining table, and the course of negotiations")

9   (Frankfurter, J., concurring). After all, [i]f those parties have dealt with each other on

10  other occasions, the pattern of those earlier negotiations may help to show their

11  expectations in the negotiations in controversy." 1 E. Allen Farnsworth, *Farnsworth on*

12  *Contracts* § 3.26c. – Meaning of Fair Dealing (4th ed. 2003).

13  231. In this case, the State is on the hook for repaying Pauma $36.2 million that it

14  obtained from misrepresenting the Tribe's prior compact rights as part of a historic

15  money grab. At the culmination of the renegotiations, Dhillon simply offered Pauma a

16  compact that it had negotiated with the neighboring tribe the Pala Band of Mission

17  Indians save for making certain provisions more onerous, such as raising the amount of

18  revenue sharing the Tribe would have to pay into the RSTF from 6% to 8%. *See* Office of

19  Governor Edmund G. Brown, Jr., Tribal-State Compact between the State of California

20  and the Pala Band of Mission Indians § 5.2(a) (May 6, 2016), *available at*

21  https://www.gov.ca.gov/docs/5.9.16_Compact.pdf (last visited June 28, 2016). Dhillon

22  did this despite the fact that Pauma operates a substantially smaller and substantially less

23  profitable gaming facility than the Pala Casino Resort; in other words, the State is trying

24  to charge more in taxes even though Pauma makes significant less in revenue/income.

25  This disparity in RSTF payments is not unique to Pala, as the State also recently negot-

26  iated compacts with the Santa Ynez Band of Mission Indians (who like Pala operates

27  2,000 machines within a destination resort casino) amongst others that similarly only

28  require payments of 6% of net win into the SDF. *See, e.g.,* Office of Governor Edmund

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

G. Brown, Jr., Tribal-State Compact between the State of California and the Santa Ynez Band of Mission Indians § 5.2(a) (Aug. 26, 2015), *available at* https://www.gov.ca.gov/docs/8.26.15_Santa_Ynez_Compact.pdf (last visited June 30, 2016). Thus, what the State is doing is engaging in retribution-ism, singling out Pauma by demanding higher revenue sharing rates (even though it operates a substantially smaller and less profitable casino) in order to offset any monies the State may have to pay as part of the restitution award in the prior compact litigation.

232. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II,* 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

## THIRTEENTH CLAIM FOR RELIEF

**[Bad Faith Negotiation – Removing Preexisting Rights to Make the State Judgment Proof (*Pauma* Claim I) (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]**

233. Pauma incorporates by reference the preceding general allegations as if set forth in full.

234. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

235. The good faith inquiry not only looks at the language of the agreement, but the "surrounding circumstances" as well after taking into account "[t]he previous relations of the parties." 1 E. Allen Farnsworth, *Farnsworth on Contracts* § 3.26c. – Meaning of Fair Dealing (4th ed. 2003); *see Truitt Mfg. Co.,* 351 U.S. at 154-55 (explaining a court should look at "[t]he pervious relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations") (Frankfurter, J., concurring). After all, [i]f those parties have dealt with each other on

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

other occasions, the pattern of those earlier negotiations may help to show their expectations in the negotiations in controversy." 1 E. Allen Farnsworth, *Farnsworth on Contracts* § 3.26c. – Meaning of Fair Dealing (4th ed. 2003).

236. In this matter, the State frustrated over eight years of compact rights under the 1999 Compact by issuing an unreasonable interpretation of the total number of slot machine licenses and inducing Pauma to execute a prodigiously more costly amendment. Though Pauma was able to rescind the 2004 Amendment and obtain an order requiring the State to pay restitution, the only way it was able to do this is because of the waivers in Section 9.4(a) of the 1999 Compact and in Section 98005 of the Government Code. Yet, in order to insulate itself from having to atone for future bad faith behavior, the State has not simply committed to acting in good faith, but has instead inserted provisions into the April 28th "complete draft [compact]" to make itself judgment proof. First, the State updated the limited waiver that used to be in Section 9.4(a) of the 1999 Compact (and is now in Section 13.4(a)) to remove claims for restitution as well as damages. Second, the State inserted another provision at Section 13.4(d) explaining that the tribe may not invoke the waiver in Government Code Section 98005 that is the sole grounds for a tribe seeking either the statutory "bad faith" remedy under IGRA or to hold the State liable for breaching its compact obligations (as it has been known to do). Thus, the State is requir-ing Pauma to contract away statutory and other rights that protected the Tribe from the State's prior wanton conduct, which it shows no signs of abating.

237. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II,* 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

///

///

///

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

1

**FOURTEENTH CLAIM FOR RELIEF**

2

**[Bad Faith Negotiation – Failing to Offer Commensurate Rights to Make-up for the**
3 **State Unreasonably Frustrating Rights under the 1999 Compact (*Pauma* Claim II)**
**(25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]**

4

238. Pauma incorporates by reference the preceding general allegations as if set
5 forth in full.

6

239. More than one-hundred and eighty (180) days have elapsed since Pauma's
7 November 24, 2014 formal request to commence renegotiations and the parties have yet
8 to agree on the "preliminary" scope of negotiations issue let alone conclude a compact.
9 *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

10

240. The good faith inquiry not only looks at the language of the agreement, but
11 the "surrounding circumstances" as well after taking into account "[t]he previous
12 relations of the parties." 1 E. Allen Farnsworth, *Farnsworth on Contracts* § 3.26c. –
13 Meaning of Fair Dealing (4th ed. 2003); *see Truitt Mfg. Co.,* 351 U.S. at 154-55
14 (explaining a court should look at "[t]he pervious relations of the parties, antecedent
15 events explaining behavior at the bargaining table, and the course of negotiations")
16 (Frankfurter, J., concurring). After all, [i]f those parties have dealt with each other on
17 other occasions, the pattern of those earlier negotiations may help to show their
18 expectations in the negotiations in controversy." 1 E. Allen Farnsworth, *Farnsworth on*
19 *Contracts* § 3.26c. – Meaning of Fair Dealing (4th ed. 2003).

20

241. In this matter, the State frustrated over eight years of compact rights under the
21 1999 Compact by issuing an unreasonable interpretation of the total number of slot
22 machine licenses and thereby inducing Pauma to execute a prodigiously more costly
23 amendment. After the district court awarded rescission of the 2004 Amendment, Pauma
24 took part in a series of settlement conferences with the State, before which the tribal
25 membership voted to simply seek an extension on the term of the 1999 Compact to make
26 up for the years of lost compact rights. From that point through the remainder of the court
27 proceeding, counsel for Pauma made it abundantly clear that the Tribe needed some

28

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

remedy that would return the years of compact rights under the 1999 Compact that the State frustrated. Despite being well aware of Pauma's position, the State simply offered the Tribe a compact proposal it had negotiated with a different tribe (and which that tribe would sign the following day) that includes more than twice as much regulation as the 1999 Compact and exponentially more revenue sharing. Never once did the State offer Pauma 1999 Compact rights for the period of time the State frustrated by compelling renegotiations so it could perpetrate its money grab under the 2004 Amendment.

242. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II*, 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

### FIFTEENTH CLAIM FOR RELIEF

**[Bad Faith Negotiation – Failure to Offer Meaningful Concessions for New Revenue Sharing Demands (*Rincon II* Claim) (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]**

243. Pauma incorporates by reference the preceding general allegations as if set forth in full.

244. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

245. According to the Ninth Circuit, "a state may, without acting in bad faith [in compact negotiations], request revenue sharing if the revenue sharing provision is (a) for uses 'directly related to the operation of gaming activities' in § 2710(d)(3)(C)(vii), (b) consistent with the purposes of IGRA, and (c) not 'imposed' because it is bargained for in exchange for a 'meaningful concession.' " *Rincon II,* 602 F.3d at 1033.

246. In this case, the State re-conferred the exact same gaming rights as under the

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

1999 Compact, offered an enhanced version of exclusivity that *might* provide for a slight reduction in payments if the State broke its prior promise and took back the exclusivity it previously granted to the tribes, and an extension of the term of the 1999 Compact (which is valid through June of 2022) of something less than twenty years. However, the Ninth Circuit already branded a more valuable form of enhanced exclusivity that would have enabled the signatory tribe to enjoin the non-tribal competitors from coming into the local market as "practically worthless" and of nothing "more than speculative value." *Id.* at 1038. On top of which, basic gaming rights that a tribe is entitled to obtain under IGRA – like additional machines or time – cannot serve as the basis for revenue sharing. *Id.* at 1039. Thus, the State simply re-conferred the gaming rights of the 1999 Compact (even though Pauma initiated the renegotiations to obtain *new* forms of games) and is now trying to increase Pauma's revenue sharing from a $315,000 payment into the RSTF to a RSTF payment of 8% of net win on machines over 350, an unspecified and unilaterally-determined sum into the SDF, and one if not more MOUs with local jurisdictions. For reference purposes, the last MOU Pauma executed with San Diego County under the 2004 Amendment required approximately $38 million in road improvement expenditures as well as yearly payments of $400,000 for sheriff service, $40,000 for the prosecution of casino-related crime, and $200,000 for a gambling addiction program.

247. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II*, 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

## SIXTEENTH CLAIM FOR RELIEF

### [Bad Faith Negotiation – Demanding Extraneous Regulations without Offering Meaningful Concessions (*Big Lagoon* Claim) (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]

248. Pauma incorporates by reference the preceding general allegations as if set

1    forth in full.

