1
2
3
4
5
6
7
8
9
10                **UNITED STATES DISTRICT COURT**
11            **SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PAUMA BAND OF LUISENO MISSION INDIANS OF THE PAUMA & YUIMA RESERVATION,<br><br>                   Plaintiff,<br><br>   v.<br><br>STATE OF CALIFORNIA, *et al.*,<br><br>                Defendants. | Case No. 16-cv-01713-BAS-JMA<br><br>**ORDER:**<br><br>(1) **DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 37);**<br><br>(2) **GRANTING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT (ECF No. 36); AND**<br><br>(3) **DIRECTING ENTRY OF JUDGMENT UNDER RULE 54(b)** |

## OVERVIEW

    This action stems from an effort to negotiate a new tribal-state gaming compact under the Indian Gaming Regulatory Act. The Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation ("Pauma" or "Tribe") seeks to offer new forms of gambling at its casino in Northern San Diego County. To make this possible, the Tribe entered into compact negotiations with the State of California and Governor Edmund G. Brown, Jr. (collectively, "State") to expand its gaming

rights. However, Pauma now claims the State has failed to negotiate with the Tribe in good faith. Pauma brings suit to trigger a remedial scheme that is designed to result in a new gaming compact.

Presently before the Court are Pauma's and the State's cross-motions for summary judgment on the Tribe's bad faith negotiation claims. (ECF Nos. 36, 37.) The parties have also submitted a joint record of their negotiations. (Joint Record of Negotiations ("JR"), ECF Nos. 32-1 to 32-4.) The Court held oral argument on the motions. (ECF No. 48.)

There is no shortage of animosity between the parties. When they commenced negotiations to reach a new gaming compact, Pauma and the State were embroiled in litigation concerning an amendment to the parties' operative compact. Unsurprisingly, the parties' negotiations became contentious and unproductive at times. But the joint record does not demonstrate the State has failed to negotiate in good faith. The State met with Pauma several times and expressed a willingness to agree that the Tribe could offer additional forms of gambling at its casino. The State also reached out to other parties for information and obtained sample agreements to help Pauma and the State negotiate a new compact. In addition, to guide the parties' future discussions, the State transmitted a first draft of a new compact. Although Pauma now takes issue with the terms proposed in this initial draft, the Tribe never objected to these terms or otherwise responded to the State's proposal. Finally, at the time Pauma stopped participating in the negotiations and filed this lawsuit, nothing indicated the State was unwilling to continue to negotiate with the Tribe to reach a compromise.

The Court cannot conclude on this record that the State has failed to negotiate in good faith. Consequently, for the following reasons, the Court denies Pauma's motion for summary judgment, grants the State's cross-motion for summary judgment, and directs entry of judgment on the claims at issue under Federal Rule of Civil Procedure 54(b).

# BACKGROUND

## I.    Indian Gaming Regulatory Act

There is a "weathered past between Native American tribes and the State of California" when it comes to tribal gaming, and the story starts well before the turn of the century. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1159 (9th Cir. 2015); *see also In re Indian Gaming Related Cases*, 331 F.3d 1094, 1095–1107 (9th Cir. 2003) ("*Coyote Valley II*").

"In the 1970s, some California tribes began to operate bingo halls on their lands as a way to generate revenue." *Coyote Valley II*, 331 F.3d at 1095. These operations "were controversial because the tribes generally refused to comply with state gambling laws, a situation that developed into a serious point of contention with [the] state government[]." *Id.* (alterations in original) (quoting *Flynt v. Cal. Gambling Control Comm'n*, 104 Cal. App. 4th 1125, 1132 (2002)).

California responded by attempting to enforce its "bingo statute" against the tribes. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 206 (1987); *see also* Cal. Penal Code § 326.5. A dispute erupted between the State and two tribes, culminating in the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 206 (1987). The tribes prevailed—the Supreme Court held California lacked the authority to enforce its bingo statute on tribal lands. *Id.* at 221–22.

"After the Court's decision in *Cabazon*, States sought recourse on Capitol Hill." *Coyote Valley II*, 331 F.3d at 1096. Within a year, "Congress attempted to strike a delicate balance between the sovereignty of states and federally recognized Native American tribes by passing" the Indian Gaming Regulatory Act ("IGRA" or "Act"), 25 U.S.C. §§ 2701–21. *Pauma*, 813 F.3d at 1160. To summarize the Act:

//

//

> IGRA was Congress' compromise solution to the difficult questions involving Indian gaming. The Act was passed in order to provide "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and "to shield [tribal gaming] from organized crime and other corrupting influences to ensure that the Indian tribe is the primary beneficiary of the gaming operation." 25 U.S.C. § 2702(1), (2). IGRA is an example of "cooperative federalism" in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme.

*Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1092 (E.D. Cal. 2002) (alteration in original), *aff'd*, 353 F.3d 712 (9th Cir. 2003).

To accomplish its purpose, IGRA "creates a framework for regulating gaming activity on Indian lands." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2028 (2014) (citing 25 U.S.C. § 2702(3)). "The Act divides gaming on Indian lands into three classes—I, II, and III." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 48 (1996). IGRA then "assigns authority to regulate gaming to tribal and state governments depending on the class of gaming involved." *Big Lagoon Rancheria v. California*, 789 F.3d 947, 949 (9th Cir. 2015) (en banc).

The final category—Class III gaming—"includes the types of high-stakes games usually associated with Nevada-style gambling." *Coyote Valley II*, 331 F.3d at 1097. "As a result, Class III gaming is subjected to the greatest degree of control under IGRA's regulations." *Pauma*, 813 F.3d at 1060. A tribe may conduct Class III gaming "only if such activities are conducted pursuant to a Tribal-State Compact entered into by the tribe and a state that permits such gaming, and the Compact is approved by the Secretary of the Interior." *Id.* (citing *Coyote Valley II*, 331 F.3d at 1097); *see also* 25 U.S.C. § 2710(d)(1), (3)(B). Thus, IGRA contemplates that a tribe and the relevant state shall negotiate to enter into a compact that (i) permits Class III gaming and (ii) may address various regulatory issues related to this type of gaming. 25 U.S.C. § 2710(d)(3)(A), (C).

## II.    1999 Gaming Compact

"Despite IGRA's negotiation and compact framework, several unresolved conflicts . . . developed between the State of California and Indian tribes surrounding class III gaming and, especially, gaming devices in casinos. *See Hotel Emps. & Rest. Emps. Int'l Union v. Davis*, 21 Cal. 4th 585, 596 (1999).  In particular, "[s]ome gubernatorial administrations were hostile to tribes conducting Class III gaming because it was then prohibited by California's Constitution, and so the State refused to negotiate with the tribes to permit it." *Pauma*, 813 F.3d at 1160.

As a result, a coalition of tribes "went directly to the people of California" and "drafted and put on the November 1998 State ballot Proposition 5." *Coyote Valley II*, 331 F.3d at 1100.  Proposition 5 required the State to enter into a model compact with tribes to allow certain Class III gaming activities.  *Id.*; *see also Flynt*, 104 Cal. App. 4th at 1136.  Proposition 5 passed, but the tribes' victory was short-lived.  The California Supreme Court held that the gaming rights the proposition conferred on the tribes violated the California Constitution's "anticasino provision." *Hotel Emps.*, 21 Cal. 4th at 615.  "Undeterred, the voters of California responded by amending the California Constitution on March 7, 2000, to create an exception for certain types of Class III Indian gaming notwithstanding the general prohibition on gambling in the State." *Pauma*, 813 F.3d at 1161 (citing *Coyote Valley II*, 331 F.3d at 1103 & n.11).

Meanwhile, in 1999, a group of tribes had started negotiating with the State to enter into nearly identical compacts under IGRA.  *See Coyote Valley II*, 331 F.3d at 1101–07 (detailing the course of negotiations).  "In April 2000, Pauma joined more than sixty other tribes who ultimately signed" a copy of this compact—the "1999 Compact." *Pauma*, 813 F.3d at 1161.

Central to the 1999 Compact "is a formula to calculate the number of gaming devices California tribes are permitted to license." *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California*, 618 F.3d 1066, 1069 (9th Cir. 2010). "The total number of slot machines allowed was restricted by contract language that

authorized the continued operation of existing machines, permitted tribes who were not yet operating machines to operate up to 350 machines, and provided a formula for a limited license pool for the remaining machines." *Id.* at 1069. The agreement allocates these limited licenses "according to a detailed draw process." *Id.* at 1071. "The draw process, which includes tiers of priority for different tribes, was designed to skew the distribution of the available licenses towards those Compact Tribes that did not yet conduct large gaming operations." *Id.* Given that Pauma signed a copy of the 1999 Compact, the Tribe was subject to the limited license pool and this draw process.

### III. 2004 Amendment and Rescission

Over the next few years, an accounting agency—and then the State itself—administered various draws from the license pool under the 1999 Compacts. *See Colusa*, 618 F.3d at 1071–72. Yet, by the end of 2003, "the State informed the tribes that the collective license pool had been exhausted." *Pauma*, 813 F.3d at 1161. "At the time, Pauma was set to enter into a contract with Caesars to build a Las Vegas-style casino in place of Pauma's tent facility near San Diego, but needed more gaming licenses to do so." *Id.* at 1161–62; *see also Pauma Band of Luiseno Mission Indians v. Harrah's Operating Co.*, No. D050667, 2009 WL 3069578 (Cal. Ct. App. Sept. 28, 2009) (summarizing Pauma's plan to contract with Caesars to compete with the Rincon tribe, which had already associated with Harrah's to build a Nevada-style casino near Pauma's smaller casino). Thus, despite Pauma's request for 750 additional licenses from the license pool draw, it received only 200 licenses. *Pauma*, 813 F.3d at 1161.

To obtain the remaining licenses it needed, the Tribe started negotiating with the State to amend Pauma's iteration of the 1999 Compact "to abolish the license pool provision and gain access to an unlimited number of licenses." *Pauma*, 813 F.3d at 1161. The State in return "demanded substantially more money per operable license during negotiations." *Id.* (citing *Rincon Band of Luiseno Mission Indians v.*

*Schwarzenegger*, 602 F.3d 1019, 1025 (9th Cir. 2010)). Pauma succeeded in securing an amendment to the compact—the "2004 Amendment"—and the right to operate more machines, but the Tribe also agreed to pay substantially higher fees. *Id.* Pauma's annual payment for the 1,050 Class III gaming machines it was currently operating at its casino increased from $315,000 under the 1999 Compact to $7.75 million under the 2004 Amendment. *Id.*

As Pauma sought reprieve from the depleted gaming license pool through an amendment to the 1999 Compact, two other tribes adopted a different approach. They sued the State in federal court to challenge its "interpretation of the formula for the license pool" in the 1999 Compact, arguing the formula authorized more gaming licenses than the State claimed. *Colusa*, 618 F.3d at 1069. By this time, the "opaquely drafted and convoluted" license formula had caused the State and certain tribes to be "mired in disputes for much of the period since the bilateral Compacts were signed." *Id.* Ultimately, in 2010, after the district court ruled in favor of the tribes, the Ninth Circuit closely examined the murky license pool provisions. *Id.* at 1070, 1073–82. The Court of Appeals concluded that "40,201 licenses were authorized for distribution statewide through the license draw process." *Id.* at 1082. This amount was significantly more than the limit the State had placed on the license pool—approximately 23,500—when informing the tribes the pool was depleted. *See id.* at 1078.

While the federal court system resolved the other tribes' challenge to the license pool provision, Pauma's putative deals to expand its casino with a Las Vegas-style operator were falling through. *Pauma*, 813 F.3d at 1162. "[T]he economic recession of 2008 struck and no deal was ever completed." *Id.* at 1162 n.4. Consequently, Pauma was still operating its same 1,050 gaming devices at its casino. *Id.* Yet, the Tribe "continued paying California the exorbitantly expensive 2004 Amendment prices for the[se] same machines it acquired under the 1999 Compact provisions." *Id.*

Pauma took action: "Shortly after the district court's decision in the action challenging the license pool formula, Pauma filed a complaint asserting eighteen claims attacking the formation of the 2004 Amendment under various theories, including mistake and misrepresentation." *Pauma*, 813 F.3d at 1162. This prior litigation centered on whether the State had "misrepresented a material fact as to how many gaming licenses were available when negotiating with Pauma to amend its Compact." *See id.* at 1059–60. In April 2010, the district court "granted Pauma's request for injunctive relief from the annual $7.75 million payments, permitting Pauma to revert to the 1999 Compact rate." *Id.* at 1162. On interlocutory appeal, the Ninth Circuit "left the injunction in place but remanded to the district court for reconsideration of the preliminary injunction factors in light of recent cases," including—by then—the Ninth Circuit's decision interpreting the 1999 Compact's license pool formula summarized above. *Id.*

After several more years of litigation, the district court entered summary judgment in favor of Pauma on its misrepresentation claim against the State. *Pauma*, 813 F.3d at 1162. In 2015, the Ninth Circuit affirmed. *Id.* at 1167. The Ninth Circuit reasoned that the State misrepresented the number of licenses available because "[t]he formula for calculating the license pool never changed—it just took over a decade to reach a final judicial interpretation which settled a longstanding dispute over the number of licenses it authorized." *Id.* at 1166. Further, the State's representation to Pauma in 2003 that the license pool was depleted was material and induced Pauma to enter into the 2004 Amendment to acquire more gaming devices. *Id.* In light of this material inducement, the Court of Appeals held Pauma was entitled "to rescission of the amendment and restitution" in the amount of $36.2 million, which was the sum of the payments Pauma made under the 2004 Amendment in excess of what would have been owed under the original 1999 Compact. *Id.* at 1173.

Yet, the Tribe had hoped for greater relief. Although the district court's judgment discharged the 2004 Amendment's onerous obligations and allowed Pauma to recoup millions of dollars in payments, the Tribe was still left with the 1999 Compact and its limitations. Thus, prior to the appeal, Pauma had asked the district court to vacate its judgment to allow Pauma to again move for summary judgment on two claims alleging the State negotiated the 2004 Amendment in bad faith in violation of IGRA. *Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation v. State of California*, No. 3:09-cv-1955-CAB-MDD, 2014 WL 12570173, at *1–2 (S.D. Cal. June 6, 2014). Through this strategy, Pauma aspired to obtain an order compelling renegotiation of the agreement "so the Tribe can obtain a successor to [the 1999 Compact]." *Id.* at *2. The district court denied this additional relief, concluding:

> Although [] IGRA may allow a court to reform or rescind an unlawful agreement (which is what Pauma wanted until now), it does not allow the Court to turn back the clock and compel re-negotiation of an agreement actually reached ten years ago, let alone one that has been rescinded and never would have been negotiated in the first place in light of the relief the Court has already granted in this case.

*Id.* at *5.

Pauma cross-appealed this determination, but the appeal failed. *Pauma*, 813 F.3d at 1171–73. The Ninth Circuit agreed with the district court that IGRA's remedy for bath faith negotiation was inapplicable because Pauma had "agreed to the 2004 Amendment and did not challenge the negotiation process under IGRA" beforehand. *Id.*

## IV. Successor Compact Negotiations

It is against this backdrop—the 1999 Compact's limited license pool, an amendment based on unrealized hopes of expansion, and years of litigation to unwind the 2004 Amendment—that the present dispute emerges. As the parties appealed the district court's rulings in Pauma's action challenging the 2004 Amendment, the Tribe

set the gears in motion to possibly obtain a successor to the 1999 Compact by another avenue—new negotiations.  On November 24, 2014, Pauma sent the State a request to "commence formal renegotiations" pursuant to Section 12.2 of the 1999 Compact "and/or" the 2004 Amendment.  (JR 1.)  This provision states:

> This Gaming Compact is subject to renegotiation in the event the Tribe wishes to engage in forms of Class III gaming other than those games authorized herein and requests renegotiation for that purpose, provided that no such renegotiations may be sought for 12 months following the effective date of this Gaming Compact.

(1999 Compact § 12.2, ECF No. 1-2.)

To trigger this provision, Pauma identified two types of Class III gaming not authorized by the 1999 Compact that it wished to conduct.  (*See* JR 2.)  First, Pauma formally requested renegotiation "on the basis that the Tribe wishes to offer . . . on-track betting at an on-reservation horse track that it plans to construct following the renegotiation of the agreement(s)."  (*Id.*)  Second, Pauma stated it was seeking to offer additional types of lottery games at its casino.  (*Id.*)  The 1999 Compact allows Pauma to operate "any devices or games that are authorized under state law to the California State Lottery."  (1999 Compact § 3(c).)  Pauma sought to "supplement the lottery games it offers by obtaining the right to conduct any games that are *not* currently authorized under State law to the California State Lottery."  (*Id.*)  Further, Pauma identified in its request examples of unauthorized lottery games, including those games that "use traditional, non-electronic punchboards"; "are played on video terminals"; and "are part of a unique tribal lottery system."  (JR 2–3.)

Beyond identifying its desired new gambling rights, Pauma highlighted that the 1999 Compact provides that, following a request for renegotiation, "the 'parties shall confer promptly and determine a schedule for commencing negotiations within 30 days of the request,' and the renegotiations . . . 'shall be governed, controlled, and conducted in conformity with the provisions and requirements of IGRA, including those provisions regarding the obligation of the state to negotiate in good faith and

the enforcement of that obligation in federal court.'" (JR 3 (quoting 1999 Compact § 12.3).)  Finally, the Tribe requested that the negotiations be kept strictly confidential. (JR 3–4.)

On December 15, 2014, the State responded to Pauma's request, agreeing to commence negotiations regarding a compact that addresses the additional forms of gaming identified by Pauma, but noted that Class III gaming activities "not authorized in California" fall outside the governor's "constitutional authority to negotiate" and are "not appropriate subjects for inclusion in a Compact."  (JR 5 (citing 25 U.S.C. § 2710(d)(1)(B); Cal. Const. art. IV, § 19, subds. (e) & (f)).)  The State suggested an initial meeting on December 24, 2014, at the Governor's Office in Sacramento, California.  (*Id.*; *see also* JR 9 (explaining why this specific date was chosen to comply with the deadline in Pauma's letter and that the State had tried to discuss any scheduling issues with Pauma).)  The State also requested that the parties discuss at their initial meeting "preliminary issues, such as process and confidentiality, with the objective of confirming the scope of the confidentiality agreement, as raised in [Pauma's] letter, and a timeframe for, and the scope of, our negotiations."  (JR 6.)

Through the exchange of additional letters, in which the parties discuss accommodating schedules and who will attend the first meeting, the parties agreed to meet in San Diego, California, on January 16, 2015.  (JR 8–16.)

A.    **First Meeting**

At their initial meeting, the parties discussed preliminary matters and Pauma's potential horse racing venture.[1]  Because the State has never entered into an on-track horse racing compact with a tribe, it sought details into Pauma's operation, which Pauma deferred discussion of as premature because the Tribe was hesitant to

---

[1] There is no contemporaneous record of the parties' first negotiation meeting.  After the meeting, the parties exchanged letters in which they memorialize—and dispute—the content of their discussions.  (JR 17–22.)

"substantially invest in the project" before knowing whether it would "have the ability to conduct on track betting at all." (JR 18; *see also* JR 21.) The State pointed out that it had "entered into off-track wagering compacts and that those might be used as a starting point for Pauma's proposed facility." (JR 21.) Further, to facilitate the process, the State "offered to bring in someone from the California Horse Racing Board" to assist the parties with their discussions. (JR 18; *accord* JR 21.)

As to Pauma's request for expanded lottery games, the parties offer differing recollections of their discussions. (*Compare* JR 18, *with* JR 21–22.) The State's memorialization provides that it "asked for examples of the types of lottery games Pauma is considering," and that the Tribe's counsel "referred the State to the games listed in the Tribe's November 24, 2014 letter." (JR 21.) Pauma then referenced a prior Ninth Circuit decision concerning tribal gaming rights in California, to which the State then reiterated its "need to understand the scope of games that Pauma intends to offer to help identify issues and establish a legal framework for future negotiations." (JR 22.) Last, the State "suggested both sides research the general legal framework for the lottery games further," prior to the parties' next meeting. (*Id.*)

Pauma, on the other hand, recalls that the State—in addition to asking for legal support for Pauma's position—also described the expanded lottery games "issue as 'murky' and requiring further research." (JR 18.) Moreover, Pauma contends it asked the State to provide its "position in writing as to the games underlying the negotiations before the next meeting, and [the State] agreed to do so." (*Id.*) The State disputes this claim. (JR 22.)

Beyond the gaming rights issues, the State recalls that, upon being asked if the Tribe sought "further amendments to its compact," Pauma's counsel "responded that at this time the Tribe wishes to focus on the additional games and nothing broader." (JR 22.) Further, according to the State, "Pauma indicated it had prepared to discuss solely confidentiality and scheduling issues at the meeting," and the State's follow-

up letter notes that "it is hopeful" the parties "can discuss Pauma's proposals to operate a live horse racing facility and offer additional lottery games in more detail at [their] next meeting." (*Id.*)

Finally, the parties discussed scheduling their "next meeting in approximately May 2015, as the parties' participating attorneys face[d] appellate briefing deadlines over the next few months"—presumably related to the then-ongoing 2004 Amendment litigation. (JR 20; *see also* JR 18.)

## B.    Second Meeting

### 1.    Prelude

A few months passed before the parties reengaged. By this point, the tenor of the negotiations was quickly deteriorating. On May 8, 2015, Pauma sent the State a letter disputing California's summary of the parties' first meeting and reiterating the Tribe's position on its request for expanded lottery games. (JR 23–25.) Pauma's Chairman particularly took issue with the State's contention that it did not agree to provide its position on the expanded lottery games issue in writing before the next meeting:

> While sensitive to the fact that the State is resistant to put anything in writing out of fear of creating a coherent record for any future bad faith suit, I am more concerned by the amount of time and money Pauma may expend going through an undefined and seemingly inefficient process in which it may be simply spinning its wheels.

(JR 24.) The Tribe then requested that the State identify "before our next meeting . . . the games over which the State is and is not willing to negotiate." (*Id.*) Next, Pauma takes issue with the State's proposed process for formulating an on-track horse racing compact, with the Tribe asking the State to meet with the State Horse Racing Board "to formulate the State's position regarding the civil regulations it would like to negotiate for during forthcoming meetings." (JR 25.)

Last, after raising these grievances, Pauma asks to postpone the next negotiation meeting to accommodate the parties' appeals in the 2004 Amendment litigation:

> Although this letter may appear to ask a lot from the State on a relatively short schedule, the recent orders in the pending compact litigation have essentially guaranteed that our attorneys will be largely preoccupied until the oral argument scheduled for July 10, 2015.  In light of that, the prudent thing to do would be to delay ou[r] next negotiation session from the May 2015 date we contemplated during our first meeting to some point shortly following the scheduled date for the oral argument.

(JR 25.)

On May 27, 2015, the State responded to Pauma's communication, agreeing to transcribe the parties' future negotiations "so we can focus our energy on discussing and resolving issues, rather than arguing about statements made at prior meetings." (JR 26.)  The State also stood by its prior summary of the first meeting, characterizing "the Tribe's posture at that meeting" as being "primarily oriented towards seeking a legal position from the State without providing a clear description of the kinds of horse racing or lottery games it sought to conduct." (*Id.*)  Beyond this back-and-forth, the State requested Pauma's Chairman provide it with "dates in early August that would be convenient for you to meet in Sacramento so we can continue our discussions." (*Id.*)

Pauma's counsel replied to the State on August 5, 2015, and provided proposed dates at the end of the month for the parties to continue their negotiations. (JR 27.)  The Tribe also, again, conveyed its perception that the State was exhibiting a lack of willingness to negotiate for the expanded gaming rights Pauma requested:

> Given the lack of a concrete response from the State over the past eight months as to whether or not it is actually willing to negotiate for these rights, Pauma has no choice but to simply construe your silence as a tacit affirmation that these forms of games are indeed available so the discussion of terms that both parties seemingly desire can finally take place.

(JR 27.)

The parties continue to spar by correspondence as they settle on a date for their second meeting and discuss other miscellaneous matters. (JR 29–37.) Ultimately, the parties would agree to meet in Sacramento at the California Attorney General's Office on September 8, 2015, for a transcribed and recorded negotiation session. (JR 33–37.)

## 2. Negotiation Session

The parties discussed several topics at their second meeting. That being said, a disagreement is interspersed throughout their negotiations. This debate concerns how the parties should move towards reaching an actual compact. The State's negotiator, "having reviewed the back and forth," proposes that "the best way to move forward" is for Pauma to "just draft compact language on those two issues" that the Tribe feels needs "to be addressed in the compact." (JR 42.) The State justifies this request by stating it "will be the best way to at least move things forward so [the parties] are not just arguing about positions" and "are actually working on language that ultimately hopefully will lead to a compact." (JR 42–43.) Pauma, on the other hand, wants more input from the State before getting started. (JR 75–76.)

### i. Horse Wagering

As to substance, the parties first discussed Pauma's on-track horse wagering request. (JR 42–76.) Pauma expressed that it is "going to be very difficult for us to come up with what a horse racing compact is supposed to be -- look like." (JR 43.) Although the State previously entered into compacts providing for off-track wagering, these compacts are "15 or 20 pages" and "[r]elatively simple." (*Id.*) In contrast, Pauma stated a compact providing for operation of a horse race track potentially implicates a wide range of horse racing regulations that "cover a whole slew of things," like weeks of operation and charity racings. (JR 43; *see also* JR 50–51.) In response, the State asked Pauma to "do [its] best" and come up with a draft—with placeholders as necessary—to "start[] the ball moving." (*Id.*) The State also

explained that it brought the Executive Director of the California Horse Racing Board to the meeting because of the complexity of a tribe conducting on-track betting in California. (JR 44.)

During this discussion, the Executive Director informed Pauma that he believes the Tribe's involvement with the horse racing business "would be very well received" because it is "a declining industry" with "tracks closing." (JR 45.) The State also encouraged Pauma to include "off-track wagering" as part of its plans, and the State informed Pauma that it had worked with the Executive Director and his staff "to update the older provisions" in compacts concerning off-track wagering. (JR 46.)

After more discussion, the State requested that Pauma put together a "shell of something that lays out what" the Tribe is looking for, and the Tribe pushed back because it believed that creating a first draft would be "a massive undertaking," (JR 49), and there are "massive amounts of regulations" that the parties may need to consider, (JR 50). The State then repeats its willingness to work with Pauma, as tribal on-track wagering has not been done in California, and the State wants to "try to figure out the best way to do it." (JR 54–55.) The parties thereafter continued to discuss issues related to on-track wagering with the Executive Director, as well as continue their debate about Pauma needing to make the first attempt at a draft compact. (JR 56–76.)

### ii.    Supplemental Lottery Games

As for the lottery games issue, Pauma asks to "work on the language today." (JR 39.) Its counsel states that in his view, this issue is "incredibly simple" when compared to the horse racing topic. (JR 76–77.) The State, however, again asks Pauma to "put together something and [the State] will respond," with its preference to "just get the ball rolling with some exchange of documents so we can focus on language." (JR 78.)

Pauma then shares its position on the lottery issue, including what it believes is the relevant state law framework. (JR 43–47.) The State admits that "there is a question there," and that the parties may need to "go back and research the history" to determine if the Tribe can engage in lottery games beyond those games authorized to the California State Lottery. (JR 47.) The parties continue to debate this issue, until they reach a flashpoint:

Pauma's Counsel: . . . We just want the rights to do lottery games. And I know this is a sensitive area for the State since the [State] lottery makes like $5 billion per year.

State's Negotiator: Right. And it goes to all of our kids' education, right? I mean --

Pauma's Counsel: I know. And our kids can't even get education. And that's why we are trying to fix this, Joe.

. . . .

State's Negotiator: I mean, actually, to make the point, it does go to schools statewide, right?

. . . .

State's Negotiator: And it benefits all of our kids, right?

Pauma's Counsel: I get it. But you -- I don't know if protectionism is, like, a valid concern under IGRA, though. You know, there is a way to provide tribes with equal rights.

State's Counsel: Actually, it is valid under IGRA. If you look at IGRA, one of the things that the State is entitled to negotiate over is to protect its own gambling industry. I'm not suggesting we would do that. But that's expressed in IGRA.

Pauma's Counsel: That's a – that's a colorful interpretation . . . .

State's Counsel: It's straight language. It's not colorful interpretation.

1  (JR 52–55.)  Pauma presses onward, with the State eventually responding that the

2  issue is what exact games the state constitution may permit the Tribes to conduct

3  because the relevant constitutional provision simply states "lottery games."  (JR 56–

4  57.)

5      The parties take a break and return, but the negotiations quickly break down.

6  (*See generally* JR 96–109.)  Pauma's counsel starts employing sarcasm.  (*See* JR 102

7  (remarking that Pauma wants to race "some elephants" and "donkeys" at its track,

8  and it is "going to be something else").  And these comments draw the ire of the

9  State's negotiator.  (*See* JR 109 ("No.  You are being sarcastic.  And it's just

10  ridiculous.").)  Eventually, the State's negotiator expresses that he believes the

11  parties "can make a lot of progress on the horse racing side."  (JR 112.)  As to the

12  lottery issue, the State says, "we will see where that goes too.  I mean, let's get some

13  language and we will respond.  At least we will have a framework of – you know,

14  we'll have the issues . . . I mean, just arguing back and forth, with all respect, isn't

15  really moving us anywhere."  (JR 113.)

16                      ###  iii.    Scope of Negotiations

17      Toward the end of the parties' meeting, the State's negotiator asks to focus

18  "on the next step" and inquires: "What's the time line?  What do we need to do?"

19  (JR 114.)  These questions prompt Pauma's counsel to bring up the start date of the

20  future compact they are negotiating for.  (*Id.*)  Yet, when Pauma wants to broaden

21  the topics of discussion, the State resists.  (JR 117.)  Its negotiator emphasizes that

22  Pauma was "clear that it" only wanted to negotiate regarding "on-track horse racing

23  and issues related to lottery games."  (*Id.*; *see also* JR 120.)  The debate over this

24  issue quickly degenerates.  More sarcasm is employed by Pauma's counsel, again

25  drawing the ire of the State's negotiator.  (*See* JR 86–126.)

26      Needless to say, the parties make limited progress during the rest of the

27  meeting.  At the end, the State's position is twofold.  (JR 140.)  First, if Pauma seeks

28  to broaden the negotiations, the State requests that Pauma adhere to the 1999

Compact by sending a letter that clarifies the scope of the negotiations. (*Id.*) Second, the State asks Pauma to send the State "some compact language" regarding the horse racing and expanded lottery games issues. (*Id.*)

### C. Resolution of Scope of Negotiations Dispute

About a month later, Pauma sends the State a letter criticizing the State's conduct at the second meeting. (JR 174–81.) After acknowledging the meeting "had a promising start," Pauma characterizes the State as trying "to bring the meeting to an end" by asking Pauma to "unilaterally draft the horse racing and on-track wagering regulations for its compact by distilling down the many hundreds of pages of convoluted State laws that have developed over the past eighty years and now govern these activities." (JR 174.) Pauma's Chairman continues: "And this says nothing about the State's abject refusal to discuss the lottery games topic even when Pauma's counsel proposed a simple one sentence revision to the language currently in . . . the 1999 Compact . . . to account for those games that are . . . not 'authorized' to the California State Lottery[.]" (JR 175.)

In addition, Pauma objects—at length—to the State's position that the parties' negotiations are limited to the additional gaming rights Pauma identified in its initial request. (JR 176–77.) Pauma also suggests the State is dodging the cooperative negotiation process "simply because of bad feelings arising out [of the prior] litigation or a desire to protect the State Lottery from tribal competition." (JR 177.)

The State responds several weeks later. (JR 182–84.) It initially focuses on the parties' dispute as to the scope of negotiations. (JR 182–83.) After incorporating excerpts from the parties' prior letters, the State concludes:

> Pauma did not previously request to negotiate subjects outside of section 12.2. Pauma now seeks to expand the scope of the negotiations to include subjects not encompassed by section 12.2 and that the State has not agreed to renegotiate since receiving Pauma's November 24, 2014 letter. Under the terms of the compact, the State is under no obligation to renegotiate any matters beyond the scope of those identified in, or related to, your initial request and declines to do so.

(JR 183.)

The State also follows-up on the horse racing issue, noting that since the parties' last meeting, the State has "reached out to the National Indian Gaming Commission to obtain information regarding other tribes that may be conducting on-track betting." (JR 183.) The State shares the fruits of its effort by attaching a "Compact Addendum between the Sisseton-Wahpeton Sioux Tribe and the State of North Dakota addressing pari-mutuel horse racing" to serve as a reference for the parties' further discussions. (JR 183, 185–205.) In closing, the State reports that it is "preparing a draft off-track wagering compact for discussion and will forward it to you soon" and "look[s] forward to reviewing Pauma's proposals regarding a framework for final compact language addressing the new forms of gaming that it proposes to offer—horse racing and lottery games." (JR 184.)

Several weeks later, Pauma reacts to the State's steadfast position on the scope of negotiations by triggering the 1999 Compact's dispute resolution process. (JR 206.) In identifying the dispute, Pauma notes:

> The amount of time the parties have spent going in circles about these issues should eliminate any need to reiterate the problems let alone provide gross specificity, but it should go without saying that the prevailing dispute relates to the proper interpretation of Sections 12.2 and 12.3 of the compact, the position the State has taken in regards to such issues over the course of the last year of negotiations, whether the State has negotiated in good faith during this time, and related issues.

(JR 206.) The Tribe also expresses its "hope that the parties will approach the future meeting . . . and any ensuing ones in good faith, thereby eliminating any need for federal court involvement." (JR 207.)

Several days later, the State acknowledges Pauma's dispute resolution request and suggests the parties meet on December 4, 2015. (JR 208.) The State also summarizes the steps it has taken to move the parties forward on the horse racing issue and also attaches "for discussion a draft compact addendum that would authorize a satellite wagering facility." (*Id.*; *see also* JR 210–21.) As for the

expanded lottery games issue, the State notes that it has "asked for draft compact language and received nothing but lengthy letters from [Pauma] or [its] lawyers that seek to blame the State for the lack of progress, but fail to do anything to help the parties move forward towards the conclusion of a compact." (JR 209.)

In follow-up e-mails, the parties discuss scheduling and the location of the dispute resolution meeting. (JR 222–27.) Pauma presses for an in-person meeting near its reservation, but the State pushes back reportedly due to the short notice and a lack of contract carrier flights to San Diego on the agreed-upon date. (JR 225–27.) Pauma again presses the State, suggesting its representatives fly into Ontario instead. (JR 224.) The State's negotiator repels Pauma, taking issue with what the State believes is the Tribe's manipulation of the holiday season:

> With all due respect, your comments about inconvenience and difficulty of scheduling lack credibility and are difficult to take seriously when you requested this meeting . . . at approximately 9 p.m. on the evening before Thanksgiving . . . . It appears that you intentionally waited until the evening before a four day holiday weekend to request a meeting within ten days so you can find some basis to argue that the State is not in compliance with its compact obligations. You appear to be implementing a strategy of obtaining a compact by litigation rather than negotiation. IGRA should not be manipulated by either party to avoid the obligation to negotiate in good faith towards the conclusion of a compact. We have tried, and will continue to try to work with you in good faith. We worked over the holiday to provide a response and present draft compact language on the Monday after the holiday. Despite your many letters and e-mails, the State has yet to receive a single word of proposed compact language from the Tribe. I believe we'd do more to further the interests of the Tribe and the State if we spent more time on developing a compact, than arguing about scheduling.

(JR 223.)

The parties met on December 4, 2015, to discuss their scope of negotiations dispute. (JR 228.) Afterwards, Pauma e-mailed the State two letters to support the

Tribe's interpretation of the renegotiation provision of the 1999 Compact. (JR 228–33.) The State agreed to provide a response within a week. (*See* JR 228.)

The State did. (JR 234–35.) Its response provides that the "exchange of information, as well as the discussion at our meeting of December 4, 2015, was helpful to frame the disputed issue," but the State concludes its interpretation of the 1999 Compact's renegotiation provision, "as consistently applied, is supported by the specific compact language and reflects the intention and understanding of compact parties." (JR 234.) That said, the State agrees to broaden the scope of negotiations:

> However, rather than focus additional time and energy on this dispute, the State is amenable and now agrees, pursuant to section 12.1 of the compact, to enter into negotiations for a new or amended tribal-state gaming compact . . . . To be clear, this letter reflects the State's understanding that both parties are amenable to considering all aspects of the existing compact and other appropriate provisions to ensure that we are able to achieve our mutual objectives.

(JR 234.) Next, the State cautions Pauma that it is engaged in "compact negotiations with a large number of tribes," emphasizing that it is committed to develop a new compact but wants to "be up front with [the Tribe] about the demands on [the State's] time to ensure that we set realistic timeframes." (JR 235.) Finally, the State requests Pauma provide a date for a future meeting, and the State's negotiator notes that he is "amenable to conducting many of our meetings by phone to avoid cost and inconvenience and to allow us to focus our efforts on productive negotiations." (*Id.*)

Several days later, the Tribe replied to the State's offer "to negotiate under the voluntary negotiation provision of" the 1999 Compact. (JR 236.) The Tribe asks the State to confirm that negotiations under the voluntary provision will include the new forms of gaming Pauma is seeking. (*Id.*) The Tribe's Chairman then informs the State he will contact it "in short order about scheduling the next negotiation session and the issues" to be addressed at that meeting once the scope of the current negotiations are confirmed. (*Id.*)

16cv1713

A few weeks later, the State confirms that "the entire compact" is up for negotiation. (JR 238.) The State then reiterates that it "has provided Pauma with draft compact language on the issue of off-track betting and a complete compact previously approved by the Department of the Interior governing tribal horse racing in another state." (*Id.*) The State's response next provides: "We have requested, but not received, the Tribe's plans for on-track betting and proposed language regarding authorized lottery games. We look forward to receiving and reviewing such documentation as part of the next step in our negotiations to ensure they move forward in a constructive manner." (*Id.*)

**D.    The State's Draft Compact**

With the parties' dispute concerning the scope of negotiations resolved, Pauma's counsel sends the State a letter several weeks later. (JR 239–41.) The letter does not include further negotiation on the horse racing provision; it instead focuses solely on the Tribe's request for expanded lottery games. (JR 244–45.) Further, the Tribe's counsel tells the State:

> Pauma prefers to conduct the negotiations in a piecemeal fashion, focusing on one material issue and then moving on to the next only after the parties have largely agreed on language for the final compact. It is my view that structuring the negotiations in such a manner will foster productivity and allow the parties to seek court guidance regarding a particular issue should an impasse arise while simultaneously remaining free to negotiate the other issues that come under the ambit of these negotiations.

(JR 241.)

As to the lottery games, Pauma's counsel suggests "two revisions" to the 1999 Compact to provide the Tribe with the gaming rights it seeks. (JR 240–41.) These revisions involve inserting a definition for the term "Lottery" and amending the scope of permitted lottery games to broaden it to include at least nine categories of additional lottery games. (*Id.*) In closing, the Tribe informs the State that as it considers Pauma's letter, the Tribe "will begin to formulate positions on other

topics—including the horse racing—so the parties may turn to those once we have reached a consensus on the lottery provisions." (JR 241.)

When the State does not respond to Pauma's piecemeal negotiation proposal in the next several weeks, Pauma follows-up. (JR 242–43.) The Tribe emphasizes that it has been "four hundred and seventy (470) days since Pauma conveyed its request to commence renegotiations of the 1999 Compact" and "respectfully request[s] that the Office of the Governor expedite its response" to Pauma's most-recent proposal. (JR 242.)

In a response several weeks later, the State declines Pauma's offer to "conduct negotiations in a piecemeal fashion." (JR 244.) The State rationalizes:

> Such an approach has no basis in the dispute resolution framework created within the Indian Gaming Regulatory Act (IGRA) that governs the possibility of an impasse in the negotiations, limits the ability of the parties to achieve consensus by giving and taking on the wide range of issues that are addressed in bilateral compact negotiations, and is remarkably inefficient.

(*Id.*)

Next, in addressing Pauma's lottery games proposal, the State argues that the governor's authority to negotiate for lottery games under the California Constitution's tribal gaming provision "has always been understood to encompass those games authorized for play by the California State Lottery." (JR 244.) That said, the State tells Pauma that it "is willing to negotiate to authorize Pauma to offer certain additional lottery games to be enumerated in the compact." (*Id.*) The State continues:

> Specifying the games provides clarity as to the scope of the authorization, avoids future disputes between the parties, and mitigates the risk of running afoul of other prohibitions on how lottery games may be conducted, such as the keno game offered by the California State Lottery that was found to be an illegal banked game by the Supreme Court in *Western Telcon, Inc. v. California State Lottery* (1996) 13 Cal. 4th 475.

(*Id.*)  "Furthermore, the State expressly takes issue with Pauma's ability under IGRA to seek to negotiate 'devices or games that are authorized to any other state lottery or any other multi-state lottery association,' 'lottery games that are played on video terminals,' 'tribal lottery systems' or other lottery systems to the extent operated or conducted off tribal lands, and 'video lottery games that dispense coins or currency.'" (JR 244–45.)  Finally, the State tells Pauma that it will provide the Tribe with "a complete draft document to guide our future discussions within the next few weeks." (JR 245.)

Several weeks later, the State sends Pauma a "draft compact" by e-mail.  (JR 246–382.)  In a margin comment to the draft compact's authorization of Class III gaming, the State notes that it "is open, as indicated in prior correspondence, to discussion regarding the authorization of additional enumerated [lottery] games." (JR 261.)  The State also comments that it "has proposed" an off-track wagering compact "that can be incorporated as an Appendix or negotiated and concluded as a separate class III gaming compact."  (*Id.*)  Pauma, however, did not respond to either the State's letter explaining its position on the additional lottery games or its proposed draft compact.

## V.    **This Action**

A few months later, the Tribe filed this action.  In its Second Amended Complaint, Pauma brings a torrent of twenty claims against the State for "bad faith negotiation" under IGRA.  (Second Am. Compl.  ("SAC") ¶¶ 210–310.)  The Tribe requests that this Court "find that the State failed to negotiate in good faith under Section 2710(d)(7)(B)(iii) of IGRA and trigger the statutory remedial scheme set forth in Section 2710(d)(7)(B)(iii)-(vii)."  (*Id.* Prayer ¶ 1.)  Pauma now moves for summary judgment on sixteen of its bad faith claims.  (ECF No. 37.)  The State, in turn, moves for summary judgment on all twenty of Pauma's IGRA claims.  (ECF No. 36.)

## LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.*

## ANALYSIS

### I. IGRA's Good Faith Requirement

IGRA provides that—upon receiving a tribe's request to negotiate a compact permitting Class III gaming—"the State shall negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710. Provided that 180 days have elapsed since the tribe's request to negotiate, the tribe "may initiate a cause of action" in federal court "arising from the failure of a State . . . to conduct such negotiations in good faith."[2] *Id.* § 2710(d)(7)(A)(i), (B)(i).

---

[2] In *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), the Supreme Court gutted IGRA's enforcement mechanism, holding that the Eleventh Amendment bars tribes from suing states in federal court for failing to negotiate in good faith. The State of California, however, has waived its sovereign immunity to Pauma's IGRA claims. *See* Cal. Gov. Code § 98005 (providing the State "submits to the jurisdiction of the courts of the United States" for a tribe's claim "arising from the state's refusal to enter into negotiations with that tribe for the purpose of entering into a different Tribal-State compact pursuant to IGRA or to conduct those negotiations in good faith, the state's refusal to enter into negotiations concerning the amendment of a Tribal-State compact to which the state is a party, or to negotiate in good faith concerning that amendment"); *see also Hotel Emps.*, 21 Cal. 4th at 615 (noting the final sentence of California Government Code § 98005 is "obviously intended to restore to California tribes the remedy provided in IGRA" that became ineffective after *Seminole Tribe*).

IGRA does not define the term "good faith."  *See* 25 U.S.C. § 2710; *see also id.* § 2703 (listing definitions for the Act).  But the statute does provide that in evaluating whether a state has negotiated in good faith, the court:

> (I)     may take into account the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities, and
>
> (II)    shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith.

*Id.* § 2710(d)(7)(B)(iii).  Further, in addition to providing these two criteria for assessing good faith, IGRA lists seven permissible negotiation topics for tribal-state compacts.  *Id.* § 2710(d)(3)(C).  The compact may include "provisions relating to" any of the following:

> (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of [gaming] activity;
>
> (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;
>
> (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
>
> (iv) taxation by the Indian tribe of such activity in such amounts comparable to amounts assessed by the State for comparable activities;
>
> (v) remedies for breach of contract;
>
> (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
>
> (vii) any other subjects that are directly related to the operation of gaming activities.

*Id.*  These seven topics, however, are "circumscribed by one key limitation on state negotiating authority: 'Except for any assessments that may be agreed to under [§ 2710(d)(3)(C)(iii)], nothing in this section shall be interpreted as conferring upon a State . . . authority to impose any tax, fee, charge, or other assessment upon an Indian tribe . . . .'" *Rincon*, 602 F.3d at 1028 (quoting 25 U.S.C. § 2710(d)(4)).  "IGRA limits permissible subjects of negotiation in order to ensure that tribal-state compacts cover only those topics that are related to gaming and are consistent with IGRA's stated purposes."  *Id.* at 1028–29 (footnotes omitted).

Given IGRA's structure, the Ninth Circuit has reasoned "that the function of the good faith requirement and judicial remedy is to permit the tribe to process gaming arrangements on an expedited basis, not to embroil the parties in litigation over their subjective motivations."  *Rincon*, 602 F.3d at 1041.  Consequently, "good faith should be evaluated objectively based on the record of negotiations, and . . . a state's subjective belief in the legality of its requests is not sufficient to rebut the inference of bad faith created by objectively improper demands."  *Id.*

Beyond this guidance, "IGRA's legislative history also makes clear that the good faith inquiry is nuanced and fact-specific, and is not amenable to bright-line rules."  *See Coyote Valley II*, 331 F.3d at 1113; *see also* S. Rep. No. 100–446, at 14 (1988) ("The terms of each compact may vary extensively depending on the type of gaming, the location, the previous relationship of the tribe and State, etc.").  Further, a state is not "guilty of bad faith" in compact negotiations simply because "it takes a 'hard line' negotiating position" with the tribe.  *See Rincon*, 602 F.3d at 1038.  "[A] 'hard line' stance is not inappropriate *so long as* the conditions insisted upon are related to legitimate state interests regarding gaming and the purposes of IGRA."  *Id.* at 1039 (emphasis in original).  Yet, if the "hard line" position "results in a 'take it or leave it offer' to the tribe to either accept nonbeneficial provisions" outside the scope of those topics authorized by IGRA or go without a compact, the State acts in bad faith.  *See id.*

IGRA also includes a burden-shifting mechanism for bad faith claims. The initial burden is on the tribe, which must introduce evidence that: (1) "a Tribal-State compact has not been entered into"; and (2) the State has either failed to respond to the tribe's request "in good faith" or has failed to respond to the request altogether. 25 U.S.C. § 2710(d)(7)(B)(ii)(I)–(II). The burden of proof then shifts to "the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities." *Id.* § 2710(d)(7)(B)(ii).

If the court concludes the state has failed to negotiate in good faith, IGRA provides for a multi-step remedy. First, the court shall order the state and tribe to conclude "a compact within a 60-day period." 25 U.S.C. § 2710(d)(7)(B)(iii). If, however, the parties are still unsuccessful in reaching an agreement, they must "submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact." *Id.* § 2710(d)(7)(B)(iv). The mediator then chooses the proposed compact that "best comports with the terms of [IGRA] and any other applicable Federal law and with the findings and order of the court." *Id.* Finally, "[i]f the State does not accept the mediator's chosen compact within 60 days, the Secretary of the Interior shall prescribe, consistent with the mediator's chosen compact and with the terms of IGRA, the conditions upon which the tribe may engage in class III gaming." *Coyote Valley II*, 331 F.3d at 1098 (citing 25 U.S.C. 2710(d)(7)(B)(vii)).

There are two significant decisions from the Ninth Circuit interpreting the good faith requirement—both involving the State of California—that further guide this Court.

**A.    *Coyote Valley***

In *Coyote Valley II*, 331 F.3d 1094 (9th Cir. 2003), the Ninth Circuit applied IGRA's good faith standard to consider a challenge to several provisions in the 1999 Compact. There, the court summarized the lengthy background underpinning the

1999 Compacts, including California's negotiations with various tribes to formulate this agreement. *Id.* at 1095–1106. The plaintiff Coyote Valley tribe initially signed a letter of intent to enter into the 1999 Compact, but it then held off over concerns with the agreement. *Id.* at 1106. The tribe ultimately brought suit against California alleging bad faith negotiation, and the district court ruled against the tribe. *Id.* at 1107.

On appeal, the Ninth Circuit classified Coyote Valley's bad faith arguments into "two kinds." *Coyote Valley II*, 333 F.3d at 1109. First, the court considered the tribe's "procedural" objection "that the State's conduct during negotiations— specifically its dilatory tactics over the course of a seven-year period—constitutes bad faith." *Id.* Having reviewed "the history of negotiations," the Ninth Circuit held it could not "conclude. . . as a procedural matter, the State has refused to negotiate in good faith." *Id.* It reasoned that the record showed California Governor Gray Davis's Administration had "actively negotiated" with the tribes, "including Coyote Valley," despite that the Davis Administration did not have the obligation to do so before the ratification of the state constitutional amendment permitting tribal gaming. *Id.* at 1110. "Moreover, at the time Coyote Valley filed its amended complaint with the district court . . . , the State remained willing to meet with the tribe for further discussions." *Id.* Thus, the Ninth Circuit concluded that to the extent the tribe had a "valid objection to negotiations by the Davis Administration," the objection was to the substance of several provisions in the 1999 Compact, not "to the timing and procedures of" the negotiations. *Id.*

Turning to the tribe's substantive objections, the Ninth Circuit analyzed Coyote Valley's challenges to three provisions contained in the 1999 Compact. *Coyote Valley II*, 333 F.3d at 1109. The first provision was the 1999 Compact's establishment of a "Revenue Sharing Trust Fund" "that grants a maximum of $1.1 million dollars to each of the State's non-gaming tribes each year." *Id.* at 1105 (citing 1999 Compact § 4.3.2.1.). This revenue sharing fund is financed by the compacting

tribes' gaming device license fees. *Id.* Coyote Valley argued that because this fund "requires payments from compacting tribes that go beyond amounts necessary to defray the costs incurred by the State in regulating class III gaming," the fund "provision cannot properly be included in a Tribal-State compact." *Id.* at 1110. And, to draw it all together, Coyote Valley argued that California negotiated in bad faith by "insisting that this forbidden provision be included in the compact." *Id.*

The Ninth Circuit was unconvinced. *Coyote Valley II*, 333 F.3d at 1111. It reasoned that IGRA provides a compact "may include provisions relating to . . . subjects that are directly related to the operation of gaming activities," and the revenue sharing fund provision "falls within the scope" of this topic. *Id.* Further, the sharing of gaming revenue with non-gaming tribes advances IGRA's goal of promoting tribal economic development and self-sufficiency. *Id.* Finally, the State had offered meaningful concessions in exchange for this provision by negotiating for Class III gaming and supporting an amendment to its constitution "to grant a monopoly to tribal gaming establishments." *Id.* at 1112.

The Ninth Circuit performed a similar analysis for the remaining two challenged provisions, which concerned labor relations and a fund that the tribes had to pay into to support "programs designed to address gambling addiction" and "state and local government agencies impacted by tribal gaming. *Coyote Valley II*, 333 F.3d at 1106–07, 1113–17. The Court concluded these provisions also did not violate IGRA. *Id.* at 1115–17. Thus, having resolved Coyote Valley's procedural and substantive objections in the State's favor, the Ninth Circuit concluded that the State did not act in bad faith. *Id.* at 1095, 1117.

## B. *Rincon Band of Luiseno Mission Indians v. Schwarzenegger*

With a shift in gubernatorial administrations, the landscape changed by the time the Rincon tribe sought to renegotiate certain provisions of the 1999 Compact in 2003. *See Rincon*, 602 F.3d at 1024. Rincon, one of Pauma's competitors in the gambling industry, had "began to generate significant revenue that enabled it to

improve tribal governmental functions and become economically self-sufficient" and wished "to expand its operations beyond what the 1999 compact permitted." *Id.* However, instead of asking in negotiations for "funds to help defray the costs of gaming, or to benefit Indian tribes, the State demanded that Rincon pay a significant portion of its gaming revenues into the State's general fund." *Id.* Rincon countered that it would pay some fees per gaming device, but emphasized that the proceeds "had to be limited to paying for the costs of regulating gaming, building infrastructure needed to support gaming operations, and mitigating adverse impacts caused by gaming operations." *Id.* at 1025. "The State held firm in its demand that a portion of tribal gaming revenues be paid into the State's general fund, rather than into an earmarked fund." *Id.* Rincon re-countered, "offering slightly increased per device fees," and this back-and-forth continued until the parties "reached an impasse" approximately a year after the State's initial revenue-sharing demand. *Id.* at 1025–26. The parties then filed cross-motions for summary judgment, and the district court ruled in favor of Rincon. *Id.* at 1026.

The State appealed, and the Ninth Circuit applied IGRA's burden-shifting framework. *See Rincon*, 602 F.3d at 1029. The court initially reasoned that once Rincon offered evidence that the State attempted to "impose taxation" through its demands—over Rincon's objections—for payments into the State's general revenue fund, the burden shifted to the State to prove it had negotiated with Rincon in good faith. *See id.* at 1029–32, 1038–39. The Ninth Circuit "conclude[d] that the State failed to meet its burden." *Id.* at 1029.

In reaching this result, the Ninth Circuit distilled its reasoning from *Coyote Valley II* and applied it to the State's expanded general fund revenue request, which exceeded the scope of the revenue requests analyzed in *Coyote Valley II* concerning payments into specialized, gaming-related funds. *Rincon*, 602 F.3d at 1032–40. Then, after concluding "that general fund revenue sharing is neither authorized by IGRA nor reconcilable with its purposes," the Ninth Circuit rationalized that where

"the State demands significant taxes and fails to offer any 'meaningful concessions' in return, a finding of bad faith is the only reasonable conclusion." *Id.* at 1036 (emphasis omitted). Accordingly, the Court of Appeals also examined whether the State had offered Rincon any meaningful concessions, and found that it did not. *Id.* at 1036–40. Hence, the State's hard line position on general fund revenue sharing forced the tribe to either choose between going without an amended compact or accepting provisions outside the permissible scope of IGRA's negotiation topics. *Id.* at 1039. And forcing this choice on the tribe amounted to bad faith on behalf of the State. *Id.* at 1042.

## II. Pauma's Bad Faith Negotiation Claims

The Court turns to applying this framework to Pauma's twenty claims for bad faith negotiation under IGRA. All of these claims arise from the same course of negotiations summarized above. For each claim, Pauma highlights either an aspect or specific part of the negotiations and alleges that the State's conduct shows a lack of good faith. The possible relief for all of these claims is the same: compelled negotiation of a new compact.

Pauma's numerous, individualized claims draw attention to certain portions of the parties' negotiations, but the Court is hesitant to take a fragmented approach to the good faith inquiry—an approach Pauma's claims occasionally invite. As mentioned above, this inquiry is "nuanced and fact-specific," is "not amenable to bright-line rules," *see Coyote Valley II*, 331 F.3d at 1113, and requires an objective evaluation "based on the record of negotiations," *see Rincon*, 602 F.3d at 1041. Thus, the Court has considered the entirety of the negotiations in weighing whether: (1) Pauma demonstrates that the State did not respond to the Tribe's request to negotiate a compact "in good faith"; and (2) if so, the State meets its burden to "prove

that the State has negotiated with [Pauma] in good faith."[3]  *See* 25 U.S.C. § 2710(d)(7)(B)(ii).

Having done so, all of Pauma's claims encounter the same problem:  the parties never "reached an impasse" in their negotiations to reach a new compact. *See Rincon*, 602 F.3d at 1026.  The joint record reveals not only an incomplete course of negotiations with untested bargaining positions, but also a first draft of a new compact that was never responded to.  Consequently, when this case's circumstances are compared to those encountered in *Coyote Valley II* or *Rincon*, all of Pauma's claims appear premature.  The Tribe implicitly recognizes this problem, and Pauma labors throughout its pleadings and briefing to portray the negotiations as being at a standstill and coming to a close when Pauma filed suit.  But the joint record does not substantiate this portrayal.  Nothing demonstrates the parties reached an impasse or that the State was unwilling "to meet with the tribe for further discussions." *See Coyote Valley II*, 331 F.3d at 1110.

Ultimately, because the Court "cannot conclude from the history of negotiations recounted above that . . . the State has refused to negotiate in good faith," the Court grants summary judgment against the Tribe on its bad faith claims. *See Coyote Valley II*, 331 F.3d at 1095, 1109, 1117 (concluding "that the State has negotiated in good faith" and affirming the district court's decision to "den[y] the [tribe's] motion and enter[] judgment for the State").  The Court further expands on these claims below.

---

[3] The State objects to Pauma's introduction of evidence outside the joint record of negotiations, largely on the grounds that this evidence is irrelevant, unduly prejudicial, or hearsay. (ECF No. 40-1.)  "[W]hile a court will consider a party's evidentiary objections to a motion for summary judgment, '[o]bjections such as lack of foundation, speculation, hearsay and relevance are duplicative of the summary judgment standard itself.'"  *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*, 310 F. Supp. 3d 1089, 1107 (S.D. Cal. 2018) (quoting *All Star Seed v. Nationwide Agribusiness Ins. Co.*, No. 12CV146 L BLM, 2014 WL 1286561, at *16–17 (S.D. Cal. Mar. 31, 2014)).  On this basis, the Court **DENIES** the State's objections.  *See id.*

## A. The Draft Compact Claims

The Court first turns to Pauma's ten "draft compact" claims. These claims—Counts 11 through 20 of the Tribe's Second Amended Complaint—are all based on the draft compact the State provided to guide the parties' future discussions. (SAC ¶¶ 260–310; *see also* JR 245.) On March 30, 2016, the State informed the Tribe that it would provide Pauma with "a complete draft document to guide our future discussions within the next few weeks." (JR 245.) Several weeks later, the State transmitted a "draft compact" for Pauma's "consideration" and said, "Please let us know when you would like to discuss." (JR 246.) This document was the first—and only—draft of a new compact exchanged between the parties. As mentioned, Pauma never responded to the State's proposal before filing this action. The Tribe now brings ten claims raising procedural and substantive objections to the parties' negotiations predicated on this draft document.

### 1. Lack of Individualized Negotiations

In Count 11, Pauma raises a procedural objection to the negotiations, arguing the State failed to negotiate in good faith because it "did not conduct any individualized negotiations with Pauma." (SAC ¶ 263.) The Tribe claims the State "simply threw in the towel and sent Pauma a 'complete draft [compact]'" that is substantially similar to an agreement the State had negotiated with another tribe, but with material changes made to Pauma's detriment. (*Id.* (alteration in original).) Thus, Pauma argues that "negotiations that started out with Pauma asking for something unique ultimately ended with the State handing out a compact that was designed for another tribe," demonstrating a lack of good faith. (Pl.'s Mot. 23:2–3.)

Pauma does not show the State failed to respond to the Tribe's request to negotiate a new compact in good faith on this basis. Initially, as forecasted above, the Court rejects Pauma's characterization that the State was "wrapping up the negotiations by simply offering a compact designed for another tribe." (*See* Pl's. Mot. 21:12–14.) The joint record demonstrates the State was seeking to continue the

negotiations and move them forward—not wrap them up. The State's negotiator stated the draft compact was to "guide [the parties'] future discussions." (JR 245.) In transmitting the draft, the State then asked Pauma to "[p]lease let us know when you would like to discuss." (JR 246.) The State did not express that this initial draft was a final offer or anything but an initial proposal. (*See* JR 245–46.) Rather, it appears the only reason the negotiations "ended with the State handing out a compact that was" based on another tribe's agreement is because Pauma did not respond to the State's draft. (*See* Pl.'s Mot. 23:2–3.) Furthermore, the State had invited the Tribe to "just to take a crack" at a first draft incorporating Pauma's requests, but it appears the Tribe never did so in draft format. (*See* JR 48; *see also, e.g.*, JR 54, 72, 143.)

The joint record also does not support Pauma's criticism that the State was "trying to cut off any further communication on the subject of" lottery games by "relaying a generic compact offer." (*See* Pl.'s Mot. 23:14–15.) A comment attached to the relevant section of the draft compact notes that the "State is open, as indicated in prior correspondence, to discussion regarding the authorization of additional enumerated [lottery] games." (JR 261.) Nothing prevented the Tribe from engaging in further discussion with the State on the lottery games subject. Nor does State's prior letter demonstrate it was "trying to cut off any further communication" on this subject. (*See* JR 244–45.) Simply put, Pauma's claim that the "State flouted the good faith requirement of IGRA by utterly failing to engage in negotiations that were even remotely responsive to Pauma's needs and concerns" does not survive scrutiny. (*See* Pl.'s Mot. 23:16–18.) Hence, the Tribe fails to demonstrate a lack of good faith on this basis.

### 2. Harshness of Proposed Terms

Next, Pauma brings a series of claims challenging the proposed terms of the draft compact. Briefly summarized, these nine claims allege the State has failed to negotiate in good faith for the following reasons:

- <u>Count 12</u>: The State allegedly offered Pauma less-favorable terms in its first proposal than that ultimately given to a neighboring tribe as retribution for Pauma's successful lawsuit against the State concerning the 2004 Amendment. (SAC ¶¶ 265–69; *see also* Pl.'s Mot. 23:19–28:4.)

- <u>Count 13</u>: The State's draft of a new compact updated the waiver of sovereign immunity in the 1999 Compact to limit the Tribe's ability to obtain court-ordered relief against the State in the future. (SAC ¶¶ 270–74; *see also* Pl.'s Mot. 34:18–36:11.)

- <u>Count 14</u>: The State allegedly failed to offer more favorable terms in the draft compact that make up for the State "frustrating" Pauma's rights for eight years under the 1999 Compact by unreasonably interpreting the 1999 Compact's license pool formula and inducing Pauma to enter into the now-rescinded 2004 Amendment. (SAC ¶¶ 275–79; *see also* Pl.'s Mot. 38:15–40:23.)

- <u>Count 15</u>: The State "re-conferred the exact same gaming rights under the 1999 Compact" in its proposal and did not offer meaningful concessions for new revenue sharing demands. (SAC ¶¶ 280–84; *see also* Pl.'s Mot. 28:5–31:17.)

- <u>Count 16</u>: The State broadened certain definitions in the draft compact to allegedly allow it to assert regulatory authority over additional tribal activities. (SAC ¶¶ 285–89; *see also* Pl.'s Mot. 31:18–34:17.)

- <u>Count 17</u>: The draft compact requires Pauma to pay into a gaming-related fund (one of the same funds analyzed in *Coyote Valley*), but the draft does not indicate the amount required, and the State has the authority to unilaterally determine the amount. (SAC ¶¶ 290–94.)

- <u>Count 18</u>: The draft compact requires the Tribe to not only pay into a revenue sharing fund to compensate for regulatory costs, but also enter into agreements with local jurisdictions for services that mitigate the impacts of Pauma's

gaming facility, resulting in—according to Pauma—an overpayment of local regulatory costs.  (SAC ¶¶ 295–99.)

- • <u>Count 19</u>: The draft compact requires Pauma to enter into memorandums of understanding with local jurisdictions to make significant revenue sharing contributions after the compact would be reviewed by the Secretary of the Interior—thereby allegedly "evading the Secretarial review process."  (SAC ¶¶ 300–05; *see also* Pl.'s Mot. 36:12–38:14.)

- • <u>Count 20</u>: The draft compact's inclusion of the Special Distribution Fund demands that "Pauma pay into a system whereby a state can fight one tribe with monies provided by another" because the State is allegedly using these funds to defend against tribal litigation.  (SAC ¶¶ 306–10.)

In moving for summary judgment, the State argues that Pauma's claims challenging the specific terms of the draft compact are premature because the Tribe never objected to these terms or responded to the State's proposal.  (Defs.' Mot. 33:20–40:11; Defs.' Reply 13:7–14:6.)

The Court agrees.  This Court will not wade into the granular details of a first draft that was never even the subject of discussion between the parties.  Pauma fails to demonstrate the State refused to negotiate in good faith simply because it proposed the challenged terms in a draft compact "to guide [the parties'] future discussions." (*See* JR 245.)

In *Coyote Valley* and *Rincon*, the negotiating parties engaged in a back-and-forth about the terms the tribes claimed the State insisted on and refused to alter in bad faith.  *See Rincon*, 602 F.3d at 1024–25 (summarizing the State's demands for general fund revenue sharing, the tribe's objections to these demands, and the parties' counterproposals that led to "an impasse"); *see also In re Indian Gaming Related Cases*, 147 F. Supp. 2d 1011, 1021 (N.D. Cal. 2001) ("*Coyote Valley I*") (noting that the tribe had "counter-offered with a modified compact that, among other things, deleted the challenged provisions entirely, while . . . enlarging other aspects of the

proposed compact favorable to it"). Here, by contrast, Pauma did not even engage the State on the various terms in the draft compact that the Tribe now challenges are improper and demonstrate a lack of good faith. And, "[h]aving declined to engage in . . . negotiations over the challenged provisions," Pauma "cannot reasonably assert that the State's" initial offer of those terms "constitutes a refusal to negotiate in good faith." *See Coyote Valley I*, 147 F. Supp. 2d at 1021–22 (rejecting a tribe's analogous challenge to the State's refusal to alter certain terms the tribe objected to).

Moreover, the Court is unpersuaded by Pauma's attempt to fit its draft compact claims into the "meaningful concessions" framework employed by the Ninth Circuit in *Coyote Valley II* and *Rincon*. In those cases, the State had either taken a "'hard line' negotiation position" or had tried to "impose" taxation on the Tribe. *See Rincon*, 602 F.3d at 1032–40 (discussing these concepts and citing *Coyote Valley II*, where the State had "insist[ed] on certain provisions"). The Ninth Circuit explained that in the context of a demand for taxation, the State "'impose[s]' something during negotiations . . . by insisting, over tribal objections, that the tribe make a given concession—a concession beyond those specially authorized by [IGRA] and contrary to the tribe's sovereign interests—in order to obtain a compact." *Id.* at 1031 (footnote omitted). Similarly, the Ninth Circuit noted that a "state may not take a 'hard line' position in IGRA negotiations when it results in a 'take it or leave it offer' to the tribe to either accept nonbeneficial provisions outside the permissible scope of [IGRA's compact topics], or go without a compact." *Id.* at 1039 (emphasis omitted).

Here, where Pauma did not respond or object to the State's proposed terms, it cannot claim the State tried to "impose" taxation or revenue sharing "by insisting, *over tribal objections* . . . that [Pauma] make a given concession . . . to obtain a compact." *See Rincon*, 602 F.3d at 1031 (emphasis added). Nor can Pauma demonstrate the State took a "hard line position" on any of the terms it now challenges. *See id.* at 1039. And because Pauma does not make this threshold showing, Pauma fails to demonstrate the State's proposal was a "take it or leave it

offer" to Pauma to accept unfavorable provisions outside the scope of IGRA or go without a compact. *See id.* In sum, in light of the posture of the negotiations in this case, the Court finds the "meaningful concessions" framework from *Coyote Valley* and *Rincon* inapposite.

Relatedly, the Court is also unpersuaded by Pauma's various efforts to characterize the draft compact as a final offer and then compare it to the final agreements entered into between the State and other tribes. For example, Pauma describes the State's first draft "as the ultimate terms the State offered." (Pl.'s Mot. 23:23.) In another instance, the Tribe labels the proposal as "the seemingly final offer [the State] extended to Pauma." (*Id.* 23:22–28:4.) Pauma then compares the terms in the State's proposal to the terms in the final agreement between the State and the nearby Pala tribe (as well as other final tribal-state compacts). (*Id.* 1:21– 2:11, 23:22–28:4.) In doing so, the Tribe highlights, for example, that the State's first proposal to Pauma requires 8% of one form of revenue sharing whereas the executed Pala compact requires only 6%. (*Id.* 1:27–2:3.)

These efforts are unconvincing. For one, Pauma's characterizations are inaccurate. Again, the State's "draft compact" was transmitted to "guide [the parties'] future discussions," included comments noting the State was open to further discussion, and was accompanied with an e-mail asking Pauma to "[p]lease let us know when you would like to discuss." (JR 245–382.) There is no indication that this proposal was the State's best, "seemingly final," or "ultimate" offer to Pauma.

In addition, the Court will not impute bad faith based on the deal another tribe received when Pauma never negotiated for or requested more favorable terms. At oral argument, the Tribe said it felt "boxed into a corner" and "almost checkmated" by the State's initial draft. (ECF No. 48.) When pressed to explain why Pauma chose not to respond to the proposal, the Tribe said Pauma felt it would have been a "pretty monumental undertaking" to obtain Pala's comparably better terms "through the course of negotiations," and that it was "under the impression that at some point the

negotiations have to break off if the parties felt like they had reached an impasse." (*Id.*) But an objective evaluation of the joint record does not substantiate these claims of an impasse or Pauma being "almost checkmated" by an initial proposal sent to guide the parties' future discussions. Nor does the evidence substantiate Pauma's speculative claim that "there was *zero* chance the State would have reduced the financial burden of the 'complete draft [compact] through further negotiation." (*See* Pl.'s Opp'n 27:11–13 (alteration and emphasis in original).) The Court is therefore unmoved by Pauma's attempts to demonstrate a lack of good faith by comparing a set of terms that are yet to be discussed with the specifics of final deals struck between the State and other tribes.[4] (*See* Pl.'s Mot. 23:22–28:4.)

In sum, Pauma's claims targeting the terms of the draft compact—Counts 12 to 20—do not demonstrate the State has failed to negotiate in good faith.

---

[4] Another one of Pauma's efforts is to repeatedly highlight throughout its briefing and pleadings that the State's negotiator described the draft compact as a "complete draft document." In numerous instances, Pauma relies on an altered version of this phrase—"complete draft [compact]"—to support its claims. (*E.g.*, Pl.'s Mot. 23:2–18 (alteration in original).) In doing so, Pauma argues "complete" means the draft document was "to the greatest extent or degree" finished—that is, a "functionally final draft of the compact. (*See id.* 23:4–10.) This effort is not convincing. Nothing prevented the Tribe from seeking to negotiate or modify the terms of the draft compact. The document itself also shows it is not "to the greatest extent or degree" finished. The draft compact includes comments indicating that the State is open to incorporating Pauma's requests to conduct new forms of gambling. (JR 247–381.) More importantly, the State expressed that this draft was to "guide [the parties'] future discussions," stated the draft was for Pauma's "consideration," and requested that the Tribe "[p]lease let [the State] know when [it] would like to discuss" the draft. (JR 245–46.)

Even less convincing is Pauma's reliance on a comment attached to the draft table of contents in the draft compact. The Tribe argues the draft compact "contained a comment bubble at the very outset explaining that the document was '[t]o be finalized before singing.'" (Pl.'s 22:13–14 (citing JR 248).) The implication Pauma asks the Court to draw is that the State was suggesting the document is "complete" and only needs to be "finalized before signing." (*See id.*) But, as indicated, the "comment bubble" Pauma relies upon is appended to the draft compact's "TABLE OF CONTENTS" header. (JR 248.) Meaning, the State was commenting that the document's table of contents was "[t]o be finalized before signing." (*Id.*) If anything, this comment undercuts Pauma's claims. It shows the State was anticipating that there would be changes made to the draft compact that would require the document's table of contents to be updated and "finalized" before execution of the compact. (*Id.*)

## B. Horse Wagering

Pauma claims in Count 3 that the State failed to negotiate in good faith in light of the State's response to the Tribe's request to engage in on-track horse wagering. (SAC ¶¶ 220–24.) The State argues it is entitled to summary judgment because the record of negotiations demonstrates the State "repeatedly attempted to engage Pauma" on this issue and "remained a willing and engaged partner for an on-track horse-racing compact." (Defs.' Mot. 29:13–31:22; *see also* Defs.' Reply 6:11–8:14.)

The Court agrees that Pauma fails to demonstrate a lack of good faith on this basis. The State's dealings with the Tribe concerning horse wagering do not reveal the State failed to respond to Pauma's request to negotiate a compact "in good faith." *See* 25 U.S.C. § 2710(d)(7)(B)(ii)(II). Pauma requested the right to conduct on-track wagering, a type of Class III gaming that it cannot presently conduct under the 1999 Compact. (JR 2.) Although the State expressed that this type of compact had never been done in California before, the State never told Pauma it would not negotiate for this new gaming right. Instead, the State sought additional information about Pauma's plans and also offered to reach out to the Executive Director of the California Horse Racing Board to assist the parties. (*See, e.g.*, JR 18, 21, 22, 30.) The State then brought the Executive Director to the parties' second meeting, where the participants discussed Pauma's request. (JR 42–76.) The State also encouraged Pauma to include "off-track wagering" as part of its plans, and the State informed Pauma that it had worked with the Executive Director and his staff "to update the older provisions" of an agreement concerning this type of wagering. (JR 46.)

Further along in the negotiations, the State "reached out to the National Indian Gaming Commission to obtain information regarding other tribes that may be conducting on-track betting." (JR 183.) The State shared with Pauma a "Compact Addendum between the Sisseton-Wahpeton Sioux Tribe and the State of North Dakota addressing pari-mutuel horse racing" to serve as a reference for the parties' further discussions. (*Id.*; JR 185–205.) The State also subsequently provided "for

discussion a draft compact addendum that would authorize a satellite wagering facility." (JR 208; *see also* JR 210–21.) Finally, the State's draft discussion compact noted that the State had proposed an "OTW wagering compact that can be incorporated as an Appendix or negotiated and concluded as a separate class III gaming compact." (JR 261.)

At the time Pauma filed this lawsuit, the Tribe had not responded to or commented on the State's sample compact from North Dakota or draft compact addendum authorizing a satellite wagering facility. Nothing in the joint record demonstrates the State, at the time Pauma filed this lawsuit, did not "remain[] willing to meet with the tribe for further discussions" concerning horse wagering. *See Coyote Valley II*, 331 F.3d at 1110.

The Court "cannot conclude from the history of negotiations recounted above that . . . the State has refused to negotiate in good faith" on this basis. *See Coyote Valley II*, 331 F.3d at 1109. Nor is the Court persuaded by Pauma's attempts to argue the State acted in bad faith. Pauma principally complains that the State insisted on more details about the Tribe's plans and did not do more to assist the Tribe in navigating "the legions of horse racing regulations" in California. (See Opp'n 15:3–20:26.) Having considered Pauma's arguments in light of the joint record of negotiations, none of them convincingly identify conduct that amounts to bad faith. Accordingly, Pauma does not demonstrate a lack of good faith based on the State's negotiations concerning horse wagering.

## C. Additional Lottery Games

### 1. The Tribe's Request

Aside from its draft compact and horse wagering claims, Pauma brings a series of claims related to its request to conduct additional lottery games. Under the 1999 Compact, Pauma is authorized to operate "any devices or games that are authorized under state law to the California State Lottery, provided that the Tribe will not offer such games through use of the Internet unless others in the state are permitted to do

so under state and federal law." (1999 Compact § 4.1(c).)  Upon seeking to negotiate a new compact, Pauma asked for the "right to conduct any [lottery] games that are not currently authorized under State law to the California State Lottery."  (JR 2.)

Lotteries are a type of Class III gaming under IGRA.  *Seminole Tribe of Fla.*, 517 U.S. at 48.  Class III gaming activities are "lawful on Indian lands only if such activities are . . . located in a State that permits such gaming for any purpose by any person, organization, or entity . . . ."  25 U.S.C. § 2710(d)(1)(B).  "Consequently, where a state does not 'permit' gaming activities sought by a tribe, the tribe has no right to engage in these activities, and the state thus has no duty to negotiate with respect to them."  *Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 64 F.3d 1250, 1256 (9th Cir. 1994).  Stated differently, "a state need only allow Indian tribes to operate games that others can operate, but need not give tribes what others cannot have."  *Id.* at 1258.

In California, lotteries are generally prohibited.  Section 19(a) of the California Constitution provides: "The Legislature has no power to authorize lotteries, and shall prohibit the sale of lottery tickets in the State."  Cal. Const. art. IV, § 19; *see also* Cal. Penal Code §§ 320–26 (broadly prohibiting the operation of lotteries). Notwithstanding this general prohibition, however, the California Constitution authorizes "the establishment of a California State Lottery."  *Id.* § 19(d).

The State's corresponding Lottery Act creates the California State Lottery, with its revenues to be "allocated for public education in California."  Cal. Gov't Code § 8880.1.  The State Lottery is limited to operating "lottery games."  *See id.* § 8880.12 (defining a "Lottery Game" for purposes of the Lottery Act); *W. Telcon, Inc. v. Cal. State Lottery*, 13 Cal. 4th 475, 483 (1996) (noting the State Lottery "agrees it is restricted to operating lottery games").  A "'Lottery Game' means any procedure authorized by the [State Lottery Commission] whereby prizes are distributed among persons who have paid, or who have unconditionally agreed to pay, for tickets or shares which provide the opportunity to win those prizes."  Cal. Gov't Code §

8880.12.  "The Lottery Act's only express limitations on the types of lottery games the commission may authorize are contained in [California] Government Code section 8880.28."  *W. Telcon*, 13 Cal. 4th at 482.  These limitations include that "[n]o lottery game may use the theme of bingo, roulette, dice, baccarat, blackjack, Lucky 7's, draw poker, slot machines, or dog racing," and that "[i]n games utilizing computer terminals or other devices, no coins or currency shall be dispensed as prizes to players from these computer terminals or devices."  Cal. Gov't Code § 8880.28(a)(1), (3).

The California Constitution's tribal gaming provision also provides an exception to the State's general prohibition on lotteries.  This provision states:

> [T]he Governor is authorized to negotiate and conclude compacts . . . for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law. Accordingly, slot machines, lottery games, and banking and percentage card games are hereby permitted to be conducted and operated on tribal lands subject to those compacts.

Cal. Const. art. IV, § 19(f).  This authorization served as the basis for the 1999 Compact, which allows tribes like Pauma to engage in casino-style gambling. *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 717–18 (9th Cir. 2003).  In *Artichoke Joe's*, several California card clubs and charities challenged whether this segment of the California Constitution satisfies IGRA's requirement that for Class III gaming to be lawful, the gaming activities must be "located in a State that permits such gaming for any purpose by any person, organization, or entity . . . ."  *Id.* at 720; *see also* 25 U.S.C. § 2710(d)(1)(B).  Their challenge required the Ninth Circuit to resolve whether "'any person, organization, or entity' should be read to exclude Indian tribes."  *Artichoke Joe's*, 353 F.3d at 720.  The Ninth Circuit concluded that a tribe is an "entity," and therefore the relevant portion of the California Constitution "'permits' class III gaming within the meaning of IGRA by

legalizing such gaming operations only when conducted by the 'entity' of an Indian tribe." *Id.* at 731.

In light of this background, Pauma argued to the State that it has the right to conduct "lottery games" beyond those authorized to the California State Lottery. (JR 2–3.) In the Tribe's view, because "lottery games . . . are . . . permitted to be conducted and operated on tribal lands subject to [gaming] compacts," California is required under IGRA to negotiate with Pauma to allow it to conduct all "lottery games," not just those "lottery games" conducted by the California State Lottery. (*See* JR 18.)

### 2. Lottery Games Claims

Pauma brings nine interrelated claims based on this request for additional lottery games. (SAC ¶¶ 210–54; *see also* Pl.'s Mot. 4:23–18:20.) In Count 1, the Tribe alleges the State has engaged in "surface bargaining" by employing "dilatory tactics or other forms of 'sophisticated pretense' to avoid reaching an agreement on" the lottery games issue. (*See* SAC ¶ 12 (quoting Farnsworth on Contracts § 3.26c – Meaning of Fair Dealing (4th ed. 2003)); *see also* Pl.'s Mot. 4:23–8:13 (focusing on the lottery games issue).) The Tribe argues the joint record shows that after Pauma requested additional lottery games, "the State did everything in its power to avoid discussing those [gaming] rights for the next five-hundred-plus days." (Pl.'s Mot. 4:27–5:1.) Count 2 relatedly alleges the State has failed to negotiate in good faith because it is trying to protect the California State Lottery from increased tribal competition. (SAC ¶¶ 215–19.)

Next, in Counts 4 through 8, Pauma alleges the State has negotiated in bad faith because it has refused to negotiate for certain types of lottery games: (i) those games not authorized to the California State Lottery, (Count 4, SAC ¶¶ 225–29); (ii) video lottery terminals, (Count 5, SAC ¶¶ 230–34); (iii) video lottery terminals that dispense coins or currency, (Count 6, SAC ¶¶ 235–39); (iv) games based on a tribal lottery system, (Count 7, SAC ¶¶ 240–44); and (v) games authorized to the Multi-

State Lottery Association or any other state, (Count 8, SAC ¶¶ 245–49). (*See also* Pl.'s Mot. 11:15–16:23.) Finally, in Count 9, Pauma claims the State negotiated in bad faith by not substantiating its position on whether Pauma can conduct additional lottery games. (SAC ¶¶ 250–54; *see also* Pl.'s Mot. 16:24–18:20.)

The State argues that "[r]egardless of these claims' multiple lottery-game labels, none shows any failure by the State to negotiate in good faith under IGRA," and "the record of negotiations demonstrates that at all times the State was willing to negotiate with Pauma over lottery games." (Defs.' Mot. 26:4–7; *see also id.* 26:1–29:12, 31:23–32:4; Defs.' Reply 3:20–6:10.) Ultimately, the Court agrees. The parties' incomplete negotiations over lottery games do not demonstrate the State has failed to respond "in good faith" to Pauma's request to negotiate a new compact. *See* 25 U.S.C. § 2710(d)(7)(B)(ii)(II).

At the threshold, like with other topics in the parties' negotiations, the Court notes the joint record does not demonstrate the parties "reached an impasse" on the lottery games issue. *See Rincon*, 602 F.3d at 1026; *see also LAWI/CSA Consolidators, Inc. v. Wholesale & Retail Food Distribution, Teamsters Local 63*, 849 F.2d 1236, 1241 (9th Cir. 1988) ("A bargaining impasse occurs when the parties could well conclude that there was no realistic prospect that continuation of discussion at that time would have been fruitful." (citation and quotation marks omitted).) Pauma claims otherwise in its briefing, (*see* Pl.'s Mot. 16:24–26), and Pauma advanced a similar claim at oral argument, but the Court is unconvinced.

Pauma's last two communications to the State (1) expressed the Tribe's preference "to conduct the negotiations in a piecemeal fashion," (2) articulated Pauma's position on additional lottery games, and (3) communicated that the State "has not indicated whether it is willing to negotiate for the requested lottery games, let alone begin to draft compact language." (JR 239–43.) In response, the State objected to Pauma's preference to conduct piecemeal negotiations and provided its position on additional lottery games:

The grant of authority to the Governor to negotiate for lottery games under . . . the California Constitution has always been understood to encompass those games authorized for play by the California State Lottery. This was the intent and understanding of the language proposed by tribal negotiators and presented to the voters as they considered the amendment to the California Constitution.

However, the State is willing to negotiate to authorize Pauma to offer certain additional lottery games to be enumerated in the compact. Specifying the games provides clarity as to the scope of the authorization, avoids future disputes between the parties, and mitigates the risk of running afoul of other prohibitions on how lottery games may be conducted, such as the keno game offered by the California State Lottery that was found to be an illegal banked game by the Supreme Court in *Western Telcon, Inc. v. California State Lottery* (1996) 13 Cal.4th 45.

To be clear, the State is not conceding that it has an obligation to negotiate for all lottery games enumerated in your January 27, 2016 letter (other than those authorized to the California State Lottery). Furthermore, the State expressly takes issue with Pauma's ability under IGRA to seek to negotiate "devices or games that are authorized to any other state lottery or any other multi-state lottery association," "lottery games that are played on video terminals," "tribal lottery systems" or other lottery systems to the extent operated or conducted off tribal lands, and "video lottery games that dispense coins or currency."

(JR 244–45.) Pauma did not respond to the State's negotiation position. And as mentioned several times, the State's proposed draft compact that was transmitted several weeks later expressed that the "State [was] open, as indicated in prior correspondence, to discussion regarding the authorization of additional enumerated [lottery] games." (JR 261.) In light of the foregoing, the parties did not reach an impasse on the lottery games issue. *See Rincon*, 602 F.3d at 1026. Rather, the State's letter—as well as the notation in its first draft of the parties' new compact provided to guide their discussions—indicates the State remained willing to continue negotiating with Pauma on this issue. *See Coyote Valley*, 331 F.3d at 1110. That the

State was open to further negotiation on the lottery games issue undercuts Pauma's various claims alleging the State failed to negotiate in good faith on this basis.

Moreover, the Court is unpersuaded by Pauma's arguments that the State failed to negotiate in good faith because it engaged in "shadow boxing" and "refused" to negotiate for particular subsets of lottery games. In advancing its "shadow boxing" count, Pauma claims the State engaged in bad faith because the State "simply sen[t] Pauma" a draft compact "that simply omitted any new games" after the parties' back-and-forth on the lottery games topic. (SAC ¶ 218; *see also* SAC ¶¶ 228, 223, 238, 243, 248, 253 (repeatedly highlighting that the State sent Pauma a draft compact "that simply re-conveys the same gaming rights as the 1999 Compact").) The Tribe similarly argues the focus should be "on answering questions like 'why did the State send Pauma a "complete draft [compact]" five hundred and twenty-two days into the negotiations that was mum on both new forms of gaming that instigated the talks?'" (Pl.'s Opp'n 24:6–8 (alteration in original).) But the draft compact provided to guide the parties' further discussions is not silent on the Tribe's request for new lottery games. The relevant portion of the draft has a comment stating that the "State is open, as indicated in prior correspondence, to discussion regarding the authorization of additional enumerated games."[5] (JR 261.)

Similarly unpersuasive is Pauma's repeated emphasis on the "five hundred and twenty-two day[]" length of the negotiations to support its allegations concerning the lottery games issue. (*See, e.g.*, Pl.'s Mot. 4:23–28.) Pauma requested the parties negotiate a new compact shortly before Thanksgiving in 2015, (JR 1), and the final communication in the joint record is dated April 28, 2016, (JR 246). Like in *Coyote Valley*, "the record reflects that both parties at times were less than diligent" in

---

[5] For the same reasons, the record does not validate Pauma's claim that the State "sought to block all new lottery games solely on the conjectural basis that one of them could run afoul of the law at some point in the future." (Pl.'s Opp'n 14:13–15 (emphasis in original).) Again, the State said it was "willing" and "open" to negotiating certain additional lottery games to be enumerated in the compact. (JR 244, 261.)

seeking to move the negotiations forward, particularly because of the State and Pauma's ongoing litigation concerning the 2004 Amendment. *See* 147 F. Supp. 2d at 1015. For example, the State's summary of the parties' January 30, 2015, meeting reports that the parties "discussed scheduling [their] next meeting in approximately May 2015, as the parties' participating attorneys [would] face appellate briefing deadlines over the next few months." (JR 20.) Then, in the next communication dated May 8, 2015, Pauma requested the negotiations be delayed for another few months because "the recent orders in the pending compact litigation have essentially guaranteed that [the parties'] attorneys will be largely preoccupied until the oral argument scheduled for July 10, 2015." (*See* JR 25.) The parties did not meet until September 8, 2015—more than six months after their first meeting. (JR 38.) Similarly, when the State was slow to respond to Pauma's January 27, 2016, letter, the State noted on March 30, 2016:

> The State's compact negotiating team is currently in negotiations with over forty other California tribes and this necessarily impacts our scheduling of meetings and response time. In addition to compact negotiations, Pauma and the State continue to actively work on the litigation currently pending at every level of the federal courts and have recently filed significant pleadings. We are committed to moving these negotiations forward but also understand if the Tribe prefers, as it has previously, to defer some negotiation matters until there is a break in the litigation.

(JR 245.) Hence, Pauma's emphasis on the total length of the negotiations paints an incomplete picture of the joint record.[6] Overall, having reviewed the joint record, "[a]ny delays that may have been caused by the State do not rise to the level of bad

---

[6] In the same vein, the Court disapproves of Pauma characterizing the State as "enter[ing] month ten of its efforts to stall the discussions" at the second negotiation session. (*See* Pl.'s Opp'n 24:15–17.) As recounted above, the parties did not meet for approximately six months between the first and second meetings—in part due to Pauma's request to delay the second meeting because of the ongoing 2004 Amendment litigation. (JR 25.)

faith." *See Coyote Valley I*, 147 F. Supp. 2d at 1015; *cf. Rincon*, 602 F.3d at 1024–26 (summarizing a course of negotiations that spanned from 2003 to 2006).

Further, Pauma's claims centered on the State's "refusal to negotiate for" certain categories of lottery games do not demonstrate the State failed to negotiate in good faith. (*See* SAC ¶¶ 225–49.) The State expressed a willingness to negotiate for additional games, including those not authorized by the California State Lottery. (*See* JR 244, 261.) And, although the State informed Pauma that it "expressly takes issue" with certain remaining categories of new lottery games, the Court is not persuaded that the State's conduct amounts to a lack of good faith—or that the parties had even reached an impasse on these other categories of new games. (*See* JR 244–45.) *Cf. Rumsey*, 64 F.3d at 1255 (noting the State "refused to negotiate with the tribes" concerning "certain stand-alone electronic gaming devices and live banking and percentage card games"); *see also Mashantucket Pequot Tribe v. State of Conn.*, 913 F.2d 1024, 1027, 1026 & n.2, 1032 (2d Cir. 1990) (noting the State "wholly fail[ed] to negotiate" when it "never entered into actual negotiations with the Tribe" following its request to "expand its gaming activities to include class III games of chance, such as" blackjack and poker).

Nor does the joint record adequately support the conclusion that the State failed to negotiate in good faith because it employed a "protectionist strategy" aimed at safeguarding the "revenue stream of the State Lottery." (*See* SAC ¶ 218.) The Court is unpersuaded that the parties' back-and-forth in the second negotiation session demonstrates the State's representatives "insinuated that . . . they were engaging in [protectionism] to protect the revenue stream of the State Lottery." (*See* SAC ¶ 218; *see also* JR 89–90 ("I'm not suggesting we would do that.").) And the State subsequently said it "is willing to negotiate to authorize Pauma to offer certain additional lottery games to be enumerated in the compact." (JR 244; *see also* JR 261.) If agreeing to negotiate to allow Pauma to offer new games beyond that conducted by the California State Lottery is part of the State's protectionist strategy,

it is a poor one. The Court cannot conclude the State has failed to respond "in good faith" to Pauma's request to negotiate a new compact on this basis. *See* 25 U.S.C. § 2710(d)(7)(B)(ii)(II).

The Court reaches the same conclusion for Pauma's claim concerning the State's alleged failure to substantiate its position on additional lottery games. Pauma assigns significant weight to the State negotiator's statement that "[t]he grant of authority to the Governor to negotiate for lottery games under article IV, section 19, subdivision (f) of the California Constitution has always been understood to encompass those games authorized for play by the California State Lottery." (JR 244; *see also* SAC ¶ 253; Pl.'s Mot. 16:24–18:20.) Pauma argues the State's "ability to throw out this baseless claim without any sort of corrective check allowed the State to shut down all discussion on lottery games and leave the negotiations in a hopeless morass." (Pl.'s Mot. 18:16–18.) But, as outlined above, the State did not "shut down all discussion on lottery games." The next sentence of the State's letter provides: "However, the State is willing to negotiate to authorize Pauma to offer certain additional lottery games to be enumerated in the compact." (JR 244.) Further, the State's proposed draft compact, which is attached to the most recent communication in the negotiations, similarly expressed that the "State is open, as indicated in prior correspondence, to discussion regarding the authorization of additional enumerated games." (JR 261.) In light of the foregoing, Pauma does not demonstrate a lack of good faith on this basis.

In sum, Pauma's lottery games claims based on the parties' incomplete negotiations are unconvincing. After Pauma pressed the State on this issue, the State agreed to negotiate for certain additional lottery games and took "issue" with several other categories of new games. The Tribe, having received the State's position on this topic, never responded to it. And Pauma's efforts to portray the State as seeking to shut down negotiation on this topic are unconvincing. Overall, the Court concludes the evidence concerning lottery games does not show the State has failed

to respond to Pauma's request to negotiate a new compact "in good faith."  *See* 25 U.S.C. § 2710(d)(7)(B)(ii)(II).

### D.    Scope of Negotiations

Pauma's remaining claim alleges the State negotiated in bad faith by erecting procedural barriers to hinder the parties' negotiations.  (SAC ¶¶ 255–59.)  This claim centers on the parties' dispute concerning the scope of negotiations that is outlined above.  (*See id.*; *see also* Pl.'s Mot. 18:21–21:11.)  To recap, the parties sparred over whether Pauma's request to offer two new forms of gaming under the 1999 Compact's renegotiation provision—Section 12.1—subjected all of the compact's terms to renegotiation.  The parties resolved their dispute, decided to proceed under the amendment provision—Section 12.2—and agreed that "the entire compact" is up for negotiation.  (JR 238.)  Having secured the State's agreement that the entire compact is subject to negotiation, Pauma then informed the State that the Tribe "prefers to conduct the negotiations in a piecemeal fashion, focusing on one material issue and then moving on to the next only after the parties have largely agreed on language for the final compact."  (JR 239.)  The State declined to conduct negotiations in this fashion, provided its position on Pauma's lottery games request, and transmitted a draft compact to guide the parties' future discussions.  (JR 244–46.)  The negotiations then ended.

In Count 10, the Tribe alleges the State's "negotiator used this change in the basis for the negotiations to shift the discussion from what the State would *give* to what it would *receive*."  (SAC ¶ 258.)  "As a consequence," in Pauma's view, the State's negotiator "simply transmitted a 'complete draft [compact]' to Pauma that the State had prepared for another tribe that incorporates legions of new regulations while simply reconveying the same gaming rights of the 1999 Compact (*i.e.*, slot machines, house banked card games, and only those lottery games that the State Lottery has authorized itself to offer)."  (*Id.* (alteration in original).)

The Court is unpersuaded that this claim demonstrates a lack of good faith. Although the parties' disagreement concerning the scope of negotiations may have caused a delay in their discussions, the joint record reveals the parties resolved this dispute and pressed onwards—with Pauma then seeking to focus on a single issue, and the State seeking to negotiate the entire compact. (JR 234–38.) The Court also notes that during the parties' dispute concerning the scope of negotiations, the State continued to engage Pauma on the lottery games and horse wagering issues. (JR 183–84, 208–09.) Overall, "[a]ny delays that may have been caused by the State [regarding this issue] do not rise to the level of bad faith." *See Coyote Valley I*, 147 F. Supp. 2d at 1015. Accordingly, when considering the balance of the parties' negotiations, the State's conduct regarding the scope of negotiations does not demonstrate the State has failed to respond to Pauma's request to negotiate a new compact "in good faith." *See* 25 U.S.C. § 2710(d)(7)(B)(ii)(II).

* * *

In sum, having considered all of Pauma's twenty bad faith negotiation claims, the Court "cannot conclude from the history of negotiations recounted above that . . . the State has refused to negotiate in good faith." *See Coyote Valley II*, 331 F.3d at 1109; *see also* 25 U.S.C. § 2710(d)(7)(B)(ii)(II). The Court therefore denies Pauma's motion for summary judgment and grants the State's cross-motion. *See Coyote Valley II*, 331 F.3d at 1095, 1009, 1117 (concluding "that the State has negotiated in good faith" and affirming the district court's decision to "den[y] the [tribe's] motion and enter[] judgment for the State").

### RULE 54(b) DETERMINATION

Having resolved the parties' cross-motions for summary judgment on Pauma's bad faith claims, the Court considers their request to enter a final and appealable judgment on these claims. (Joint Mot. 2:19–24, ECF No. 28.) "A district court order is . . . not appealable unless it disposes of all claims as to all parties or unless judgment is entered in compliance with Federal Rule of Civil Procedure 54(b). *Romoland Sch.*

*Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738, 747 (9th Cir. 2008).  This Court's resolution of the parties' cross-motions does not dispose of this action in its entirety—Pauma also brings two claims against the State for breach of the 1999 Compact.  (SAC ¶¶ 311–20.)  Hence, the Court turns to Rule 54(b).  This rule provides:

> When an action presents more than one claim for relief . . . , the court may direct entry of a final judgment as to one or more, but fewer than all, claims . . . only if the court expressly determines that there is no just reason for delay.  Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims . . . does not end the action as to any of the claims . . . and may be revised at any time before the entry of a judgment adjudicating all the claims[.]

Fed. R. Civ. P. 54(b).  "Thus, as Rule 54(b) makes plain, "[f]inality is achieved only if the court takes each of two steps—it must make an 'express determination that there is no just reason for delay' and it also must make 'an express direction for the entry of judgment.'"  *United States v. Gila Valley Irrigation Dist.*, 859 F.3d 789, 797 (9th Cir. 2017) (quoting 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction and Related Matters* § 3914.7 (2d ed. 1991)).

Rule 54(b) "was adopted 'specifically to avoid the possible injustice of delay[ing] judgment o[n] a distinctly separate claim [pending] adjudication of the entire case . . . .  The Rule thus aimed to augment, not diminish, appeal opportunity.'"  *Jewel v. Nat'l Sec. Agency*, 810 F.3d 622, 628 (9th Cir. 2015) (alterations in original) (quoting *Gelboim v. Bank of Am. Corp.*, --- U.S. ---, 135 S. Ct. 897, 902–03 (2015)).  Although the Supreme Court "has eschewed setting narrow guidelines for district courts to follow" when applying Rule 54(b), the Court has discussed "factors that may inform a judge's decision."  *Wood v. GCC Bend, LLC*, 422 F.3d 873, 878 n.2 (9th Cir. 2005).

Initially, "a district court must take into account judicial administrative interests" to "assure that application of the Rule effectively 'preserves the historic

federal policy against piecemeal appeals.'" *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 8 (1980) (quoting *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 438 (1956)). In doing so, the court may consider "whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals." *Id.* In addition, the district court should assess the equities of the case to determine whether there is a just reason for delay. *See Wood*, 422 F.3d at 882 n.7; *see also Curtiss–Wright*, 446 U.S. at 8, 10 (recognizing the winning party's financial stake in an early outcome as one of the equities the district court may consider under Rule 54(b)).

The Court finds entering a final judgment under Rule 54(b) on Pauma's bad faith negotiation claims is appropriate. First, in considering the judicial administrative interests, the Court notes that Pauma's bad faith claims are analytically distinct from the Tribe's remaining two claims. While the first group of claims addresses the requirement to negotiate in good faith under IGRA, the remaining two claims are essentially breach of contract claims. There is some overlap in the backstory for these two sets of claims, but even if there is a subsequent appeal, an appellate court would not have to decide the same issues. In addition, having assessed the equities, the Court does not discern any just reason for delay. Consequently, the Court will direct entry of final judgment on Pauma's bad faith negotiation claims. *See* Fed. R. Civ. P. 54(b).

//
//
//
//
//
//
//

**CONCLUSION**

In light of the foregoing, the Court **DENIES** Pauma's motion for summary judgment (ECF No. 37) and **GRANTS** the State's cross-motion for summary judgment (ECF No. 36). Further, the Clerk of the Court shall enter a final judgment under Federal Rule of Civil Procedure 54(b) on Counts 1 through 20 of Pauma's Second Amended Complaint (ECF No. 27) in favor of the State and against Pauma.

**IT IS SO ORDERED.**

**DATED: September 28, 2018**

**Hon. Cynthia Bashant**
**United States District Judge**

16cv1713