2          249. More than one-hundred and eighty (180) days have elapsed since Pauma's

3    November 24, 2014 formal request to commence renegotiations and the parties have yet

4    to agree on the "preliminary" scope of negotiations issue let alone conclude a compact.

5    *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

6          250. Akin to the *Rincon II* revenue sharing test, a state can request environmental

7    mitigation measures so long as the "such measures relate to gaming operations or can be

8    considered standards for the operation and maintenance of the Tribe's gaming facility…

9    [and] [t]he State… offer[s] concessions in exchange for its request." *Big Lagoon*

10   *Rancheria v. California,* 759 F. Supp. 2d 1149, 1161 (N.D. Cal. 2010), *aff'd,* 789 F.3d

11   947 (9th Cir. 2015).

12         251. In this case, the April 28th "complete draft [compact]" broadened the defin-

13   itions of "Gaming Facility" and "Project" so the State can now assert regulatory authority

14   over such things as roads, parking lots, hotels, utility or waste disposal systems, water

15   supplies, walkways, and any commercial enterprise that it may contend serves the gaming

16   facility. The Assistant Secretary opined on the legality of the scope of these definitions

17   when reviewing the Upper Lake compact in 2011, concluding that they "may encompass

18   the most expansive range of activities [to be regulated] in any compact approved, or

19   considered to have been approved, by the Department since the adoption of IGRA in

20   1988." In fact, according to the Assistant Secretary, one could read these terms to "apply

21   to tribal activities far removed from the conduct of gaming, and therefore clearly

22   unrelated to the operation of Class III gaming." Yet, despite trying to exceed the purview

23   of IGRA, the State did not offer any meaningful concessions in exchange for this broad

24   grant of authority to generally regulate the reservation.

25         252. This conduct amounts to bad faith negotiation by the State that necessitates

26   triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that

27   is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II,*

28   602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

remedy is to permit the tribe to process gaming arrangements on an expedited basis").

## SEVENTEENTH CLAIM FOR RELIEF

### [Bad Faith Negotiation – Including a Blank Check SDF Provision (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]

253. Pauma incorporates by reference the preceding general allegations as if set forth in full.

254. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

255. The good faith inquiry not only looks at the language of the agreement, but the "surrounding circumstances" as well after taking into account "[t]he previous relations of the parties." 1 E. Allen Farnsworth, *Farnsworth on Contracts* § 3.26c. – Meaning of Fair Dealing (4th ed. 2003); *see Truitt Mfg. Co.,* 351 U.S. at 154-55 (explaining a court should look at "[t]he pervious relations of the parties, antecedent events explaining behavior at the bargaining table, and the course of negotiations") (Frankfurter, J., concurring). After all, [i]f those parties have dealt with each other on other occasions, the pattern of those earlier negotiations may help to show their expectations in the negotiations in controversy." 1 E. Allen Farnsworth, *Farnsworth on Contracts* § 3.26c. – Meaning of Fair Dealing (4th ed. 2003).

256. In this case, the April 28th "complete draft [compact]" asks Pauma to pay into the SDF. The problem with this is the draft does not indicate the amount, and in fact the State unilaterally determines this amount according to the amounts it appropriates to *eight* agencies it claims are involved in the regulation of Indian gaming. In essence, the State has written itself a blank check to ask for whatever amount it wants during the first year of the agreement, which is a significant concern seeing that the State has accumulated four (and what should be five) bad faith findings in the past six years and previously misrepresented Pauma's rights under the 1999 Compact so it could increase its revenue

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

sharing receipts by 2,460%.

257. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II*, 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

**EIGHTEENTH CLAIM FOR RELIEF**

**[Bad Faith Negotiation – Demanding Double (or Triple) Payment of Local Regulatory Costs (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]**

258. Pauma incorporates by reference the preceding general allegations as if set forth in full.

259. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

260. The text of IGRA explicitly contemplates that a state may ask its tribal adversary to agree to "assessments… in such amounts as are necessary to defray the cost of regulating such [class III] activity." *See* 25 U.S.C. § 2710(d)(3)(C)(3).

261. However, this grant of authority to negotiate for regulatory assessments does not empower a state to ask a tribe to pay certain "regulatory" costs two or three times. Even though the State determines the amount of the SDF payment by looking at the budget appropriations for *eight* agencies it claims are involved in the regulation of Indian gaming, the actual purposes of the money include making grants to "local government agencies impacted by tribal government gaming." Despite this, the April 28th "complete draft [compact]" nevertheless still requires Pauma to "enter into agreements with local jurisdictions… for such undertaking and services that mitigate the impacts of the Gaming Facility." Then, if Pauma ever decides to increase the size of its gaming facility, it "shall enter into an enforceable written agreement with the County" to provide compensation

for "law enforcement, fire protection, emergency medical services and any other public services to be provided by the County to the Tribe for the purposes of the Tribe's Gaming Operation as a consequence of the Project," "programs designed to address gambling addiction," and the "mitigation of any effect on public safety attributable to the project." Thus, the April 28th "complete draft [compact]" positions local jurisdictions to double or triple dip on "regulatory" payments.

262. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II*, 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

## NINETEENTH CLAIM FOR RELIEF

**[Bad Faith Negotiation – Having the MOUs Evade Secretarial Review & Other Undiscovered Forms of Bad Faith (25 U.S.C. § 2710(d)(7)(A)(i) & Cal. Gov't Code § 98005)]**

263. Pauma incorporates by reference the preceding general allegations as if set forth in full.

264. More than one-hundred and eighty (180) days have elapsed since Pauma's November 24, 2014 formal request to commence renegotiations and the parties have yet to agree on the "preliminary" scope of negotiations issue let alone conclude a compact. *See* 25 U.S.C. §§ 2710(d)(7)(B)(i), (ii)(I).

265. IGRA enforces the duty to negotiate in good faith by requiring the Secretary of the Interior (or a delegatee) to review the terms of an executed compact. *See* 25 U.S.C. § 2710(d)(8). After the review, the Secretary can either explicitly approve or disprove the compact, or approve it by silence by withholding comment for 45 days after receipt. *See* 25 U.S.C. § 2710(d)(8)(A)-(D). A compact approved by silence "shall be considered to have been approved by the Secretary, but only the extent that the compact is consistent with the provisions of [IGRA]." *See* 25 U.S.C. § 2710(d)(8)(C).

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

266. This review power, however, turns on the State submitting the entire compact to the Secretary, and not inserting in "escape hatch" provisions that require the tribe to make significant revenue sharing outlays after the review is done. The MOUs the April 28th "complete draft [compact]" would require with the local jurisdictions are two such provisions. After all, the last MOU Pauma had to execute under the 2004 Amendment required upwards of $38 million in road improvement expenditures and annual payments of $400,000 for sheriff service, $40,000 for the prosecution of casino-related crime, and $200,000 for a gambling addiction program. If the information pertaining to these financial obligations were to go before the Secretary at the time of his review, he could determine whether all of the revenue sharing is legal or if certain portions should be struck down for violating the prohibition on taxation in Section 2710(d)(4) of IGRA. *See* 25 U.S.C. § 2710(d)(4). Yet, the State knows this and is trying to find a way to shoehorn in as much revenue sharing as possible by evading the Secretarial review process.

267. This conduct amounts to bad faith negotiation by the State that necessitates triggering the tripartite remedial process set forth in Section 2710(d)(7)(B) of IGRA that is designed to "expedite" negotiations. 25 U.S.C. § 2710(d)(7)(B)(i)-(vii); *see Rincon II,* 602 F.3d at 1041 (explaining the "function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis").

268. It is also worth noting that "it is States not tribes that have crucial information in their possession that will prove or disprove tribal allegations of failure to act in good faith." *Big Lagoon Rancheria v. California,* 2010 U.S. Dist. Lexis 69144, *14-15 (N.D. Cal. 2010) (citing S. Rep. No. 100-446 at 14 (1998)). While counsel for Pauma believes it has identified most of the grounds of bad faith arising from the "complete draft [compact]" or otherwise, the above rule goes to show that "there may be evidence in the possession of the State that bears on the reasonableness of its bargaining position" and reveals during the course of litigation other forms of bad faith that are not patently obvious. *Id.*

///

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

**PRAYER FOR RELIEF**

WHEREFORE, the Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation prays as follows:

1. That the Court find that the State failed to negotiate in good faith under Section 2710(d)(7)(B)(iii) of IGRA and trigger the statutory remedial scheme set forth in Section 2710(d)(7)(B)(iii)-(vii).

2. That the Court award Pauma its costs of suit and attorneys' fees as allowed by law or equity; and

3. That the Court award any other relief that may be available under the waivers in Section 9.4(a) of the 1999 Compact/2004 Amendment or Section 98005 of the Government Code as a result of the State's failure to negotiate in good faith.

RESPECTFULLY SUBMITTED this 1st day of July, 2016

PAUMA BAND OF MISSION INDIANS

By: */s/ Kevin M. Cochrane*
Cheryl A. Williams
Kevin M. Cochrane
caw@williamscochrane.com
kmc@williamscochrane.com
WILLIAMS & COCHRANE, LLP
42072 5th Street, Suite 103
Temecula, California 92590
Telephone: (619) 793-4809

70             Case No.: _____
COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS